**CHARLES H. CARTER**                    *        In The
1500 Lochwood Road
Baltimore, Maryland 21218               *        Circuit Court

                 **Plaintiff**          *

vs.                                              For

GardaWorld Security Services – US.      *        Baltimore County, Maryland
c/o **COO Prentice Robertson**
1699 South Hanley Road, Suite 350       *
St. Louis, Mo. 63144
                                         *        Case Number:
and,
                                         *

GardaWorld Security Services – US.
**Project Manager, Donna Kile**          *
10455 Mill Run Circle
Owings Mill, Maryland 21117             *
(In her Professional and Individual Capacity)

and,                                     *

GardaWorld Security Services – US.       *
**Assistant Project Manager, Colonel Steven Martin**
10455 Mill Run Circle                    *
Owings Mill, Maryland 21117
(In his Professional and Individual Capacity)    *

and,                                     *

GardaWorld Security Services – US.
**Site Supervisor, Lieutenant Lamont Green**     *
10455 Mill Run Circle
Owings Mill, Maryland 21117             *
(In his Professional and Individual Capacity)

and,                                     *

GardaWorld Security Services – US.       *
**Site Supervisor, Lieutenant Marcella Young**
10455 Mill Run Circle                    *
Owings Mill, Maryland 21117
(In her Professional and Individual Capacity)    *

and,
                                         *

1

GardaWorld Security Services- US.
**Corporal Shawan Burrell**                    *
10802 Red Run Boulevard
Owings Mills, Maryland 21117
(In her Professional and Individual Capacity)    *

and,                                            *

GardaWorld Security Services – US              *
Human Resources Department Mid-Atlantic
Human Resources Manager – Jody E. Gaines       *
8201 Corporate Drive, Suite 550
Landover, Maryland 20785                        *

                    **Defendants**              *

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Charles H. Carter, Plaintiff, *Pro Se*, files this Complaint against GardaWorld Security

Services – US (Hereafter "GardaWorld") and Chief Operations Officer Prentice Robertson, Project

Manager, Donna Kile, Assistant Project Manager, Colonel Steven Martin, Site Supervisors'

Lieutenant Lamont Green and Marcella Young, Corporal Shawan Burrell, Shift Supervisor, and,

Human Resources Manager, Jody E. Gaines, ("Defendants") and states:

## Background

CHARLES H. CARTER ("Plaintiff" or "Carter"), became employed with GardaWorld

on May 7, 2019 and was terminated on September 25, 2020, making his employment tenure with

GardaWorld approximately 17 months. Before the termination was initiated by GardaWorld and

the Defendants, Plaintiff was no longer on any form of probation, therefore Plaintiff should have

been afforded all the rights, benefits and privileges as was any other GardaWorld's security officer

under the current employment agreement and state and federal laws.

2

Plaintiff was terminated based on a knowingly fabricated event, which concludes and includes a well-over year long, continuous series of baseless, fabricated administrative charges and related adverse actions that have been generated with malicious intent and forethought, without probable cause and in violation of various state and federal laws. The Defendant's actions have made this termination process a year-and a half long process, as reflected by GardaWorld's business records. All listed Defendants, while acting in concert with each other willingly, knowingly, and continuously participated in all the complaint-described events, that are contained within the four corners of this document.

### Facts Common to All Issues

1.     That all events giving rise to this civil suit occurred in Baltimore County, Maryland.

2.      GardaWorld Security Services - US ("*GardaWorld*" or "Defendants"), has international offices situated in various countries and various states throughout the United States but maintain and function as a security agency within the State of Maryland. In this matter before the Court, the totality of their business is conducted in Baltimore County, Maryland (CareFirst Blue Cross and Blue Shield's facilities, 10453 Mill Run Circle, 10455 Mill Run Circle, 10800 Red Run Boulevard, 10802 Red Run Boulevard and 10715 Red Run Boulevard), all of which are located in Owings Mills, Maryland 21117.

3.     At the time of all occurrences, Prentice Robertson was the Chief Operating Officer and an employee agent of GardaWorld and is responsible for general management and oversight of GardaWorld in the United States.

4.     At the time of all occurrences, Donna Kile was an employee agent of GardaWorld and the project manager who is responsible for general management and oversight of GardaWorld's worksites and did personally direct and/or participate in this matter being brought before the court.

3

5.    At the time of all occurrences, Colonel Steven Martin was an employee agent of GardaWorld and is responsible for assisting with general management of GardaWorld's worksite(s) and did personally direct or participate in this matter being brought before the court.

6.    At the time of all occurrences, Lieutenant Lamont Green was an employee agent of GardaWorld and is the site supervisor for GardaWorld's worksite, 10455 Mill Run Circle, Owings Mill, Maryland 21117 and did personally direct and/or participate in this matter being brought before the court.

7.    At the time of all occurrences, Lieutenant Marcella Young was an employee agent of GardaWorld and is the site supervisor for GardaWorld's worksites 10802 and 10800 Red Run Boulevard, Owings Mill, Maryland 21117 and 10715 Red Run Boulevard, Owings Mill, Maryland 21117 and subsequently,  shift supervisor of 10455 Mill Run Circle, Owings Mill, Maryland 21117 and did personally direct and/or  participate in this matter being brought before the court.

8.    At the time of all occurrences, Corporal Shawan Burrell was an employee agent of GardaWorld and is the shift supervisor for GardaWorld's worksites, 10800, 10802 and 10715 Red Run Boulevard, Owings Mill, Maryland 21117 and did personally direct and/or participate in this matter being brought before the court.

9.    At the time of all occurrences, Security Officer Charles H. Carter was an agent of GardaWorld and has been employed there, in a full-time capacity, from May 7, 2019, until September 25, 2020, the date of his knowingly unlawful and deceptive-based termination. This unlawful termination was based on the Defendant(s) deliberate, with malicious intent, violations of various laws, rules and policies, which include but not limited to violations of the enacted State of Maryland Governor's Executive Order, The CDC's Covic-19 Workplace Guidelines; the January 12th, 2018, Maryland Legislature enacted Maryland Healthy Working Families Act (MHWFA), The Family

4

First Coronavirus Response Act (FFCRA), which is valid April 1, 2020 through December 31, 2020 and the Occupational Safety and Health Act of 1970.

10.     This Court may exercise jurisdiction over the Defendants(s) under Md. Cts. & Jud. Proc. Code Ann. § 6-102, as Defendant(s) is organized under the laws of and maintain its principle place of business in the State of Maryland.

11.     Venue is proper to this Court under Md. Cts. & Jud. Proc. Code Ann. §6-201 as GardaWorld maintains its principle place of business in Baltimore County, Maryland.

12.     On September 25, 2020, Plaintiff was terminated from his employment, as a security officer at Gardaworld for allegedly *mishandling a lost cellular telephone*. At no time during Plaintiff's tenure with GardaWorld was there ever any event that involved a lost, found or created cellular telephone event that involved the Plaintiff and/or any GardaWorld entity. Still, the related termination notice reflects (Verbatim):

> Charles Carter's employment is being terminated due to violating Company Policy. **On 9/21/20**, Ofc. Carter retrieved a cell phone from a locked security desk draw at 715-B post. Ofc. Carter plugged the phone up and began to charge it using his own personal charger; with full knowledge that the cell phone did not belong to him. Once the phone was charged, Ofc. Carter made multiple attempts to unlock the phone. After 2 ½ hours of numerous attempts, Ofc. Carter was finally successful in gaining access into the cell phone; at which time he went through the phone viewing its contents. Ofc. Carter should not have tampered with the found property. Policy states that when property is found; then a lost and found form must be completed/submitted and a supervisor notified.[1]

13.     The eight (8) page response, which was attached to the termination notice by Plaintiff, provided GardaWorld's business records that showed, in part, a history of the Defendant(s)

---

[1] It is important to note that the termination notice also reflected that there is no prior Counseling or Corrective Action for the subject of termination, the date of the termination is Friday, September 25th, 2020, four days after the alleged event; there were no investigative inquiries made during this event, the termination notice deliberately neglects to advise who observed the alleged event and/or who generated this GardaWorld business record, management's Colonel Steven Martin and Lieutenant Lamont Green signed the termination notice, and there was an eight page response attached to the termination notice, which was dated September 25, 2020. **(See E.2)**. This GardaWorld business record was designed to bring a fraudulent action and submitted in bad faith.

continuous and knowingly false and unlawful administrative charges filed against Plaintiff. When preparing this eight (8) pages response, it was the Plaintiff's belief that the newest false administrative charges were to be in reference to a fabricated harassment charge. Plaintiff subsequently found out the newest charge was in reference to a knowingly false lost cellular telephone event. Plaintiff immediately, on September 25, 2020, submitted, in writing, his version of the accurate event to management. In part, the written notification reflects (verbatim):

> The truth is as follows: During the start of my Monday morning shift (0600 hours), I unlocked and opened my post locked draw. I observed my co-workers telephone in this locked draw. Still, I immediately opened the phone, utilizing the "Emergency Feature"[2] Seeing that it needed charging I placed it on the charger and left it there until its owner, my relief (Officer Angela Al-Marteen) arrived at work.[3] When she did arrive to relieve me (1400 hours), she advised that she had lost it and had ordered another. She unplugged the telephone and took it in her possession. Noting: That the last time I was at this location was on Friday, September 18, 2020, when she relieved me. I left there to work overtime at Red Run 802 from 0300 to 2000 hours.[4] **(See E.14)**

14.     At the time and date of Plaintiff's unlawful termination, Friday, September 25, 2020, for mishandling allegedly lost property, the mentioned allegedly lost cellular telephone had been in the owner's possession for four (4) days and was knowingly never lost property.

15.     Albeit, this present termination event is knowingly tainted with deceptions and bald assertions, the Defendants in this matter before the court have continued on a negative course of conduct that has been improperly directed at Plaintiff, for approximately one and a half years. These charges lack probable cause, proper investigation, validity, and proper policy-based or legally based reasoning. This is reflected in Plaintiff's termination notice where it notes: *Dates of Prior Counseling or Corrective Actions* six (6) date boxes were left blank. This indicates that

---

[2] This feature allows anyone to see emergency information to contact owner.
[3] I know her telephone. I see it at work every day.
[4] Plaintiff worked overtime at RR802 because Corporal Burrell was still out on medical. She was schedule to return **September 22, 2020, Tuesday, on the 1200 to 2000 hours shift.**

Plaintiff has never been involved in any prior counseling or corrective actions events. This deception neglected to mention Defendants have continuously filed numerous false, unfounded and unlawful administrative charges and with related adverse actions against Plaintiff. When these previous administrative charges and related adverse actions have been forced to stand under the light of truth or legally based challenges, the charges merely have been placed into a historical darkness, by management, with no additional investigation or subsequent penalties imposed on the presently listed involved Defendants, who continue to act with managerial malice and impunity.

16.    **Nexus 1:** Plaintiff incorporates by reference the allegations set forth in paragraph 1 through 15, as is fully set forth.

Previous Corrective Action Charges:

a.    February 7, 2020: Corporal Shawan Burrell charges: Failure to perform duties and watching something on phone. **(See E.33 and E.39)**[5]

b.    February 7, 2020: Corporal Shawan Burrell and Lt. Marcella Young charge Plaintiff with termination able offenses and document it as a *Formal* and *Final Warning*, with views of termination. The related charges were post abandonment and leaving work early. **(See E.32).** All charges were subsequently abandoned as Plaintiff provided documentation that verified that all actions in these events were conducted based on GardaWorld Employee Handbook Policy. **(See E.34 – E.39: Inequitable Treatment in the workplace).**

c.    February 14 and 18th, 2020: Corporal Shawan Burrell and PFC. James Mingle, under the supervision of Lt. Marcella Young, administratively charged Plaintiff with calling out for work on

---

[5] Plaintiff's six inch by three-inch telephone screen (i.e., iPhone 6 plus), was fully facing the security cameras, not moving and being charged and the investigator, Corporal Shawan Burrell, couldn't decipher what was allegedly being viewed on the screen, so she describes it as seeing Plaintiff watching *'something'*. (See E.34 - E.39) But, during the alleged September 21, 2020 lost cellular telephone event, the unnamed observer could see that the phone was being *charged with Plaintiff's charger* and *Plaintiff opening and accessing telephone.*

2/14/20 and upon return on 2/18/20 did not present a medical slip. **(See E.42)**. Defendants attempted to make it appear that medical usage was for four (4) days. GardaWorld business records reflect that Plaintiff called out on medical on Friday, the 14th, does not work weekends, Monday, the 17th of February 2020 was a holiday (i.e., President's Day). so returning on Tuesday the 18th was appropriate. **(See E. 42-45 and E.86)** The writing, filing and presentation of these unlawful administrative charges against Plaintiff are a violation of the Maryland Healthy Working Families Act (MHWFA), whereas, an employer is prohibited from making a complaint, bringing an adverse action, or testifying in an action in bad faith against an eligible employee for using this state law protected activity.

d.     Numerous documented retaliatory-based attacks on Plaintiff by Defendants ensued up and through the date of the September 25th, 2020 termination notice. **(See E.30 to E.72)**. As GardaWorld's business records will reflect, there came a point and time where Colonel Steven Martin was given a written complaint on Lt. Marcella Young and other Defendants. Colonel Steven Martin shortly thereafter explained that *"he gave the written complaint to Lt. Marcella Young to address because he should not have to do her job."* This action gave rise to Lt. Young's construction of management's sanctioned memorandum deemed ***Expectations.***

As a direct result of the submitted complaint, on February 13, 2020, Lt. Marcella Young and PFC. James Mingle distribute a memorandum, generated by Lt. Young, Corporal Burrell and PFC. Mingle, which explains Plaintiff's responsibilities and duties, titled ***Expectations.***   This memorandum advises that Plaintiff is to sat at his desk and never take his eyes off his computer monitors. Additionally, that the chain of command starts and ends with Lt. Young, Sgt. Crosby, Corporal Burrell and PFC. Mingle. Plaintiff was prohibited from going pass these individuals, in the chain of command, without their permission. **(See E.59 – E.63)** This is the point in which the

8

Plaintiff's worksite, 10715 Red Run Boulevard, Suite 120B, Owings Mill, Maryland 21117, which is a one-man post, began being called, by other security members, *Cell Block 120B.*

e.      In April 2020, after it became apparent, to Plaintiff, that management supported any and all improper actions of their supervisors, Human Resources was notified under complaint number 587999286301 and given documentation of most of the aforementioned issues and events, which included documentation that reflects how these policies are a *Hinderance of the Efficiency and Effectiveness of Security at RR715* **(See E.67 to E.72)** . On May 14, 2020, Human Resources' *Final Report of Investigation* finds no wrongdoings on the part of GardaWorld's management or its supervisors, as it pertains to the above described and submitted complaints. **(See E.89 – E.92).**

On May 23, 2020, Plaintiff sent GardaWorld's Human Resources Manager, Jody E. Gaines, the complaint investigator, a written response in reference to her *Final Report.* This response makes claims that the final report appears to not have addressed none of Plaintiff's complaints. It appears the final report was written to side-with and support GardaWorld's management's communication. For example, Plaintiff's complaint asked, why are Defendants allowed to continuously charge him with false administrative charges? Human Resources written response was to explain what charging procedures are, never answering the question. **(See E.93 – E.99).**[6] After the Human Resources' *Final Report of Investigation* was sent to GardaWorld's Management, Project Manager Donna Kile, submitted a memorandum to Plaintiff that was deemed ***Continued Expectations***, which had the goal of reenforcing the prison-like policies for Plaintiff at that which had now been deemed *Cell Block 120B.*

f.      The most recent false and retaliatory administrative charges filed against Plaintiff by Defendants was filed on July 27, 2020. During this event, Lt. Marcella Young charges the Plaintiff

---

[6] After the GardaWorld's Human Resources Final Investigative Report was finalized in May 2020, some of the Defendants were promoted, this included PFC. Burrell to Corporal Shawan Burrell.

with a '*Final Formal Warning*' event which knowingly and deliberately reflects that Plaintiff called in to the GardaWorld Command Center and advised that he would not be in to fill his tour of duty *for personal reasons*. **(See E.6)**. This adverse action followed several emails from Lt. Young to Plaintiff, *where Lt. Young complained that Plaintiff had called in and advised that he was sick, now he's saying he was injured.* Administratively charging Plaintiff with absence due to a call-in for *personal reasons* removes the administrative charging issues from a policy-defensible medically-based and legally protected category, which is protected by the Maryland Healthy Working Families Act/Maryland Earned Sick and Safe Leave Policy and places it in a unaccused absence category. Lt. Marcella Young knowingly and deceptively made the administrative charges fit her unlawful and retaliatory desires. Noting that on July 24, 2020 at 1356 hours, three (3) days before Lt. Young presented Plaintiff with administrative charging documents for this event, Defendant, Corporal Shawan Burrell contacted Plaintiff and interrogated him in reference to this investigation that concluded with fraudulent data and another writing, filing and presentation of unlawful administrative charges against to Plaintiff, that are a violation of the Maryland Healthy Working Families Act (MHWFA), a knowingly safe and sick leave law violation and protected activity. **(See E.7).**[7]

A portion of the retaliatory data and its source, which complained of management's deliberate violation of the above-mentioned Maryland Earned Sick and Safe Leave Law and documented deliberate deceptions by management was included in the "*8-page attachment to termination notice*". Management paid the Plaintiff, after he advised that *he has never received any sick and safe leave days/pay and every time he took a medical day he was administratively*

---

[7] Nexus: Corporal Shawan Burrell utilizes a culture of defending, writing business records and conducting investigations for Lieutenant Marcella Young. A formal complaint, which generated a GardaWorld business record was submitted to management, as it pertains to this culture, on October 17, 2019, which gave rise to a continuing course of retaliatory and unlawful actions. **(See E.46 – E.53).**

*charged instead of paid.* **(See E.24 – E.28).**[8]   Management still allowed Defendant, Lieutenant Marcella Young and Corporal Shawan Burrell, one week after the event, on a non-workday (Sunday, July 19th, 2020), to administratively and deceptively generate false charges against Plaintiff and then support the Defendant's improper and illegal actions. The project manager, Donna Kile, in writing advises, please *understand that the reason you called out is not the issue, whether personal issues, an injured knee or anything else. You called out for two shifts and this caused a need for coverage and overtime being accrued.* Defendant Donna Kile, concluded this written communication advising, *the warning notice remains and will be sent to the corporate office.* **(See E.2 - E.10).**[9] Plaintiff was again being penalized for using sick and safe leave days that he was paid for using and was a participating in a protected activity. Noting that management's documented and continued sanctioning of these law violations and retaliatory acts is a violation of the law.

g.    Maryland Healthy Working Families Act (MHWFA)

> Leave accrues at a rate of one hour for every 30 hours that an employee works (including hours worked outside of Maryland). Accruals must begin as of February 11, 2018, the effective date of the MHWFA. The maximum annual accrual of sick and safe leave is 40 hours. An employee is entitled to carry over up to 40 hours of unused accrued sick and safe leave, but is not entitled to have an accrual of more than 64 hours at any time. Employers that provide the full amount of sick and safe leave at the beginning of the year do not have to allow the carryover of unused leave. In either case, the employer designates when the year begins and ends.
>
> New employees begin accruing leave on date of hire, but an employer is not required to allow an employee to use accrued leave *during the first 106 calendar days of employment.*

---

[8] It was not until the writing of these emails and the subsequent notification from Project Manager Donna Kile, that the Plaintiff was made aware that Marco Miranda was not Defendant's supervisor. On September 28, 2020, Donna Kile contacted Plaintiff at his home and advised to discontinue contacting Marco Miranda because he is not an employee of GardaWorld. He gave all emails to her and she will give to Human Resources.

[9] It must be noted that during this Sick and Safe Leave Law violation, Corporal Shawan Burrell was a part of the investigative entity that generated the deliberately false and in violation of the law administrative charges. **(See E.7: July 17, 2020 and July 24, 2020)** The present termination investigation and notification was retaliatory, as well as sponsored by the same Defendants, acting in concert, in violation of the law.

Earned Sick and Safe Leave may be used for the following:

To care for or treat an employee's mental or physical illness, injury or condition;
To obtain preventive medical care for the employee or the employee's family member;

To care for a family member with a mental or physical illness, injury or condition;
For maternity or paternity leave;

For absence due to domestic violence, sexual assault or stalking committed against the employee or a family member under certain circumstances.

An employer is required to provide each employee a written statement of used and available paid and unpaid sick and safe leave with each pay period.

An employer is prohibited under the law from taking adverse action against an employee who exercises a right under the Maryland Healthy Working Families Act and an employee is prohibited from making a complaint, bring an action, or testifying in an action in bad faith.

An employer and/or employee may not penalize and employee for using any accrued sick and safe leave, under this law.[10]

At the time the Plaintiff's first used any sick and safe leave, February 19, 2020; nine (9) months from the date of hire, when Corporal Shawan Burrell and PFC. James Mingle; under the supervision of Lt. Marcella Young, Plaintiff had been employed, on a full time basis with GardaWorld, for well over 250 calendar days. **(See E.86).** The same applies to July 27th, 2020's administrative charges, there was no abuse or use of medical days. **(See E.6).** Lt. Young deceptively administratively charged Plaintiff for using that which was his right to use and Project Manager, Donna Kile supported Lt. Young and Corporal Shawan Burrell's improper actions that were clearly in violation of MHWFA and unlawful. Instead of termination for Defendants deliberate violations, Lieutenant Marcella Young was moved to a neighboring location to work, Carefirst Blue Cross and Blue Shield, 10455 Mill Run Circle, Owings Mill, Maryland 21117 and

---

[10] At the date of this administrative charging process, July 27, 2020, Plaintiff had been eligible for the utilization of MHWFA for 14 months.

removed from her site supervisor position. No penalties inflicted on Corporal Shawan Burrell, who assisted in the adverse unlawful investigation and actions.

h.     Most Recent Corrective Action Form: Review **(See E.6)**

*Today's Date: 7/19/20* (This is a Sunday. A non-working date for Plaintiff and Lt. Young, so she had to be not working and generated these charges. With Corporal Shawan being a part of the investigative entity for this event, Lieutenant Marcella Young writes that on this Sunday, the day before this alleged infraction, Plaintiff was going to use two medical days for *personal reasons,* even after she debates, via emails, that Plaintiff called in sick or injured. She knowingly and deliberately was being deceptive and penalizing Plaintiff for participating in a protected activity.

*Date of Prior Counseling or Corrective Action: 2/5/20* (This is the event where Lt. Young, Cpl. Burrell and PFC. Mingle charged Plaintiff with abandoning post, failure to perform duties, use of cellular phone.) All charges that were subsequently found to be generated in violation of GardaWorld's policy and improper. **(See E.32 through E.39).**

17.     **Nexus 2:** Plaintiff incorporates by reference the allegations set forth in paragraph 16 through 16(h), as is fully set forth.

18.     Defendant, Corporal Shawan Burrell, who had been out on medical leave for several weeks, returned to work on September 22, 2020, the day after the alleged lost cellular telephone event (September 21, 2020). She was assigned to work the 12:00 pm to 8:00 pm shift at 10802 Red Run Boulevard, Owings Mill, Maryland 21117, where she is the shift supervisor.

19.     History of Corporal Shawan Burrell's medical absence: There came a time when Corporal Burrell discontinued responding to work for her tour of duty. This continued for several weeks. After a couple of weeks of her being absent it was rumored that she had tested positive for Corona virus 19 and that was the reasoning she was out.  Additionally, Corporal Burrell's absence was

13

also the reasoning Plaintiff had been working regular overtime at 10802 Red Run Boulevard, Owings Mill, Maryland 21117. Once Corporal Burrell discontinued coming to work, for medical reasons, the Plaintiff immediately, after his tour of duty and, in part, because of the *recently documented mandatory overtime policy*, filled in for Corporal Burrell, in an overtime capacity.[11]

20.     Shortly before Corporal Burrell's return to duty, Plaintiff was made aware that it had been confirmed that Corporal Burrell had tested positive for Corona Virus 19 and management had not informed anyone of the positive testing results per CDC's guideline policy or the Governor's Executive Order, and/or taken any precautionary measures to protect employees after the positive test result. Additionally, Defendants, several days after the positive finding, sent emails to a chosen few employee, who worked in the building but not all employees who worked in the building and/or work area. Once this information was found out about the positive test results several individuals walked off the worksite. refusing to return until they got tested. The Plaintiff never received notice of the positive testing, no written communications to the effect and/or was privy to any information of any special attention given the working area during this event as he continued to work there in an overtime capacity to replace Corporal Shawan Burrell.[12] Complaints were made to management.

21.     The Plaintiff was exceptionally verbal about the neglect of management to follow any employee Coronavirus protection policies; The Governor of Maryland's Executive Order, Covid-19 Employees Positive Testing Responsibilities, which is based on the Center for Disease Control and Prevention's (CDC), June 28, 2020 Guideline; the CDC's Covid-19 Guidance: Business and Employers and The Family First Coronavirus Response Act (FFCRA), which is valid April 1, 2020

---

[11] Plaintiff would work his tour of duty, 6:00 am to 2:00 pm, then respond to 10802 Red Run Boulevard, Owings Mills, Maryland 21117 and work in Corporal Burrell's place, 2:00 pm to 8:00 pm.

[12] In part, Plaintiff worked overtime as a direct result of Defendant's recently issued mandatory *overtime directives*.

14

through December 31, 2020, all of which direct that management must notify employees, cleanse working areas, and grant employees the opportunity to be tested after a positive finding of Coronavirus 19, at the workplace. Plaintiff found out about the positive test result a couple of days before Corporal Shawan Burrell's return to duty. Plaintiff immediately, in an overtime capacity, filled in for Corporal Burrell at her worksite, on her first days of absence, not being advised of the possible infectious circumstances.

21(a).      Occupational Safety and Health Act of 1970: The Occupational Safety and Health Act requires employers to comply with safety and health standards and regulations promulgated by Osha or by a state with an OSHA-approved state plan. In addition, the Acts General Duty Clause, Section 5(a)(1), requires employers to provide their employees with a workplace free from recognized hazards likely to cause death or serious injury.

22.      Defendant, Corporal Shawan Burrell returned to work on Tuesday, September 22, 2020.

23.      On Tuesday, September 22, 2020 and in a continuing retaliatory manner, Defendants, working in concert and disgruntled about Plaintiff's complaints about Defendants not following the rules/laws/policies as they relate to the Coronavirus Employee Protection laws/rules/policies; the previously filed knowingly deceptive administrative charges which penalizes Plaintiff for participating in a protected activity (MHWFA); her friend and co-conspirator Lieutenant Marcella Young being move to another work location after being stripped of her site supervisor status, as a direct result of filing deceptive, retaliatory and unlawful administrative charges against Plaintiff who was participating in protected activities; Corporal Shawan Burrell, initiated and generated fraudulent adverse and retaliatory in nature administrative charges against Plaintiff, so as to result in Plaintiff's termination of employment and the infliction of various other maliciously intended injuries. Consequently, and retaliatory in nature; fraudulent, probable causeless lost cellular

15

telephone administrative charges were fashioned and filed against Plaintiff. Termination of

employment was the immediate and direct result.

a.       Fraud: In law, fraud is intentional deception to secure unfair or unlawful gain, or to deprive
a victim of a legal right. §8-402 – Fraudulent misrepresentation by corporate officers or agents. (a)
Prohibited: An officer or agent of a corporation may not sign, or in any manner assent to, a
statement to or a publication for the public or the shareholders that contains false representations of
the corporation's assets, liabilities, or affairs, to: (2) commit fraud in another manner. (b) Penalty
– A person who violates this section is guilty of a misdemeanor and on conviction is subject to
imprisonment not less than 6 months and not exceeding 3 years or a fine not less than $1,000.00
and not exceeding $10, 000.00 or both. [An. Code 1957, art. 27, §174; 2002, ch. 26, §2.]

b.       Defendants knowingly committed the unlawful act of fraud when they generated, signed
and utilized documents to terminate Plaintiff that reflect lost cellular telephone when they knew
no such event existed; cellular telephone was recovered by owner on the same day it was removed
from the locked security post desk draw (i.e., September 21, 2020), where owner placed it on
Friday, September 18, 2020. **(See E.11)**

c.       The Plaintiff's termination was four-fold in unlawful acts and involved identical
Defendants. (1) July 27, 2020, administrative charges against Plaintiff were retaliatory in nature
and in violation of the law that dictates that Defendants cannot knowingly make a complaint, bring
an adverse action and testify in an action in bad faith. Defendants did so when they, (2) in a
retaliatory manner, knowingly filed fraudulent administrative charges against Plaintiff on
September 22nd and 25th, 2020, **(See E.2)** and (3) when Defendants penalized and retaliated against
the Plaintiff for complaining about not having a workplace free from recognized hazards likely to
cause death or serious injury. Lastly; (4), the July 27, 2020, administrative charges, filed against
Plaintiff were in violation of the law because of the legal writings self-contained violations and
previous, February 19, 2020, unlawful filing, by the same Defendants and the same laws applied,
which were retaliatory in nature and in violation of the law that dictates that Defendants cannot
knowingly make a complaint, bring an adverse action and testify in an action in bad faith. **(See
E.42).**

24.       On September 22, 2020, the day after the alleged lost cellular telephone event (September

21, 2020), Corporal Shawan Burrell returned to work from her weeks of being on medical leave.

Once Plaintiff had concluded his scheduled tour of duty (i.e., 6:00 am to 2:00 pm) and left the

building (10715 Red Run Blvd., suite 120B), Corporal Burrell immediately responded to the

location, picked up the owner of the alleged lost cellular telephone and together they responded to

GardaWorld's Command Center with Project Manager Donna Kile, Colonel Steven Martin,

Lieutenants Lamont Green and Marcella Young to address the lost telephone allegations. Noting, all mentioned events are camera recorded and viewable for future reference.

25.     On September 23, 2020 and until September 25, 2020, security officer Anglea Al-Marteen, the owner of the above mentioned cellular telephone, had been rescheduled to work her tour of duty, as Plaintiff's relief, to another location, 10802 Red Run Boulevard, Owings Mill, Maryland 21117, under the direct supervision of Corporal Shawan Burrell.

25a.     Security Officer Anglea Al-Marteen never lost her cellular telephone. She locked it in the security post desk draw on Friday, September 18th, 2020, her last day of working. Plaintiff retrieved it from locked post draw on Monday morning, September 21, 2020 and officer recovered it when she arrived at work, same date. There was never a lost cellular telephone event. Defendant's, in a retaliatory manner, fabricated this event to penalize Plaintiff for complaining about Defendant's improper actions and violations of the and below listed rules, laws and policies.

26.     During the course of the events, between September 1 through September 25th, the site supervisor Lieutenant James Johnson was the site supervisor for 10802, 10800 and 10715 Red Run Boulevard, Owings Mill, Maryland 21117. Lt. Johnson was also the supervisor for all individuals involved in the alleged lost cellular telephone event. Corporal Shawan Burrell, Lt. Johnson's subordinate, initiated and worked on this allegedly lost cellular telephone event outside of the standard chain of command. Corporal Burrell worked on the event and drafted administrative charges with management (Donna Kile, Col. Steven Martin, Lt. Lamont Green and Lt. Marcella Young), at the Command Center. Lt. James Johnson was made aware of the termination event on September 25, 2020, when Colonel Steven Martin and Lieutenant Lamont Green arrived at Plaintiff's worksite to terminate Plaintiff.

26a.     **Nexus 3:** Project Manager, Donna Kile's continuous documented sanctioning and defense
of all Defendants, who are her subordinates, violations of the Maryland Healthy Working Families
Act (MHWFA) and various other law, rules and policies violations, in part, is to conceal Kile's
knowingly direct and personal violations of this law, which may be motivated by financial gain.
MHWFA, in part, advises:

> An employer is required to provide each employee a written statement of used and available paid
> and unpaid sick and safe leave with each pay period.
>
> An employer is prohibited under the law from taking adverse action against an employee who
> exercises a right under the Maryland Healthy Working Families Act and an employee is prohibited
> from making a complaint, bring an action, or testifying in an action in bad faith.

Defendant and Project Manager Donna Kile has *never* provided (Plaintiff) *employees with
any statement of used and available paid or unpaid sick and safe leave.* Her subordinates, on every
level of management, administratively charged Plaintiff every time he used this protected activity.
These administrative charges cannot be issued unless approved by management.    All available
pay for this sick and safe leave period was never mentioned by management and/or provided;
administrative charges and adverse actions were.

Plaintiff began his employment with Whelan Security on May 7, 2019, Kile was the Project
Manager at that time.   Several months after Plaintiff's entry-on-duty date, Whelan Security was
purchased by GardaWorld Security Services – US. Plaintiff was issued a new identification badge
and uniforms, under the colors of this corporation/Company, with continued full benefits and
Donna Kile remaining the Project Manager, who is responsible for general management and
oversight of GardaWorld's facilities in Maryland.  In July of 2020, when Lieutenant Marcella
Young, in violation of this law, took adverse action against the Plaintiff for utilizing this protected
activity and Project Manager, Donna Kile approved her actions (**See E.2 to E.10**), was the first
and only time, in well-over one year, Plaintiff was paid for his sick and safe leave. (**See E.22 to
E.28**). Plaintiff was previously administratively charged every time he used this protected activity.

Donna Kiles voluntary and continued sanctioning of these law violations, by law, dictates that all and every adverse action sanctioned by Defendant Kile and directed at Plaintiff, directly, personally or through her subordinates, from the date of the first documented violation, all administrative charges and related adverse actions, termination and up to and including Defendant Kile's subsequent *testimony in an action in bad faith*, (i.e., Maryland Department of Labor, DLLR), for Plaintiff's claims for unemployment insurance, is a violation of the MHWFA law. **(See E.42 and E.86 and E.1 to E.99)** Actually, Defendant Donna Kile, based on this law, was in violation of the law 30 days after Plaintiff's entry on duty date, which was May 7, 2019.

MHWFA, in part dictates:

> New employees begin accruing leave on date of hire, but an employer is not required to allow an employee to use accrued leave *during the first 106 calendar days of employment.*

As GardaWorld's business would reflect, Plaintiff's first usage of MHWFA was well-over 250 calendar days of employment, over eight months, in spite of the fact that during the Plaintiff's *entire tenure* with this organization, request for leave has *always* been denied. The last denial was given by Corporal Shawan Burrell, minutes after the written request was submitted Corporal Burrell denied my request via the telephone.

27.     On October 2nd and 4th of 2020, termination notification with explanation was faxed (314-261-7340) to the Chief Operations Officer of GardaWorld, Prentice Robertson per his Open-Door Policy Complaint process. This faxed material also advised that the entire wrongful termination packet was mailed to his office, via United States Postal Services certified mail #7019-0700-0000-4578-0981,[13] and scheduled to be delivered on Monday, October 5, 2020. Via a telephone communication with COO Prentice Robertson, Plaintiff was advised that he had received material

---

[13] Complaint packet included all documents in this Complaints Exhibits section, E.1 through E.99.

included in complaint and that he had given it to the Chief Human Resources Officer for investigation.

> Complaint Resolution (Open-Door Policy)[14]
> As part of the policy, GardaWorld makes every effort to provide a positive work environment for our employees. If you are concerned about an issue, please contact your immediate supervisor or manager. If the issue is not satisfied to your satisfaction, you are welcome to discuss your concerns with every level of management at GardaWorld in successive order, up to and including the COO of GardaWorld. (Not in its entirety)

28.   Plaintiff incorporates by reference the allegations set forth in paragraph 17 through 27, as is fully set forth.

At the date of this writing, November 15, 2020, Plaintiff has not heard any words or received any communications about the GardaWorld Human Resources Complaint filed on September 25, 2020 (Complaint # 628371930801) or that which was delivered to the COO of GardaWorld. Additionally, Plaintiff, on September 25, 2020, filed a claim for unemployment insurance via the Maryland's Department of Labor (DLLR). The status of this claim remains *On Hold: Unresolved Separation Issues*. GardaWorld management advised the DLLR that Plaintiff's termination was the results of his knowing and deliberate violations of organizational policy. Again, a violation of MHWFA: *an employee is prohibited from testifying in an action in bad faith.*

### Conclusion

Sadly, the totality of the described events within the four corners of this complaint are just a sampling of the illegal and improper events and actions, which occurred on a daily basis, and which occurred during this approximately year-and-a- half-long unlawful termination process. There were and remains federal issues that are not being claimed at this time and the *Res Judicata Laws* does not prohibit Plaintiff from a later date filing.  These illegal actions occurred with the frequency of bullets being discharged from a machine gun during a time period before the

---

[14] GardaWorld Employee Handbook, pg. 25 -26.

industrial revolution, where workers had *no* rights. The only policy or rule that was followed was

"*Donna Said*."[15] The lawless actions that have knowingly and deliberately taken place during this

described time, which were directed at the Plaintiff, should be included in an academic training

book on what employers should not allow to happen in the workplace. Defendants deliberate

unlawful actions and their operating with managerial impunity gives rise to the following counts:

Count I.
(Wrongful Termination)

29.    Plaintiff incorporates by reference the allegations set forth in paragraph 28 through 28, as is fully set forth.

30.    Maryland wrongful terminations laws protect employees from being fired for illegal reasons. A termination is considered to be illegal if it violates a law, or if it violates terms that are set out in an employment contract. This present termination violates aspects of public policy laws, namely, the Maryland Healthy Working Families Act (MHWFA), found in §§ 3-1301 through 3-1311 of the Labor and Employment Article of the Maryland Annotated Code.

31.    The Defendants, knowingly and deliberately, while working in concert with each other, breached the Good Faith and Fair Dealings policy, as they acted unfairly toward Plaintiff and fabricated reasons to fire him; and fired the Plaintiff, for complaining that the employer broke laws, regulations, and/or ordinances.

   a.    On February 19, 2020, Defendants, continue to unlawfully punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

   b.    On July 27, 2020, Defendants, unlawfully continue to punish Plaintiff, and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

   c.    On September 22 and 25th, Defendants, unlawfully continue to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

---

[15] This phrase, *"Donna Said"* was used to justify most actions, regardless of how it contradicted with actual policy or law. This phrase also signifies that the action is approved by the Project Manager, Defendant Donna Kile.

d.   During the course of Plaintiff's tenure with GardaWorld, the project manager, Donna Kile continued on a course of conduct that knowingly and deliberately, with malicious intent, conducted and directed adverse and unlawful actions against the Plaintiff, that caused complaints to be made and documented  testimony in bad faith to be generated, which ultimately caused Plaintiff's termination of employment. This adverse and unlawful actions was the result of Plaintiff exercising his rights under the Maryland Healthy Working Families Act, a protected activity.

32.   As a result of the Defendants' conduct and actions, Plaintiff Charles H. Carter has suffered and will continue to suffer emotional anguish, loss of reputation, stress, humiliation, embarrassment, severe emotional distress and financial loses.

<div align="center">

Count II.
(Retaliation)

</div>

33.   Plaintiff adopt and incorporate by reference into this Count II, all the allegations contained in paragraph 29 through 32, as if fully set forth.

34.   Defendants acting in concert with each other have, knowingly and continuously, continued to · punish Plaintiff, with employment termination, harassment, malicious prosecution and retaliatory acts , for engaging in legally protected activity: to wit: the utilization of the Maryland Healthy Working Families Act (MHWFA), leave days, which is found in §§ 3-1301 through 3-1311 of the Labor and Employment Article of the Maryland Annotated Code.

a.   On February 19, 2020, Defendants, unlawfully continued to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

b.   On July 27, 2020, Defendants, unlawfully continued to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

c.   On September 22 and 25th, Defendants, unlawfully continued to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

d.   During the course of Plaintiff's tenure with GardaWorld, the project manager, Donna Kile continued on a course of conduct that knowingly and deliberately, with malicious intent, conduct and directed punishment against Plaintiff who exercised his right under the Maryland Healthy Working Families Act, whereas, Defendant did knowingly make or have to be made complaints, bring adverse actions and testify in an action in bad faith.

35.   The Defendants, knowingly and deliberately, while working in concert with each other, breached the Good Faith and Fair Dealings policy, as they acted unfairly toward Plaintiff and

fabricated reasons to fire him; and ending his employment for complaining that the employer broke laws, regulations, and/or ordinances.

36.     As a result of the Defendants' conduct and actions, Plaintiff Charles H. Carter has suffered and will continue to suffer emotional anguish, loss of reputation, humiliation, embarrassment, severe emotional distress and financial loses.

WHEREFORE, Plaintiff Charles H. Carter demands Five Hundred Thousand Dollars ($500,000.00), for damages, including but not limited to those damages listed above, and any other damages permitted by law, plus interest and cost and any and all other relief to which this court finds him entitled.

Count III.
(Wrongful Termination)

37.     Plaintiff incorporates by reference the allegations set forth in paragraph 33 through 36, as is fully set forth.

38.     Maryland wrongful terminations laws protect employees from being fired for illegal reasons. This present termination violates aspects of public policy laws, to name a few, The Governor of Maryland's Executive Order, dated March 23, 2020, Employers Covid-19 Employees Positive Testing Responsibilities, which is based on the Center for Disease Control and Prevention's (CDC), June 28, 2020 Guideline, the CDC's Covid-19 Guidance: Business and Employers and The Family First Coronavirus Response Act (FFCRA), which is valid April 1, 2020 through December 31, 2020, which states:

If the employee becomes sick during the day, they should be sent home immediately. Surfaces in their workspace should be cleaned and disinfected. Information on persons who had contact with the ill employee during the time the employee had symptoms and 2 days prior to symptoms should be compiled. Others at the facility with close contact within 6 feet of the employee during this time would be considered exposed and should be advised accordingly.

38a.    This termination violates the Occupational Safety and Health Act of 1970, which requires employers to comply with safety and health standards and regulations promulgated by Osha or by a state with an OSHA-approved state plan. In addition, the Acts General Duty Clause, Section 5(a)(1), requires employers to provide their employees with a workplace free from recognized hazards likely to cause death or serious injury.

39.     The Defendants, knowingly and deliberately, while working in concert with each other, breached the Good Faith and Fair Dealings policy, as they acted unfairly toward Plaintiff and fabricated reasons to fire him; and fired the employee/Plaintiff, for complaining that the employer broke laws, regulations, and/or ordinances.

40.     As a result of the Defendants' conduct and actions, Plaintiff Charles H. Carter has suffered and will continue to suffer emotional anguish, loss of reputation, serious threats to mental and physical injury, humiliation, embarrassment, severe emotional distress and financial loses.[16]

Count IV.
(Retaliation)

41.     Plaintiff adopt and incorporate by reference all the allegations contained in paragraph 37 through 40, as if fully set forth.

42.     Defendants acting in concert with each other have, knowingly and continuously, continued to punish the Plaintiff for engaging in legally protected activity: to wit: Demanding and complaining about the employers violations of aspects of public policy laws, namely, The Governor of Maryland's Executive Order, dated March 23, 2020, Employers Covid-19 Employees Positive Testing Responsibilities, which is based on the Center for Disease Control and Prevention (CDC), June 28, 2020 Guidelines.

42a.    Defendants acting in concert with each other have knowingly and continuously continued to punish Plaintiff for engaging in legally protected activity: Demanding and complaining about the employers violations of aspects of public policy laws, namely; the Occupational Safety and Health Act of 1970, which requires employers to comply with safety and health standards and regulations promulgated by Osha or by a state with an OSHA-approved state plan. In addition, the Acts General Duty Clause, Section 5(a)(1), requires employers to provide their employees with a workplace free from recognized hazards likely to cause death or serious injury.

43.     The Defendants, knowingly and deliberately, while working in concert with each other, breached the Good Faith and Fair Dealings policy, as they acted unfairly toward Plaintiff and fabricated reasons to fire him; and fired the employee/Plaintiff, for complaining that the employer broke laws, regulations, and/or ordinances.

44.     As a result of the Defendants' conduct and actions, Plaintiff, Charles H. Carter has suffered and will continue to suffer emotional anguish, loss of reputation, threats to physical injury, a serious threat to loss of life, humiliation, embarrassment, severe emotional distress and financial loses.

        WHEREFORE, Plaintiff Charles H. Carter demands Five Hundred Thousand Dollars ($500,000.00), for damages, including but not limited to those damages listed above, and any other damages permitted by law, plus interest and cost and any and all other relief to which this court finds him entitled.

---

[16] At the time of his termination Plaintiff was 64 years old. He is categorized by the Center for Disease Control and Prevention (CDC), the National Institute of Health (NIH), The United States Health Department and the Surgeon General of the United States, to be in the age group most susceptible to contracting this life-altering disease and dying from this deadly public health crisis and global pandemic: Covid-19. Defendant's knowingly and improperly placed Plaintiff in a potentially harmful and life-altering situation.

Count V.
(Harassment/ Malicious Prosecution)

45.   Plaintiff adopt and incorporate by reference all of the allegations contained in paragraph 41 through 44, as if fully set forth.

46.      The actions and continuous course of conduct of the Defendants during their numerous and well over year long sub-standard investigation(s) were intentionally performed with malice and fore thought, as well as without probable cause.

     a.   On February 19, 2020, Defendants, unlawfully continued to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

     b.   On July 27, 2020, Defendants, unlawfully continued to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

     c.   On September 22 and 25th, Defendants, unlawfully continued to punish Plaintiff and did take adverse action against Plaintiff who exercises his right under the Maryland Healthy Working Families Act, whereas, Defendants did knowingly make a complaint, bring an adverse action and testify in an action in bad faith.

     d.   During the course of Plaintiff's tenure with GardaWorld, the project manager, Donna Kile continued on a course of conduct that knowingly and deliberately, with malicious intent, conduct and directed punishment against Plaintiff who exercised his right under the Maryland Healthy Working Families Act, whereas, Defendant did knowingly make or have to be made complaints, bring adverse actions and testify in an action in bad faith.

47.   The Defendants have deliberately applied rules and directed actions against the Plaintiff in their continuing substandard investigation(s) that have never been applied to any other known individual during the Defendants existence. These actions continued even after Plaintiff requested Defendants to immediately discontinue and stop.

48.   As a result of the Defendants' conduct and actions, Plaintiff Charles H. Carter has suffered and will continue to suffer emotional anguish, loss of reputation, permanent physical injury, humiliation, embarrassment, severe emotional distress and financial loses.

     WHEREFORE, Plaintiff Charles H. Carter demands Three Hundred Thousand Dollars ($500,000.00), for damages, including but not limited to those damages listed above, and any other damages permitted by law, plus interest and cost and any and all other relief to which this court finds him entitled.

Count VI.
(Hostile Working Environment)

49.   Plaintiff incorporates by reference the allegations set forth in paragraph 45 through 48, as is fully set forth.

50.   As a direct result of the Defendants' conduct and actions, Plaintiff Charles H. Carter has suffered and   endured well-over one year's worth of daily, continuous negative and adverse actions, which have no probable cause or lawful bases, that has caused him to continue to suffer, emotional anguish, loss of reputation, humiliation, embarrassment, severe emotional distress and financial loses.

WHEREFORE, Plaintiff Charles H. Carter demands Two Hundred Thousand Dollars ($200,000.00), for damages, including but not limited to those damages listed above, and any other damages permitted by law, plus interest and cost and any and all other relief to which this court finds him entitled.

Count VII.
(Negligence)

51.   Plaintiff incorporates by reference the allegations set forth in paragraph 49 through 50 as is fully set forth.

52.   As a result of the Defendant(s) deliberate conduct and actions, during their numerous sub-standard investigations, which was known to be in total conflict with laws of this state, as well as the rules and regulations of GardaWorld Security Services – US., the Plaintiff, Charles H. Carter suffered with the lost of certain liberties, falsely accused, was forced to suffer emotional distress and was cruelly and maliciously prosecuted.

53.   The Defendant(s) conduct and actions were a deliberate failure to use the amount of care a reasonable person would exercise and/or their deliberate failure to act properly during their continuous investigation(s) and employment related actions.

WHEREFORE, Plaintiff, Charles H. Carter demands judgment against Defendants, GardaWorld Security Services – US., COO Prentice Robertson, Project Manager, Donna KIle, Assistant Project Manager, Colonel Steven Martin, Site Supervisors, Lieutenants' Lamont Green and Marcella Young and Corporal Shawan Burrell in the amount of Three Hundred Thousand Dollars ($300,000.00), plus interest and cost and any other relief that this court deems proper.

Count VIII.
(Intentional Infliction of Emotional Distress)

54.   Plaintiff incorporates by reference the allegations set forth in paragraph 51 through 53, as is fully set forth.

55.    The aforesaid conduct of the Defendant(s) was intentional and/or reckless, extreme and outrageous, which conduct was calculated to cause emotional distress of a severe nature, or was committed with reckless indifference to whether emotional distress would result and did cause emotional distress to the Plaintiff.

56.    As a direct and a proximate result of the Defendant's conduct, working in concert, Plaintiff suffered severe emotional distress, mental anguish, fear, embarrassment, and humiliation, loss of income, lost wages, medical expenses, and personal damages to his career and was other wised damaged.

WHEREFORE, Plaintiff, Charles H. Carter demands judgment against the Defendants for Five Hundred Thousand Dollars ($500,000.00), for damages, including but not limited to those damages listed above, and any other damages permitted by law, plus interest and cost and any and all other relief which this court finds necessary.

### Standard of Review

*At the will employment in Maryland*:

In Maryland, employees work "at the will" of their employers. This means, in the absence of an express contract, agreement or policy to the contrary, an employee may be hired or fired for almost any reason -- whether fair or not -- or for no reason at all. There are certain exceptions to this general rule which provide some protection to employees from illegal discrimination based on such categories as race, color, gender, national origin, religion, age, disability or marital status. Examples of other employment at-will exceptions include laws which protect employees from termination or *retaliation* for filing workers' compensation claims, *for attempting to enforce rights to receive overtime or the minimum wage, for asserting rights to work in a safe and healthy workplace, for refusing to commit criminal acts*, for reporting for jury duty or military service, collective bargaining agreement, employment contract, existing law, recognized public policy provides or for being subject to a wage attachment for any one indebtedness. Terminating an employee for any of these specific reasons may constitute a violation under the applicable State or federal law.

Employers should exercise caution when developing handbooks and related policy statements to avoid implied contract claims. However, the Maryland courts have held that under certain circumstances, *clear* and *specific* statements contained in an employee handbook or policy manual *may* create an employment contract. For example, the state Court of Special Appeals has indicated that an implied contract of employment may be found based on an employer's policy statement that outlines specific steps that must be taken prior to terminating an employee (*Staggs v. Blue Cross of Maryland Inc.*, 486 A.2d 798 (MD Ct. Spec. App. 1985).

**An agency must follow its own rules and regulations:**

In *Hopkins v. Maryland Inmate Grievance Commission*, 40 Md. App. 329, 391 A.2d 1213 (1978), the Court of Special Appeals of Maryland discussed the question of whether and Administrative Agency is required to follow its own rules and regulations. The Court stated: "*It is well established that the rules and regulations promulgated by an administrative agency cannot be waived, suspended and/or disregarded in a particular case so long as such rules and regulations remain in force.*" 2Am.Jur. 2d Administrative Law, pp. 266-67 (1956: K. Davis, Administrative Law of the 70s, section 5-03-5 (Cum. Supp. 1977). This rule has been recognized in federal and state jurisdictions and has become known as the "*Accardi Doctrine*" since it was announced in U.S. Ex-rel. *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S. Ct. 499, 98 L.Ed.681 (1954). There the Supreme Court vacated a deportation order of the Board of Immigrations of Appeal because the Board and the Attorney General failed to follow its own rules and regulations. This doctrine has been broadly applied. See *Service v. Dulles*, 354 U.S. 367, 77 S. Ct. 1152, 1L.ED.2d 1402 (1959) and *United States v. Heffner*, 420 F,2, D809 (4th Cir. 1970). There the Internal Revenue Service's Special Agents failed to follow their own procedures regarding the

interrogation of taxpayers suspected of criminal fraud. The Supreme Court enunciated what appeared to be the prevailing rule when it held:

> "An agency of the government must scrupulously observe rules and regulations or procedures which it established. When it fails to do so, it's actions cannot stand, and the Courts will strike it down." I.d, at S11.40 Md. App. 329, 391 A.2d 1213, 1216-17 (Footnote omitted).

The same rule applies to all administrative agencies and/or Maryland businesses, including entities, like armed security guards with badges and certifications, who are governed by administrative agencies and the Maryland State Police Certification. Under Maryland's Code of Regulations, Title 29. Maryland State Police, Subtitle 04: Licensing and Permits, Chapter 29.04.01. Security Guard Agency Licensing and Security Guard Certifications, under Chapter 29.04.01.07 (viii):   Agency, licensee, or certified individual knowingly providing false information, statements, or documentation to the Secretary during an investigation, application, or routine correspondence is prohibited. When an armed individual with a badge is suspended or terminated the employer must, within ten days, turn in their badges to the Maryland State Police with a written explanation as to the reasons for this action. This reasoning must not be false and or in violation of the law.

**Legal Personal Responsibility:**

In order for an employee to be held personally liable for a tort allegedly committed by the corporation, Plaintiff must demonstrate that the employee "specifically directed the particular act(s) to be done or participated or cooperated herein." *Shipley v. Perlberg*, 140 Md. App. 257, 266, 780 A.2d 396 (2001). "An officer or director is not liable for the torts of which the officer had no knowledge or to which the officer had not consented." Id. At 266. In Shipley, Plaintiff sued Perlberg, an officer of the corporation which owned the property where Shipley was allegedly injured as a result of lead paint poisoning. There, the Court declined to hold Perlberg personally liable because "Plaintiff failed to submit 'any' evidence that would be admissible that would reflect the fact that Perlberg did participate in the actions alleged in the Complaint." Id. At 263.

Similarly, in *Fletcher v. Havre De Grace Fireworks Company*, 229 Md. 196, 177 A.2d 908 (1962), The Court Dismissed the Plaintiff's complaint where the court found that the allegations made by Plaintiff against the individual directors were too general to permit a finding of personal

liability. Id. At 201. The Plaintiff's theory against the individual directors was that they were liable because they controlled the conduct of the business. The lower court sustained demurrers by the individual officers on the grounds that the Plaintiff's allegations were 'too general to charge [the director] with liability'. *Shipley* at 267. In this case before the court, the Defendant, COO Robertson was provided with documented notification of the continuing events and allowed time for its investigation and resolution. The present Plaintiff's complaint against all Defendant(s) stands on a foundation based on their direct and personal involvement and participation with the incidents herein described. All listed GardaWorld Defendants, acting in concert and each with direct involvement are legally responsible for the torts herein listed.

Defendant(s) did abuse the protection afforded them by the Maryland "at the will" laws when they terminated the Plaintiff's employment for participating in protected activities, with the elements of retaliation being introduced in this matter when the termination, partly, was based on Plaintiff attempting to assert his rights to work in a safe and healthy workplace. The deliberate and wrongful actions on the part of the Defendant(s) have caused and continue to cause named Plaintiff substantial losses in earnings and employment benefits, pain, suffering, emotional distress, loss of dignity, humiliation, and damages to his reputation and livelihood.

**Wherefore,** Plaintiff moves the Court for a judgment to be entered in favor of the Plaintiff against Defendant(s) and ORDER an award of monetary relief, in the form of compensatory and punitive relief to redress the injured Plaintiff, in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00), as a matter of law. Additionally, this judgment should include immediate employment reinstatement with retroactive back-pay and full benefits and the removal of all termination related information from Plaintiff's employment records; and, any other relief that the Courts deem necessary, including scheduling this matter for a Jury Trial.

Date: November _16_TH_, 2020

Charles H. Carter, *Pro Se*
1500 Lochwood Road
Baltimore, Maryland 21218
(443) 760-2225
Ccharlescarterb@aol.com

**DEMAND FOR JURY TRIAL**
Plaintiff demands that this case be tried by a JURY.

31

DELIBERTLY AND DECEPTIVE WRONGFUL TERMINATION

10/14/20, WENT TO Hospital Found my INSURANCE CANCELLED
Sept. 30. Had To pay out-of-pocket.
HAD INSURANCE For SINCE MAY 2019,

UI, Filed 9/29/20 8:14AM

E-1.

Note: Date of prior counseling left blank as *all* previous charges deemed unfounded.
No times of event, no witnesses or complainant and no report of any lost property, just bald assertions.

## GARDAWORLD                    CORRECTIVE ACTION FORM

Today's Date: 9/25/20

Employee Name: Charles Carter          Branch Location: Delaware-Valley      Account Name: CareFirst

Date of Policy Violation or Incident: 9/21/20          Reason for Notice: Termination

Dates of Prior Counseling or Corrective Action: 

**Situation Statement:** *Describe the incident, event, or situation; use dates, times, names, and facts. If policy violation, reference specific policy violation.*

Ofc.Charles Carter's employment is being terminated due to Violating Company Policy. On 9/21/20, Ofc. Carter retrieved a cell phone from a locked security desk drawer at 715-B post. Ofc. Carter plugged the phone up and began to charge it using his own personal charger; with full knowledge that the cell phone did not belong to him. Once the phone was charged, Ofc. Carter made multiple attempts to unlock the phone. After 2 1/2 hours of numerous attempts, Ofc. Carter was finally successful in gaining access into the cell phone; at which time he went through the phone viewing it's contents. Ofc. Carter should not have tampered with the found property. Policy states that when property is found; then a lost and found form must be completed/submitted and a supervisor notified.

**Actions to be taken:** *Examples include items such as appropriate standards, training, time frames, additional assistance that will be provided, expectations of behavior, consequences for further violations, or failure to perform up to standards, etc.*

Termination.

**Employee Remarks:** *Use additional sheet if more space is needed.*

SEE 8 PAGE RESPONSE.

**Acknowledgement:** *I have read and understand this notice and have been given the opportunity to make appropriate remarks. I further understand that improvement must be immediate and sustained. Failure to take immediate corrective action may result in further corrective action, up to and including termination.*

| CHARLES CARTER | CHARLES CARTER | 9/25/20 |
|---|---|---|
| Employee Printed Name | Employee Signed Name | Date |
| Col. Steve MARTIN | Col. Steve Martin | 9/25/20 |
| Manager Printed Name | Manager Signed Name | Date |
| Lamont Green | Green | 9-25-20 |
| Witness Printed Name | Witness Signed Name | Date |

1

E.2

This is a response to complaint. Read Continuing Hostile Working Environment first, the coaching agreement.

Respectfully,

**Charles H. Carter**
**Security Officer**
**GardaWorld Security**
**Email: Charles.Carter@carefirst.com**
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



F-3

September 25, 2020

While at work, I was involved with communications about the mentality of some of the officers here. I presented an excerpt of a true and accurate representation of a recent communication I was involved in. During this telephonic communication the young lady, stopped in the middle of her statement and said:

"Have you ever been involved with a young lady my age, 25.

She then immediately said, "Oh shit yo, I think I shit myself."

I thought then and now that her words were funny and sad. Sad because of the mentality involved and funny because it was just funny. There were no names involved with my repeating this excerpt and no photographs shown, as some (four) had been sent to me via the telephone. Meaning, I showed no photographs and mentioned no names attached to this excerpt.

Two days later, Corporal Burrell, who had been out on medical leave for several weeks and had been back to work for two days, got wind of these words and assumed I was talking about another individual. Ultimately, this non-event, with the assistance of Cpl. Burrell, was reported as a harassment allegation involving the young lady, she ASSUMED the above communication pertained to. (It was not).

To be as brief as I can, I have grown tire of certain GardaWorld supervisors' continuous attacks on me and these attacks being sanctioned by management. Numerous complaints have been formally filed to management as it pertains to, for example, Corporal Burrell and her supervisor, Lt. Marcella Young. Both have previously filed unfounded and deception charges against me totaling at least seven times. Most, except for one was deemed unfounded.

Once Cpl. Burrell charged me with leaving my post six minutes early, when policy dictates, in writing, that what I did and how I handled the event was proper. The way she wrote up these charges were terminatable offenses. She knowingly was attempting to get me terminated.

Cpl. Burrell is given a ride to work, most days, in the company vehicle and still arrives late. In spite, she still signs in as being on time. Most recently, September 22, 2020. She arrived at OM1 at 1210 hours, mobile picked her up and transported her to her post, she arrived at 1220 hours. Burrell later signed in, on her time sheet as working 1200 to 2000 hours.



E-4

Burrell's supervisor, Lieutenant Johnson, has no control over her actions as it appears the chain of command does not apply to Burrell. He has written her up, several times, and the charges administratively disappear.

Another recent example: In July 2020, I took a medical day because crashed into my granddaughter's bicycle with my bike and hurt myself. In a timely manner, I called GardaWorld's Command Center at CareFirst and advised I would not be in because of this injury. (I rarely ever take off but every time in the past that I have, I have been charged by either Cpl. Burrell or Lt. Young.[1])

Lieutenant Young subsequently sent me email messages that argued, in writing, I, meaning me, told the command center *I was sick but now I'm saying I was injured*. Then Lt. Young generates charging papers that advised *I called the command and told them I wasn't coming in because of personal reasons*. This is a clear-cut documented lie and done to validate her allegations. She knew that if these days were deemed medical day that I should have been paid.

I voiced a complaint in writing to Donna Kile, Project Manager, who advised *I wasn't charged because I was injured or sick or because I called out, I was charged because I caused them to have to pay overtime*. I additionally advised Kile that every time, in the last years that I called out on medical, which I rarely ever do, I was administratively charged by one of the above mentioned two supervisors. I have never gotten paid for using legally provided medical days. Lastly, instead of my being administratively charged for using these days I should have been paid.

Ultimately, Donna Kile went into the payroll system and paid me for one of the medical days in which I was administratively charged, the first time I was paid for one of medical days in well over one year and still penalized me for its usage, and she still left the administrative charges on my records or in my personnel folder. (1) these two supervisors are right no matter how wrong they are, (2) the rules don't apply to them, and (3) their actions have been and continue to be sanctioned by management. (See Attached Email Transcript/ Coaching Agreement).

Respectfully,

Charles H. Carter

---

[1] Noting that all the times I was administratively charged by Cpl. Burrell It was Lt. Marcella Young who approved the charges.

E.5.

Here, Lt. Young charged me for using medical days the Project Manager, Donna Kile, paid me for and Kile, in writing, supported her actions. It was also found that this unlawful charge/penalty was to be used as the foundation for the wrongful termination.

During my weekend off, while at lake, my granddaughter and I collided with our bicycles. She laughed and I incurred a swollen knee that became exceptionally painful to walk on.

Soaking and non-usage of the knee became a relief process that was successful.
Fortunately/unfortunately this is not the first time I fell off my bicycle and knew what to do. I have fully recovered from this minor injury.

Respectfully,

**Charles H. Carter**
**Security Officer**
**Gardaworld Security**
Email: Charles.Carter@carefirst.com
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



**From:** Carter, Charles
**Sent:** Monday, July 27, 2020 7:56 AM

E·6

**To:** Young, Marcella <Marcella.Young@carefirst.com>; Crosby, Madison
<Madison.Crosby@carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James
<James.MingleJr@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>
**Subject:** Sick and Safe Leave Policy

Good Morning,

On Friday, July 17, 2020, I was relieved at 1356 hours. I logged off the computer and went to take off my uniform top. Minutes later I returned, and my relief was having problems logging on to the computer. I thought that I may have locked the computer instead of logging off, so I asked him to let me check. As soon as I went behind the desk to try to address the problem the telephone rang. It was Cpl. Burrell, who immediately advised me that I could not be behind the counter without a uniform on. I immediately left the area, scanned out (1401 hours exactly) and left the building. This problem with the computer may have been the start of the Milestone problem they had all that weekend.

On the next Friday, July 24, 2020, I was relieved at approximately 1356 hours. I logged off the computer and went to take off my uniform top. Minutes later I returned (1359 hours), and my relief advised that Cpl. Burrell was on the telephone and wanted to know where I was. I got on the telephone and was immediately interrogated by Cpl. Burrell about not bring in a doctor's slip for my recent leave. Knowing that Cpl. Burrell had been on post since about 1200 hours and had received the email that was sent via the chain of command, including to her, on 7/22/20 at 0747 hours and that the email clearly advised I had no doctor's slip (below):

> *Lt. Young,*
> *Yesterday, July 21, 2020 at 0639 hours, I received a telephone call from Sgt. Crosby to find out if I was coming to work. I advised him that I had contacted the Command Center on July 20th at about six thirty or seven o'clock in the evening. The Command Center was told of my status and why I would not be in on the 21st., for my tour of duty. Sgt. Crosby then advised that the information from the Command Center had not been passed on to him, so he did not know about the issue. Why the information was not properly passed on is unknown to me. If there was a miscommunication about 'illness' and/or 'injury' by the time the word got to you, again, I can't explain. The fact remains that I fell off a bicycle, injured my knee and did not go to seek any medical attention. Therefore, I cannot produce any medical slip, doctor slip or hospital verification, as none exist.*
> *Respectfully,*

Why would she, Cpl. Burrell, be calling me and interrogating me about this issue exactly one minute before my tour of duty ends? She had already been on post for hours. I believed that she was just using the doctor slip as an excuse but was calling to see if I had left a minute or two early so that I could be penalized. Still, since it is apparent that Lt. Young, who had just recently penalized me for taking medical leave, in the form of a Corrective Action Form (6/3/20) and Cpl. Burrell have a fixed position about the doctor slip issues. And, Cpl. Burrell appears to be postured to again penalize this writer for the same non-offense, for clarity sake, I need to know the exact policy.

E.7

Hello Officer Carter,

Please understand that the reason you called out is not the issue, whether personal issues, an injured knee or anything else. You called out for two shifts and this caused a need for coverage and overtime being accrued. The policy that is enforced at this account has never changed. If you call out and are not able to produce a doctor's note, you will receive a disciplinary notice. We did include both shifts on one warning notice but you did miss two shifts and I felt only one warning notice was necessary.

You continue to think that anytime you are subject to disciplinary action whether a coaching agreement, a disciplinary notice or anything else that is clearly noted in the handbook that someone is treating you in a personal matter. Officer Carter, you are treated no differently than anyone else, nor will you ever be. The fact remains you called out for two shifts, and had no documentation that is considered an excused absence. If your knee was injured enough to call out for two shifts, the expectation is that you would have needed to seek medical attention. It is highly offensive in your statement *"It is apparent that, for the purposes of charging me with something, management deliberately utilized false information."*

The warning notice remains and will be sent to the corporate office. Yes, there was confusion and the information that you called out was not given to the supervisor on duty, but the information was passed onto the Account Manager and Project Manager in the form of an email. Due to it being very early hours both were sleeping and did not see the email to make sure the on duty supervisor was aware. That issue was immediately addressed. You were not written up for not calling out or making appropriate contact, you were written up for calling out for two shifts without proper documentation, which is a fact and not a false accusation.

If you would like to further discuss this, you can contact myself and/or Account Manager, Steve Martin.

Thank you,
**Donna M. Kile**
CareFirst Project Manager
**GardaWorld**
10455 Mill Run Circle | Owings Mills, MD 21117
W: 410-998-5384 | C: 443-220-6826 | Donna.Kile@CareFirst.com
www.garda.com



**From:** Carter, Charles <Charles.Carter@carefirst.com>
**Sent:** Monday, July 27, 2020 10:41 AM
**To:** Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>

*E·8*

**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>
**Subject:** RE: Sick and Safe Leave Policy

On July 27, 2020, at 1010 hours, shortly after management was sent the below email in reference to sick and safe leave., Lt. Young responded to my location and served this officer with another Corrective Action Form, which advises: *On Sunday 7/19/20 at 6:40p Ofc. Charles Carter called the Command Center and informed the officer on **duty that he would not be in for personal reasons** on Monday 7-20-20 and Tuesday 7-21-20. Officer Carter did not bring a doctors note for either of the days that he went absent.*

Below is a **transcript** of some of the issues that transpired during this event.  It is apparent that, for the purposes of charging me with something, management deliberately utilized false information. For example, below is a transcript of email communications between management and I. Management's position was that I told the Command Center officer that I was ill instead of injured, as I fell off a bike. In this present charging document management writes that I told them I would not be in **for personal reasons**, which is totally different from an injury. (Knowingly false).
(Note: Copy of Corrective Action Form below.)

**Transcript:**

Lt. Young,

Yesterday, July 21, 2020 at 0639 hours, I received a telephone call from Sgt. Crosby to find out if I was coming to work. I advised him that I had contacted the Command Center on July 20th at about six thirty or seven o'clock in the evening. The Command Center was told of my status and why I would not be in on the 21st., for my tour of duty. Sgt. Crosby then advised that the information from the Command Center had not been passed on to him, so he did not know about the issue.  Why the information was not properly passed on is unknown to me. If there was a miscommunication about 'illness' and/or 'injury' by the time the word got to you,  again, I can't explain. The fact remains that I fell off a bicycle, injured my knee and did not go to seek any medical attention. Therefore, I can not produce any medical slip, doctor slip or hospital verification, as none exist.

Respectfully,

**From:** Young, Marcella <Marcella.Young@Carefirst.com>
**Sent:** Wednesday, July 22, 2020 7:10 AM
**To:** Carter, Charles <Charles.Carter@carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>
**Subject:** RE: Absence Reasoning

I understand what saying but was informed that you were ill a doctors note is needed for your absence.

**From:** Carter, Charles <Charles.Carter@carefirst.com>
**Sent:** Wednesday, July 22, 2020 6:03 AM
**To:** Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>
**Subject:** Absence Reasoning

E·9

My understanding of the policy, based on Mrs. Kile's recent email (July 6, 2020), which advises that *EVERYONE is eligible to accrue 5 sick days every year*. And if this policy is based on the Maryland Healthy Working Families Act/ Maryland Earned Sick and Safe Leave policy, which advises:

*Earned sick and safe leave begins to accrue on February 11, 2018, or the date on which an employee begins employment with the employer, whichever is later.*
*An employee accrues earned sick and safe leave at a rate of at least one hour for every 30 hours the employee works; however,*
*an employee is not entitled to earn more than 40 hours of earned sick and safe leave in a year or accrue more than 64 hours of earned sick and safe leave at any time.* (See Attachment)

MAY 7, 2019 due.
I have been employed here since ~~March 7, 2020~~, on a full time basis, when Cpl. Burrell penalized me on 2/19/20 for not having a doctor's slip and the subsequent times I have been penalized for this type event, which includes Lt. Young's recent filings (6/3/20), when she prepared the Corrective Action Form, on her day off, as she had called in medical. Question: did I or had I accrued any sick or safe leave from March 2019 to the date of Lt. Youngs last actions against me (6/3/20)?

Again, to date, I have *never received any sick or safe leave days*, as they have always been superseded by Corrective Action Forms or some form of penalties.
Additionally, based on my belief on this policy, if I am correct, I have a plethora of comparison cases, which include but not limited to Lt. Young and Cpl. Burrell, who have been granted the privilege of using the benefits associated with this policy.

Respectfully,
**Charles H. Carter**
**Security Officer**
**Gardaworld Security**
**Email: Charles.Carter@carefirst.com**
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



E·10

To: GardaWorld Human Resources                    September 25, 2020

From: Charles H. Carter #188645
          1500 Lochwood Road
          Baltimore, Maryland 21218

                              RE: Continuing Hostile Working Environment/
                              Termination

To Whom It May Concern:

On September 25th, 2020 at 1210 hours, I was wrongly, unjustly and deceptively terminated. The reasoning given, in writing, was mishandling lost property. *See Attachment 1.* The termination document says, I found some lost property in a locked desk draw and gained access.

The truth is as follows: During the start of my Monday morning shift (0600 hours), I unlocked and opened my post locked draw. I observed my co-workers telephone in this locked draw. Still, I immediately opened the phone, utilizing the ''Emergency Feature''[1] Seeing that it needed charging I placed it on the charger and left it there until its owner, my relief (Officer Angela Al-Marteen) arrived at work.[2] When she did arrive to relieve me (1400 Hours), she advised that she thought she had lost it and had ordered another. She unplugged the telephone and took it in her possession. Noting: That the last time I was at this location was on Friday, September 18, 2020, when she relieved me. I left there to work overtime at Red Run 802 from 0300 to 2000 hours.

The termination notice advises that they observed me unlock, open and retrieve the telephone from the security desk draw. They conveniently placed no times on this event and/or who did the observing.  They had the ability to view the cameras to see how it got there, but didn't.  They have in the past viewed cameras to validate incidents or events. The telephone was never lost, if it's in a secured locked draw. They have the ability to see exactly when and if I entered that particular building during the course of the weekend, which I did not work and/or re-enter the building. The last time I entered any CareFirst building was on the 18th of September at 1500 hours and exited at 2000 hours, when I completed my tour of duty at RR802. There are various negligent actions that occurred during this incident that has left me wrongfully terminated, embarrassed and humiliated.

Unfortunately, there have been so many unlawful attacks on me in this workplace that I have become used to their attacks. I actually expected for them to confront me with a bogus harassment complaint, as Corporal S. Burrell, had returned to work after being out ill and she accompanied Officer A. Marteen, my relief, to the command center with a complaint.  This is the reasoning that I had prepared a response to the believed to be coming bogus harassment complaint. Same was attached to the Termination Notice, with the writings *"See 8 Page Response"* written on the front of the termination notice, before copies were made.

---

[1] This allows anyone to see emergency Information so as to contact owner.
[2] I know her telephone. I see it at work every day.

1

E. 11

Lastly, I had previously filed, via GardaWorld's Human Resources several Hostile Working Environment Complaints on the subjects involved in this event. All original documents were given to Colonel Steve Martin and Lieutenant Lamont Green.

Respectfully,

Charles H. Carter

2

E.12

SOME OF THE PRESENT HUMAN RESOURCES SUBMISSIONS, UNDER NEW REPORT #
628371930801

E. 13

To: GardaWorld Human Resources                               September 25, 2020

From: Charles H. Carter #188645
      1500 Lochwood Road
      Baltimore, Maryland 21218

                                        RE: Continuing Hostile Working Environment/
                                            Termination

To Whom It May Concern:

   On September 25th, 2020 at 1210 hours, I was wrongly, unjustly and deceptively terminated.
The reasoning given, in writing, was mishandling lost property.  *See Attachment 1.*
The termination document says, I found some lost property in a locked desk draw and gained
access.

   The truth is as follows: During the start of my Monday morning shift (0600 hours), I
unlocked and opened my post locked draw. I observed my co-workers telephone in this locked
draw. Still, I immediately opened the phone, utilizing the ''Emergency Feature''[1] Seeing that it
needed charging I placed it on the charger and left it there until its owner, my relief (Officer
Angela Al-Marteen) arrived at work.[2] When she did arrive to relieve me (1400 Hours), she
advised that she thought she had lost it and had ordered another. She unplugged the telephone
and took it in her possession. Noting: That the last time I was at this location was on Friday,
September 18, 2020, when she relieved me. I left there to work overtime at Red Run 802 from
0300 to 2000 hours.

   The termination notice advises that they observed me unlock, open and retrieve the
telephone from the security desk draw. They conveniently placed no times on this event and/or
who did the observing.  They had the ability to view the cameras to see how it got there, but
didn't.  They have in the past viewed cameras to validate incidents or events. The telephone was
never lost, if it's in a secured locked draw. They have the ability to see exactly when and if I
entered that particular building during the course of the weekend, which I did not work and/or re-
enter the building. The last time I entered any CareFirst building was on the 18th of September at
1500 hours and exited at 2000 hours, when I completed my tour of duty at RR802. There are
various negligent actions that occurred during this incident that has left me wrongfully
terminated, embarrassed and humiliated.

   Unfortunately, there have been so many unlawful attacks on me in this workplace that I
have become used to their attacks. I actually expected for them to confront me with a bogus
harassment complaint, as Corporal S. Burrell, had returned to work after being out ill and she
accompanied Officer A. Marteen, my relief, to the command center with a complaint.  This is
the reasoning that I had prepared a response to the believed to be coming bogus harassment
complaint. Same was attached to the Termination Notice, with the writings *"See 8 Page
Response"* written on the front of the termination notice, before copies were made.

---

[1] This allows anyone to see emergency information so as to contact owner.
[2] I know her telephone. I see it at work every day.

1

E. 14

Lastly, I had previously filed, via GardaWorld's Human Resources several Hostile Working Environment Complaints on the subjects involved in this event. All original documents were given to Colonel Steve Martin and Lieutenant Lamont Green.

Respectfully,

Charles H. Carter

2

E. 15

# GARDAWORLD

## CORRECTIVE ACTION FORM

**Today's Date:** 9/25/20

**Employee Name:** Charles Carter    **Branch Location:** Delaware-Valley    **Account Name:** CareFirst

**Date of Policy Violation or Incident:** 9/21/20    **Reason for Notice:** Termination

**Dates of Prior Counseling or Corrective Action:**

**Situation Statement:** *Describe the incident, event, or situation; use dates, times, names, and facts. If policy violation, reference specific policy violation.*

Ofc.Charles Carter's employment is being terminated due to Violating Company Policy. On 9/21/20, Ofc. Carter retrieved a cell phone from a locked security desk drawer at 715-B post. Ofc. Carter plugged the phone up and began to charge it using his own personal charger; with full knowledge that the cell phone did not belong to him. Once the phone was charged, Ofc. Carter made multiple attempts to unlock the phone. After 2 1/2 hours of numerous attempts, Ofc. Carter was finally successful in gaining access into the cell phone; at which time he went through the phone viewing it's contents. Ofc. Carter should not have tampered with the found property. Policy states that when property is found; then a lost and found form must be completed/submitted and a supervisor notified.

**Actions to be taken:** *Examples include items such as appropriate standards, training, time frames, additional assistance that will be provided, expectations of behavior, consequences for further violations, or failure to perform up to standards, etc.*

Termination.

**Employee Remarks:** *Use additional sheet if more space is needed.*

SEE 8 PAGE RESPONSE.

**Acknowledgement:** *I have read and understand this notice and have been given the opportunity to make appropriate remarks. I further understand that improvement must be immediate and sustained. Failure to take immediate corrective action may result in further corrective action, up to and including termination.*

| | | |
|---|---|---|
| _Charles Carter_ | _Charles Carter_ | 9/25/20 |
| Employee Printed Name | Employee Signed Name | Date |
| _Cpl. Steve Martin_ | _Cpl. Stew Martin_ | 9/25/20 |
| Manager Printed Name | Manager Signed Name | Date |
| _Lamont Green_ | _[signature]_ | 9-25-20 |
| Witness Printed Name | Witness Signed Name | Date |

E·16

Updated: August 2019

This is a response to complaint. Read Continuing Hostile Working Environment first, the coaching agreement.

Respectfully,

**Charles H. Carter**
**Security Officer**
**GardaWorld Security**
**Email: Charles.Carter@carefirst.com**
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



2

E.17

September 25, 2020

While at work, I was involved with communications about the mentality of some of the officers here. I presented an excerpt of a true and accurate representation of a recent communication I was involved in. During this telephonic communication the young lady, stopped in the middle of her statement and said:

"Have you ever been involved with a young lady my age, 25.

She then immediately said, "Oh shit yo, I think I shit myself."

I thought then and now that her words were funny and sad. Sad because of the mentality involved and funny because it was just funny. There were no names involved with my repeating this excerpt and no photographs shown, as some (four) had been sent to me via the telephone. Meaning, I showed no photographs and mentioned no names attached to this excerpt.

Two days later, Corporal Burrell, who had been out on medical leave for several weeks and had been back to work for two days, got wind of these words and assumed I was talking about another individual. Ultimately, this non-event, with the assistance of Cpl. Burrell, was reported as a harassment allegation involving the young lady, she ASSUMED the above communication pertained to. (It was not).

To be as brief as I can, I have grown tire of certain GardaWorld supervisors' continuous attacks on me and these attacks being sanctioned by management. Numerous complaints have been formally filed to management as it pertains to, for example, Corporal Burrell and her supervisor, Lt. Marcella Young. Both have previously filed unfounded and deception charges against me totaling at least seven times. Most, except for one was deemed unfounded.

Once Cpl. Burrell charged me with leaving my post six minutes early, when policy dictates, in writing, that what I did and how I handled the event was proper. The way she wrote up these charges were terminatable offenses. She knowingly was attempting to get me terminated.

Cpl. Burrell is given a ride to work, most days, in the company vehicle and still arrives late. In spite, she still signs in as being on time. Most recently, September 22, 2020. She arrived at OM1 at 1210 hours, mobile picked her up and transported her to her post, she arrived at 1220 hours. Burrell later signed in, on her time sheet as working 1200 to 2000 hours.



*E. 18*

Hello Officer Carter,

Please understand that the reason you called out is not the issue, whether personal issues, an injured knee or anything else. You called out for two shifts and this caused a need for coverage and overtime being accrued. The policy that is enforced at this account has never changed. If you call out and are not able to produce a doctor's note, you will receive a disciplinary notice. We did include both shifts on one warning notice but you did miss two shifts and I felt only one warning notice was necessary.

You continue to think that anytime you are subject to disciplinary action whether a coaching agreement, a disciplinary notice or anything else that is clearly noted in the handbook that someone is treating you in a personal matter. Officer Carter, you are treated no differently than anyone else, nor will you ever be. The fact remains you called out for two shifts, and had no documentation that is considered an excused absence. If your knee was injured enough to call out for two shifts, the expectation is that you would have needed to seek medical attention. It is highly offensive in your statement *"It is apparent that, for the purposes of charging me with something, management deliberately utilized false information."*

The warning notice remains and will be sent to the corporate office. Yes, there was confusion and the information that you called out was not given to the supervisor on duty, but the information was passed onto the Account Manager and Project Manager in the form of an email. Due to it being very early hours both were sleeping and did not see the email to make sure the on duty supervisor was aware. That issue was immediately addressed. You were not written up for not calling out or making appropriate contact, you were written up for calling out for two shifts without proper documentation, which is a fact and not a false accusation.

If you would like to further discuss this, you can contact myself and/or Account Manager, Steve Martin.

Thank you,
**Donna M. Kile**
CareFirst Project Manager
**GardaWorld**
10455 Mill Run Circle | Owings Mills, MD 21117
W: 410-998-5384 | C: 443-220-6826 | Donna.Kile@CareFirst.com
www.garda.com



**From:** Carter, Charles <Charles.Carter@carefirst.com>
**Sent:** Monday, July 27, 2020 10:41 AM
**To:** Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>

E.19

During my weekend off, while at lake, my granddaughter and I collided with our bicycles. She laughed and I incurred a swollen knee that became exceptionally painful to walk on.

Soaking and non-usage of the knee became a relief process that was successful.
Fortunately/unfortunately this is not the first time I fell off my bicycle and knew what to do. I have fully recovered from this minor injury.

Respectfully,

**Charles H. Carter**
**Security Officer**
**Gardaworld Security**
**Email: Charles.Carter@carefirst.com**
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



**From:** Carter, Charles
**Sent:** Monday, July 27, 2020 7:56 AM

E·20

My understanding of the policy, based on Mrs. Kile's recent email (July 6, 2020), which advises that *EVERYONE is eligible to accrue 5 sick days every year*. And if this policy is based on the Maryland Healthy Working Families Act/ Maryland Earned Sick and Safe Leave policy, which advises:

*Earned sick and safe leave begins to accrue on February 11, 2018, or the date on which an employee begins employment with the employer, whichever is later.*
*An employee accrues earned sick and safe leave at a rate of at least one hour for every 30 hours the employee works; however,*
*an employee is not entitled to earn more than 40 hours of earned sick and safe leave in a year or accrue more than 64 hours of earned sick and safe leave at any time.* (See Attachment)

I have been employed here since March 7, 2020, on a full time basis, when Cpl. Burrell penalized me on  2/19/20 for not having a doctor's slip and the subsequent times I have been penalized for this type event, which includes Lt. Young's recent filings (6/3/20), when she prepared the Corrective Action Form, on her day off, as she had called in medical. Question: did I or had I accrued any sick or safe leave from March 2019 to the date of Lt. Youngs last actions against me (6/3/20)?

Again, to date, I have *never received any sick or safe leave days*, as they have always been superseded by Corrective Action Forms or some form of penalties.
Additionally, based on my belief on this policy, if I am correct, I have a plethora of comparison cases, which include but not limited to Lt. Young and Cpl. Burrell, who have been granted the privilege of using the benefits associated with this policy.

Respectfully,
**Charles H. Carter**
**Security Officer**
**Gardaworld Security**
**Email: Charles.Carter@carefirst.com**
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



E. 21

To: GardaWorld Human Resources                    September 26, 2020

From: Charles H. Carter #188645
1500 Lochwood Road
Baltimore, Maryland 21218

RE: Continuing Hostile Working Environment/
Termination
HR's Report # 628371930801

Good Morning,

In reference to the above listed wrongful termination and my previously submitted documents to GardaWorld's entities, they were written while in a rush and I neglected to mention several factors. I do so now:

During the termination process, in front of Colonel Steven Martin and Lieutenant Lamont Green, I asked the Colonel, who wrote up the charges? He advised that he couldn't tell me that.[1] When asked, who made the observations, he advised Human Resources was watching the cameras. (I offer my apologies to HR for making them get up at 0530-something in the morning to watch an incident that they didn't know was going to happen.) The charging document (Coaching Agreement), advises that, "*after 2 ½ hours of numerous attempts, Ofc. Carter was finally successful in gaining access into the cell phone: at which time he went through the phone viewing its contents*". (Access was never gained to the cellular telephone, only the *Emergency Feature*, which shows the owners contact information.)[2] And, this process did not last for 2 ½ hours, it was more like 15 minutes, total, in intervals.

If a security guard finds some lost property, is he or she allowed to investigate the item which was found? If a security guard finds his or her co-workers property what rule prevents him or her from holding and giving same back to that co-worker? The issue of confirmation of ownership was no longer a question after reviewing "Emergency Feature" on telephone. Any question surrounding this event can certainly be answered by viewing the video play-back feature on the cameras, as well as property return to owner when she arrived to start her tour of duty. When asked about where is the telephone now, the Colonel's response was he did know.

On Monday, September 21, 2020 at approximately 1345 hours, the day of this deceptively pseudo-investigation, when my co-worker arrived for her tour of duty, the telephone that had

---

[1] On September 22, 2020, at approximately 1430 hours, Corporal Burrell, on her first day back from several weeks of medical leave, left her post and responded to RR715B to meet with the owner of the telephone, noting that the owner of the telephone had the property in her possession. Together they responded to GardaWorld's Command Center. These charges were drafted by Corporal Burrell, as I have received enough of her writings and I am familiar with her standard utilized phrases. Corporal Burrell wrote up these charges.

[2] This 'Emergency Feature' is designed to allow anyone, without a code, to access the telephone and review contact information.

1

E·22

been lying on the desk all day, charging, was given to its owner. This can also be seen on security cameras. To reiterate, at home, on my desk I still have and use a typewriter. I am old school, when it comes to a lot of this modern technology. I still call my children to assist me with the features on my own cellular telephone. I do not have the ability or desire to unlock someone's telephone. Again, the cameras video review will show that.

Think about the deception used in this incident. The guard was transported to GardaWorld's Command Center on the 22nd of September, a day after she was given her cellular telephone that she had to have dropped in the desk draw; Corporal Burrell conducting her pseudo-investigation with deceptive and non-factual statements, in violation of GardaWorld's policy and the Colonel and lieutenant sitting at the table with me, four days after the so-called event, serving me termination notice for misuse of lost property, that they know was not lost property. During this pseudo-investigation they made no inquiries. How did they know the cellular telephone in the draw wasn't mine or my new phone? Why did they allow me 2 ½ hours to sit on post using a telephone? Why I was not charged with theft? The mentality of some of the people at this place of employment rises to the level of slow or low."

This incident, this pseudo-investigation and the subsequent termination action was misconducted and designed to knowingly and deceptively meet one's desired improper goal, in total conflict with GardaWorld's policy. It is for this reason that I respectfully request, (1) that your organization PRESERVE all recorded evidence, as it pertains to this event and, (2) after a proper investigation, that all involved GardaWorld entities, if found liable, be properly and fairly sanctioned for their knowingly, deliberate and voluntary involvement in this improper action(s).

Respectfully;

Charles H. Carter

CC: Marco Miranda
    Donna Kile

2

E. 23

Mail body: Fwd: Wrongful Termination

Sent from my iPhone

Begin forwarded message:

**From:** Charles Carter <ccharlescarterb@aol.com>
**Date:** September 28, 2020 at 1:40:49 AM EDT
**To:** "marco.miranda@carefirst.com" <marco.miranda@carefirst.com>, "ccharlescarterb@icloud.com"
<ccharlescarterb@icloud.com>
**Subject: Wrongful Termination**
**Reply-To:** Charles Carter <ccharlescarterb@aol.com>

    I am aware that I advised that the last communication to you in reference to my wrongful termination was given on the 27th of September 2020, but here and now at 0020 hours in the morning some exceptionally important information was just realized. I have been charged by Lieutenant Young and Corporal Burrell at least six or seven times. Most, with the exception of one, had been removed from my personnel record as they were ultimately deemed UNFOUNDED. The one that was not deem UNFOUNDED is the late July 2020 administrative charge, which is in violation of the Maryland Health Working Family Act/ Maryland Earned Sick Leave Policy.  This law basically advises that you can't penalize someone for using this medical leave. (*The nature of this unfounded and in violation of the law administrative charge was attached in my eight page response to my Termination Notice*).

    Briefly, I injured my knee and called out on medical. Lieutenant Young, in an email, argued with me about *my calling in saying I was sick but now I have changed my words to I was injured*. (*The above listed law advises that it applies to sick or injured*). Still, Lt. Young must have been advised that I took this medical on a date that she was not at work, on medical leave, because the date of the administrative charges was dated, 7/19/20, and reflects: FINAL FORMAL WARNING. This administrative charging document also reflects: Date of Prior Counseling or Corrective Action: 2/5/20 (i.e., deception). This charging document was served on me on 7/27/20, eight days after the alleged incident. She then, in this charging document writes,  *Carter called in and advised that he would not be in for personal reasons* (i.e., *a know deception*).  I submitted written concerns about this charging to Project Manager, Donna Kile. She advised, in writing, that *I wasn't being charged for using the medical; I was charged for causing them to have to pay someone overtime for the time I missed and the charges would remain*. I advised, in writing, that I have been employed at GardaWorld for well over one and a half years and every time, which there was not many, I took medical, I was charged by Burrell or Young, never paid for that time. As of two weeks ago, the only charge that was listed on my record was this charge. A subsequent check of my pay document revealed Kile did subsequently, without my knowledge, pay me for the medical day used but the administrative charge remained.

    The long-winded gist of this communication is, this July administrative charging document was being used and is being used to be the foundation of this wrongful termination, as it has been deemed, with no legal or policy basis, as a Final Formal Warning, so the next alleged violation, after that, theoretically, could rise to the level of termination. **All of the above listed information was included as an eight page attachment to the Termination Notice.**

E·24

Mail body: Fwd: Medical payment verification

Sent from my iPhone

Begin forwarded message:

**From:** Charles Carter <ccharlescarterb@aol.com>
**Date:** September 28, 2020 at 5:46:07 AM EDT
**To:** "marco.miranda@carefirst.com" <marco.miranda@carefirst.com>, "ccharlescarterb@icloud.com"
<ccharlescarterb@icloud.com>
**Subject: Fwd:  Medical payment verification**
**Reply-To:** Charles Carter <ccharlescarterb@aol.com>

ٻ

Sir,

Medical verification for July 20 and 21st, 2020. This is the first time I was paid medical since May 7, 2019, when I became employed at GardaWorld. Every time I took medical I was administrative charged.. Lt. Young made reference to a last corrective action issued to me and that was 2/5/20. (i.e., Date of Prior Counseling or Corrective Action: 2/5/20). In this matter Corporal Burrell administratively charged me with Failing to obtain permission to leave work during work hours. She alleges she saw me leave at 1824 hours instead of 1830 hours, while working overtime. Also, on February 5, 2020, Officer Carter was spotted at 1536 hours by Cpl. Burrell watching something on his phone as she scanned the cameras. What was on my telephone was a still picture, my screen saver, as my telephone sat charging. A review of the cameras revealed that no policies were violated in both charges and the charges were dismissed and allegedly removed from my file. The Colonel assured me that there was nothing else in  my file. There are no valid prior counseling or corrective actions in my folder and there shouldn't be.

Attached is my schedule for the month of July 2020, excerpts from my GardaWorld ehub payroll statement, which reflects that I was paid 16 hours for the two days (20 and 21st of July), then administratively charged for using those days. In Lt. Young's administrative charging document, which she dates 7/19/20, a non-work date, she writes, on Sunday, the19th of July 2020, Carter Called and said he be out for personal reasons but did not bring in a doctor's slip. On the 20th of July she did not respond to work, she called out medical. What would I need a medical slip for if the call in was allegedly for person reasons?  Why would I be paid for medical time if the days were used for personal reasons? Why am I again, in violation of policy and law, being penalized for usage of those medical days.

I sincerely apologize for the recent emails but the information must be known.

Respectfully,

——Original Message——
From: Charles Carter <ccharlescarterb@icloud.com>
To: Charles <ccharlescarterb@aol.com>
Sent: Mon, Sep 28, 2020 4:51 am
Subject: Fwd: Medical payment verification

Sent from my iPhone

Begin forwarded message:

**From:** Charles Carter <CCHARLESCARTERB@icloud.com>
**Date:** September 28, 2020 at 4:50:55 AM EDT
**To:** Charles <ccharlescarterb@aol.com>
**Subject: Medical payment verification**

ٻ

E·25

E.26

**GARDAWORLD**

PAYROLL
Check Number
1725327

Date
07/31/2020

Deposited to the Account of — Account Number — Amount

Charles Carter
1500 Lochwood Rd
Baltimore MD 21218-1602

NON NEGOTIABLE

[illegible]/22/2020

Whelan Security Mid Atlantic, LLC

Section - [illegible]
eStub - Electronic Paystub

| Date | Location | Pay Rate | OT Rate |
|---|---|---|---|
| 07/13/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/14/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/15/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/16/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/17/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/20/20 | CareFirst Red Run 802 - | $26.44 | |
| 07/22/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/23/20 | CareFirst Red Run 715 - | $26.44 | |
| 07/24/20 | CareFirst Red Run 715 - | $26.44 | |
| Total | | | |

| In | Out | Reg | OT | Week |
|---|---|---|---|---|
| [illegible] am | [illegible] pm | [illegible] | | |
| [illegible] am | [illegible] pm | [illegible] | | |
| [illegible] am | [illegible] pm | [illegible] | | |
| [illegible] am | [illegible] pm | [illegible] | | |
| [illegible] am | [illegible] pm | [illegible] | | |
| | | [illegible] | | [illegible] |
| [illegible] am | [illegible] pm | [illegible] | | |
| [illegible] am | [illegible] pm | [illegible] | | |
| [illegible] am | [illegible] pm | [illegible] | | |
| | | [illegible] | | [illegible] |

| Earnings Type | Taxable | Non Tax | YTD | Taxes Type | Taxes | YTD |
|---|---|---|---|---|---|---|
| Hours/Salary | 2,115.20 | | 39,358.30 | Federal W/H | 138.50 | 4,401.[illegible] |

**GARDAWORLD**

PAYROLL
Check Number
1725327
Date
07/31/2020

Deposited to the Account on          Account Number          Amount

XXXXX00163          1,045.07

Charles Carter
1500 Lochwood Rd
Baltimore MD 21218-1602

NON NEGOTIABLE

---

Current View    Month    Week    Day

This Month

| | **July 2020** | | | | | > |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| | S:57a Armed Sec CareFirst Red Ru | 6a Armed Securi CareFirst Red Ru 3p Armed Securi CareFirst Red Ru | 5:53a Armed Sec CareFirst Red Ru | 6:01a Armed Sec CareFirst Red Ru | | |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 6a Armed Securi CareFirst Red Ru | 5:56a Armed Sec CareFirst Red Ru | 5:54a Armed Sec CareFirst Red Ru | 5:54a Armed Sec CareFirst Red Ru | 5:53a Armed Sec CareFirst Red Ru | |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 5:53a Armed Sec CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | 5:53a Armed Sec CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | 5:54a Armed Sec CareFirst Red Ru | |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| | 12a Armed Secu CareFirst Red Ru | | 5:53a Armed Sec CareFirst Red Ru | 5:53a Armed Sec CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | |
| 26 | 27 | 28 | 29 | 30 | 31 | |
| | 5:55a Armed Sec CareFirst Red Ru | 5:53a Armed Sec CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | |
| | 5:56a Armed Sec CareFirst Red Ru | Armed Securi CareFirst Red Ru | 5:55a Armed Sec CareFirst Red Ru | 5:53a Armed Sec CareFirst Red Ru | 5:57a Armed Sec CareFirst Red Ru | |

E-27

**Mail body: Fwd: Termination Solution**

Sent from my iPhone

Begin forwarded message:

> **From:** Charles Carter <ccharlescarterb@aol.com>
> **Date:** September 28, 2020 at 1:44:49 AM EDT
> **To:** "scarbroughlaw@gmail.com" <scarbroughlaw@gmail.com>, "ccharlescarterb@icloud.com" <ccharlescarterb@icloud.com>
> **Subject: Fwd: Termination Solution**
> **Reply-To:** Charles Carter <ccharlescarterb@aol.com>

—Original Message—
From: Charles Carter <ccharlescarterb@aol.com>
To: marco.miranda@carefirst.com <marco.miranda@carefirst.com>; ccharlescarterb@icloud.com <ccharlescarterb@icloud.com>
Sent: Sun, Sep 27, 2020 10:21 am
Subject: Termination Solution

Good Morning Sir,

I am aware that I have bombarded you email account with the particulars of my recent wrongful termination (i.e., Friday, September 25, 2020), but the facts had to be placed before you. The first thing that any legal entity will ask, if this legal issue is placed before them is, did you attempt to resolve the issue within the organization. This is the reasoning why this present-day email and sincere wrongful termination solution is being presented to you:

As the facts in this case are crystal clear, I would respectfully, today, request the following solution for this believed-to-be insult to every investigative entity on this planet:

Immediate reinstatement with retroactive back-pay and full benefits for any time loss, listing no break in service;.
Remove of any references of this termination from my records;
Return to my original work site and shift;
Those who have involved themselves in this event be investigated and properly sanctioned, if found liable for their involvement;
and, apply other benefit you deem reasonable and legal, as a result of the deliberate and knowing injuries inflicted on this writer,        so this type action(s) will not happen again.

This is my desires and is an alternative to seeking the time-consuming legal recourse (e.g., filing for unemployment, making claims to the proper authorities, attorney's fees and wastefully consuming time). Whatever your response may be I thank you for your time.

Lastly, this, the following, is the only assumption that I have and will make as it pertains to this event. If there is some form of report made for a lost cellular telephone, it had to be made on the 22nd of September 2020 and Corporal Burrell's fingerprints are all over it and naturally sanctioned by management.

This concludes all communications in reference to this event.

Respectfully,
Charles H. Carter
Formerly, #188645.

*E.28*

PRIOR FILED COMPLAINTS OF HARASSMENT/DISCRIMINATION/HOSTILE

WORKING ENVIRONMENT

E·29

SUPPLEMENTAL TO EXISTING COMPLAINT

**Please Attach to My Existing Complaint # 587999286301**

1. **Corrective Action Form dated February 6, 2020**: Rules of Conduct (Failing to obtain permission to leave work early).

2. **Corrective Action Form dated February 6, 2020**: Failure to perform duties satisfactorily (Looking at something on telephone).

3. **Inequitable Treatment at the Workplace**: A synopsis of the recently filed administrative changes was emailed to PFC. Mingle, to forward up the chain of command. There was also this typed, hard copy, of a detailed explanation of the fraudulent charges left for this supervisor. He acknowledged receiving same. Note: attached to the email was a picture (3A) of what this writer was alleged to be looking at on his phone, as the security cameras should reflect.

4. **Email dated February 13, 2020**: This email was sent to PFC. James Mingle and was making inquiries as to what is the status of submitted above item number 3. He advised, in his response, he'd speak with me soon.

5. **Corrective Action Form dated February 19, 2020**: Administrative charges concerning medical issues. Charges that are based on another company's policy, not GaradaWorld's.

6. **Email dated February 19, 2020**: A detailed explanation of why these charges are not valid based on policy.

Blatantly inflicted individualized penalties, directed at this writer, are not new. They have been inflicted dating back to my first day of being assigned to this one man post, which is located off-site of the original neighboring site, which is across the street from where management is located.

7. **Email dated October 17, 2019**: Questioning my breaks or break resulted in the former assistant account manager, James Hamrick, to respond to my location and discus the contents of my concerns. This is when he told me about management's direction of putting together a packet and terminating me.

8. **Email dated October 11, 2019**: This email advises employees at the neighboring facilities of their break schedules. It was during the notification of this 'Break Schedule' that management stripped me, at this one man post, of his breaks.

9. **Email dated September 20, 2019**: Issues over tour of duty relief lateness and the non-concern of management.

Policies imposed on me as a result of my desires to exercise my rights that were generated during my 2020 concern filings and administrative charges:

E. 30

10.   **Email dated February 5, 2020**: This individual, the author of most of my recently received administrative charges, sends out acknowledgment of her authority.

11.   **Email dated February 13, 2020**: Notice from management re-advising of policy and what appears to be addressing my concern filing and complaints publicly.

12.   **Email dated February 13, 2020**: Management re-advising that phone are not to be used on post at anytime.

13.   **Email dated January 8, 2020**: Hindrance of the Efficiency and Effectiveness of Security at RR715.

There is a plethora of documented evidence that validates that those involved in creating a continuing course of conduct that has generated acts of discrimination, harassment, creating a hostile working environment and unfair labor practices events, all of which are named in the generated above listed documents,  knowingly and deliberately, with malice, have acted to be injurious to this writer. Numerous verification documents have not been submitted because of fax cost but they do exist, as well as continue to verify management's sanctioning of the aforementioned acts or actions.

Respectfully,

Charles H. Carter

**PLEASE ATTACH THESE ATTACHMENTS TO MY EXISTING**
**COMPLAINT/REPORT # 587999286301.**

E·31

# GARDAWORLD                    CORRECTIVE ACTION FORM

Today's Date:

Employee Name: [illegible]     Branch Location: [illegible]     Account Name: [illegible]

Date of Policy Violation or Incident: [illegible]     Reason for Notice: Formal Warning

Dates of Prior Counseling or Corrective Action: [illegible]

**Situation Statement:** *Describe the incident, event or situation, use dates, times, names, and facts. If policy violation, reference specific policy violation*

In GardaWorld handbook on page 35 under Rules of Conduct failing to obtain permission to leave work during work hours. On February 05 2020 Ofc. Charles Carter was working RR715B shift 1400-1830 and was seen on camera leaving post at 1824 before his shift was complete. Further investigation into Ofc. Charles Carter also shows that he left RR715A 1500-2100 post on January 30,2020 at 2045 then came over to RR802 at 2048 to turn in his radio and keys. On neither day Ofc. Charles Carter did not contact his supervisor, when leaving your post before your shift is over is call abandoning post. Security officers must contact the supervisor on duty if they need to leave early.

**Actions to be taken:** *Examples include items such as appropriate standards, training, time frames, additional assistance that will be provided, expectations of behavior, consequences for further violations, or failure to perform up to standards, etc.*

Any further infractions will result in a Final Formal Warning being issued.

**Employee Remarks:** *Use additional sheet if more space is needed*

Not only 1st offense.
[illegible handwriting]

**Acknowledgement:** *I have read and understand this notice and have been given the opportunity to make appropriate remarks. I further understand that improvement must be immediate and sustained. Failure to take immediate corrective action may result in further corrective action, up to and including termination.*

_____          _____          2/7/20
Employee Printed Name                Employee Signed Name                Date

_____          _____          2/7/20
Manager Printed Name                 Manager Signed Name                 Date

James Mungle                        _____          2/7/80
                                                                         Date

1

Updated August 2019

E-32

# GARDAWORLD

## CORRECTIVE ACTION FORM

Today's Date [

Employee Name [                    ] Branch Location [                    ] Account Name

Date of Policy Violation or Incident: [                    ] Reason for Notice: Informal Warning

Dates of Prior Counseling or Corrective Action: [     ][     ][     ][     ][     ]

Situation Statement. *Describe an incident, event or situation, use dates, times, names and facts, etc. and attach additional specific policy violation.*

DISCIPLINARY MATRIX GUIDELINES C1 Failure to comply with job requirements  24  Failure to perform job duties satisfactorily  There has been several emails sent out to all offices about being on your phone and not paying attention to Galaxy and CCTV'S  On February 05, 2020 Ofc  Charles Carter was spotted at 1530 by Cpl  Shawan Burrell watching something on his phone as she was scanning the cameras  GardaWorld expects employees to follow codes of conduct, which will protect the interests and safety of its personnel

Actions to be taken: *Example to include items such as appropriate standards, training, time frames, additional monitoring, etc, that will be provided. Include statements of behavior, consequences for further violations, or failure to perform up to standards, etc.*

Any further infractions will result in a Formal Warning being issued.

Employee Remarks: *Use additional sheet if more space is needed.*

was guilty of  violation

Acknowledgement. *I have read and understand this notice and have been given the opportunity to make appropriate remarks. I further understand that improvement must be immediate and sustained. Failure to take immediate corrective action may result in further corrective action, up to and including termination.*

Employee Printed Name                 Employee Signed Name                 Date

Manager Printed Name                  Manager Signed Name                  Date

Witness                               Witness Signed Name                  D

2

*E·33*

## Inequitable Treatment at the Workplace

In response to recent administrative charges:

Brief History:[1]

On or about February 4, 2020 at 1815 hours, an associate, Shannon Toppin, who is an associate at RR715B, properly enter the facility carrying her two year old child. I immediately advised her that the child could not be allowed to go in the working area unless the director granted permission. She responded by saying that the director was not there. I responded by advising her that this is the reasoning why the child could not enter. She, Toppin, professionally acknowledged this fact and was about to leave when I signaled her over to the desk.

> Several days before, the date of the alleged allegations (February 5, 2020), Director Rodney Baylor, while Carter was working in an overtime capacity at RR715A, appeared at the security desk with his seven years old son (Gavin Bell). There were some problems with my getting the printer to print badges, so I entered Bell's information into the computer system, hand wrote his information on the log and gave him a blank badge holder. I advised that when the problem was corrected the actually printed badge would be provided. It wasn't until the aforementioned subjects were about to leave the building that the system was corrected. Not having any use for the badge at this point the printed badge (which was shortly scheduled to expire) was given to the director's son.

This is the reasoning why I signaled the mother and child over to the desk. In a customer services manner and attempting to ensure that the associate/client was not antagonized by the rule enforcement. I was in the process of taking a picture of the mother and child to give for keepsake, as was done with the director's son. As they approached the counter Cpl. Burrell called on the telephone and demanded to know if the child was going in without proper permission. I advised that the child was not being allowed into the facility. She repeated the question as if I had not answered her and I repeated my answer. She then advised that she saw me on PassagePoint, so it looked like I was allowing the child to enter. I repeated that the child was not being allowed in the facility and they were waiting for an associate to respond to their location in the lobby. The mother did subsequently go into the facility but left the child in her car with someone.

Several minutes later Cpl. Keys called me on the telephone and demanded to know why I had acknowledged her alarm that was on the computer screen. I advised that it was time for me to log off and go home but the computer would not allow me to do so without acknowledging it. Since it had been *unacknowledged* for well over an hour I did so, not knowing any other way to log off. Cpl. Keys then proceeded to lecture me on why I should never acknowledge any other

---

[1] It is important to note that all listed alleged allegations was observed and generated into complaint form by Cpl. Shawan Burrell. With the exception of the January 30th, 2020 incident mention, all events were alleged to have occurred on the same date, February 5th, 2020. Lastly, these alleged allegations all allegedly occurred during Officer Carter working in on overtime capacity and under the supervision of Cpl. Burrell.

1

3                    E.34

locations alarms. When I mentioned that it went unacknowledged for well over an hour she advised that she had been in a meeting.

It is my belief that Cpl. Burrell contacted the Command Center and made a complaint to Cpl. Keys and this is the reason that she called and why she took the posture she did during the call. It is a fact that the presently generated charges are inequitable in nature and initiated because Cpl. Burrell feared me making some form of complaint, as the same incident had just recently occurred, involving her, the director's secretary's daughter and me. She could counteract any complaints by filing these retaliatory and inequitable charges. (All Cpl. Burrell had to do was wait a couple of minutes and see if this non-threatening two year old was allowed into the facility.)

Moments after leaving the facility I contacted then, Officer Mingle, who was working overtime at RR715A. I inquired as to the acknowledgement of alarms and explained the Cpl. Burrell's above listed incident. He advised that since the child wasn't allowed to enter; it was his belief that there was no problem. In addition to explaining to me about how to get RR715A's printer to work, since he was having the same problem I had when working there, he advised me on how to log off without acknowledging alarms.

### Charges at Face Value

In GardaWorld handbook on page 35 under Rules of Conduct failing to obtain permission to leave work during work hours:[2]

*On February 5, 2020, Carter was seen leaving his assignment at 1824 hours instead of 1830 hours.* The writer of these charges neglected to write the charge out in their entirety. The mentioned section actually reads "not including lawful off-duty meal periods and rest breaks". Could a 'lawful rest break' be considered 'getting off'? Would it make a difference if the rest break is 16 hours long?

During the above mentioned period and times, in overtime capacity, once a guard calls out, his pay period time discontinues. This is reflected on all previous pay records and paystubs. If I am working until 1400 hours, in an overtime capacity, and sign out at 1345 hours, this is reflected in the pay records and pay. This doesn't apply to regular work hours. If I sign out at 1453 during my regular shift I still get paid the full 8 hours. On the other hand, if I sign out at 1300 hours and supposed to be working until 1400 hours, the above listed rule applies.

I am at work *every day* at least ½ hours before the shift starts and completely logged on and ready for business by the start of the shift. I have no need or desire to violate a rule over six (6) minutes. Is there someone who knowingly and deliberately is attempting to make these six

E·35

minutes an issue to benefit their desires? If supervision were to look they would see that this is a daily occurrence for some and there is no charges attached to any of those entities.

Further investigation into Officer Carter also shows that he left RR715A 1500-2100 post on January 30, 2020 at 2045 then came over to RR802 at 2048 to turn in his radio and keys.

It is Carter's belief that to leave RR715A at exactly 2100 hours and then travel to RR802 to return gear using his personal vehicle and time would put him in violation of GardaWorld's *Off-the-Clock Work Policy: GardaWorld strictly prohibits nonexempt employees from working off-the-clock, including preparatory and/or conclusory work at the beginning and end of work. Employees must not perform any work off-the-clock. . . . . Working "off-the-clock" for any reason is a violation of Company policy and employees violating this policy will be subject to disciplinary action up to and including termination of employment.*

During Cpl. Burrell's investigation of me she notes that she found that I abandoned my post on January 30, 2020. She verifies this with video photographs from January 30th, 2020, which were recovered and printed on January 6th, the day the charging documents were generated. My point is, as mentioned before, Cpl. Burrell knowingly and deliberately utilizes her rank, the cameras and her desires to knowingly and deliberately imposed penalties on the undersigned. It also appears that Lt. Young co-signs or sanctions all of her actions.

Carter left from RR715A minutes early so as to allow him time to get to another part of the Carefirst reservation and return equipment. The records will reflect that the writer of these allegations failed to note that Carter, while still on the worksite, called off duty at RR802 at 2053 and scanned out, while still at RR802 at 2100 hours.

Failure to comply with job requirements – 24. Failure to perform job duties satisfactorily.

On February 5th, 2020, Officer Charles Carter was spotted at 1536 by Cpl. Burrell watching something on his phone as she was scanning the cameras.

Carter's cellular telephone was propped up against the printer and clearly showed a still picture on his screen. Cpl. Burrell called me on the telephone and advised you can't watch whatever you're watching on that phone. I simply laid the phone face down. Still, it should be clear, looking at the cameras, to see that there was the still picture on my phone. Same is attached, which is my screen saver that my granddaughter made for me.

Miscellaneous

On 2/6/20 at about 0800 hours, I called RR802 to speak with PFC. Mingle because I had, just like everyone else, received notification to log off galaxy. I could not do so because there was an unacknowledged alarm at RR802 and Mingle had a day or so jus explained to me how to do so without acknowledging alarms but I had forgotten. Cpl. Burrell answered the telephone

E. 36

and advised PFC. Mingle was in a meeting but she could help. She ultimately advised me to go ahead and acknowledge the alarm because she had taken care of it.

On 2/7/20 at about 0715 hours, after a thunderstorm, I contacted PFC. Mingle and advised that I was about to do an off-schedule tour because I needed to check building for water leaks after the storm. He acknowledged my request and advised he's put his camera on my post. He subsequently called me and asked if I found anything. I advised and he advised that Lt. Young wanted an incident report written. Same date, at 0825 hours, Lt. Young called me and advised that she was watching my screen and what was I doing, because the screens were somewhat white. I advised that I was writing the report as directed. She then advised me, "You don't have to be so indignant," and the communication ended.

On 2/7/20 at about 1100 hours, during a meeting with Lt. Young and PFC. Mingle, Lt. Young was talking to me and then suddenly stopped and demanded to know why I was looking at her like I was. I calmly explained to her that she was talking to me and I was looking at her as she talked.

Look at the alleged offenses; the severity of the alleged offenses; the focus; the day of the alleged offenses. On the 5th of February, GardaWorld staff had a meeting at RR802 and after the meeting was over Cpl. Burrell returned to her position as my supervisor and the alleged allegations immediately arose. It's as if her actions blatantly admit to targeting.

Lastly, I am not working utilizing a 'police mentality' as inferred. With the exception of academic training I left the law enforcement arena in 2005 and all employment after that focused on customer service skills. Still, I clearly understand the chain of command and the privilege supervision has here to forward their words and complaints up the chain. For example, *he calls it stretching and she calls it exercising.* When the words passed up the chain of command are tainted with unethical intent *lies* the problem.

Respectfully,

S/O Charles H. Carter

4

E.37



**FedEx Office.**

February 08, 2020 09:41　　　　　Page: 1
Receipt #: 0903651850
VISA #: XXXXXXXXXXXXX5696
2020/02/08 09:40

| Qty | Description | Amount |
|-----|-------------|--------|
| 8 | PNG B&W S/S 8.5x11 & 8.5x14 | 1.04 |

| | | |
|--|--|--|
| SubTotal | 1.04 |
| Taxes | 0.06 |
| Total | 1.10 |

The Cardholder agrees to pay the Issuer of the charge
card in accordance with the agreement between the
Issuer and the Cardholder.

3003 N. Charles St.
Baltimore,MD 21218
410-467-2454
www.FedExOffice.com

Tell us how we're doing and receive
　 off your next $40 print order
ɑt fedex.com/welisten or 1-800-398-0242
Offer Code:_____ Offer expires 06/30/2020

By submitting your project to FedEx Office or by
making a purchase in a FedEx Office store, you
agree to all FedEx Office terms and conditions,
including limitations of liability. Request a copy
of our terms and conditions from a team member
or visit fedex.com/officeserviceterms for details.

Please Recycle This Receipt

E. 38



******************************************************************************

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
******************************************************************************

3A

2

E·39

**usa0903@fedex.com**

| | |
|---|---|
| **From:** | Charles Carter <ccharlescarterb@icloud.com> |
| **Sent:** | Friday, February 21, 2020 3:47 PM |
| **To:** | usa0903@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Inequitable Treatment at the Workplace |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 20, 2020 at 6:11:39 AM EST
> **To:** "CCharlescarterb@icloud.com" <CCharlescarterb@icloud.com>
> **Subject: FW: Inequitable Treatment at the Workplace**

> **From:** Mingle Jr, James <James.MingleJr@carefirst.com>
> **Sent:** Thursday, February 13, 2020 7:14 AM
> **To:** Carter, Charles <Charles.Carter@carefirst.com>
> **Subject:** RE: Inequitable Treatment at the Workplace

> Good Morning S/O Carter.
> I will be over later today to discuss this.
> Respectfully,

> **From:** Carter, Charles <Charles.Carter@carefirst.com>
> **Sent:** Thursday, February 13, 2020 7:06 AM
> **To:** Mingle Jr, James <James.MingleJr@carefirst.com>
> **Subject:** Inequitable Treatment at the Workplace

> Sir,

> I've been sitting here for several days, naturally, concerned at to what is going on with the recently filed charges. It's a bit unnerving to not know what is going on in this matter. Are they launching an all-out offensive against me; are they moving forward with the charges; did the powers-to-be feel that my position lacks validity or did they even receive the filed documents? Because of the nature of the charges I believe that its reasonable to at least know basic information surrounding this event. Knowing this relieves some degree of stress. I have heard nothing, as it pertains to the above-mentioned issue, but non-fact based rumors.

4

> Respectfully,
> ***************************************************************************
> *
> Unauthorized interception of this communication could be a violation of Federal and State Law.
> This communication and any files transmitted with it are confidential and may contain protected
> health information. This communication is solely for the use of the person or entity to whom it

E.40

1

was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*************************************************************************

2

E·41

# GARDAWORLD

## CORRECTIVE ACTION FORM

**Today's Date:** 2/18/20

**Employee Name:** Carter, Charles   **Branch Location:** RR 10715B   **Account Name:** CareFirst

**Date of Policy Violation or Incident:** 2/18/20   **Reason for Notice:** Informal Warning

**Dates of Prior Counseling or Corrective Action:**

**Situation Statement:** *Describe the incident, event, or situation; use dates, times, names, and facts. If policy violation, reference specific policy violation.*

On 2/14/20 S/O Charles Carter called off for his 2/14/20 0600-1400 RR715B shift stating he was ill. On 2/18/20 S/O Carter responded back to work but did not bring a note from a doctor's note. When asked, he advised that he did not have one.

**Actions to be taken:** *Examples include items such as appropriate standards, training, time frames, additional assistance that will be provided, expectations of behavior, consequences for further violations, or failure to perform up to standards, etc.*

All unexcused absences are in violation of Company policy. A doctor's note is required for every absence due to illness. Any further infractions will result in progressive disciplinary action.

**Employee Remarks:** *Use additional sheet if more space is needed.*

SEE GARDAWORld'S ABSENCE/TARDINESS policy, PAGE 83. Not Guilty of THIS offense

**Acknowledgement:** *I have read and understand this notice and have been given the opportunity to make appropriate remarks. I further understand that improvement must be immediate and sustained. Failure to take immediate corrective action may result in further corrective action, up to and including termination.*

Employee Printed Name | Employee Signed Name | Date 2/19/22

Manager Printed Name JAMES MINGLE | Manager Signed Name | Date 2/19/20

Witness Printed Name Shawan Burell | Witness Signed Name | Date 2/19/20

E.42

Updated: August 2019

**usa0903@fedex.com**

| | |
|---|---|
| **From:** | Charles Carter <ccharlescarterb@icloud.com> |
| **Sent:** | Friday, February 21, 2020 3:48 PM |
| **To:** | usa0903@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Response to Corrective Action Form dated 2/19/20 |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 19, 2020 at 10:29:27 AM EST
> **To:** "CCharlescarterb@icloud.com" <CCharlescarterb@icloud.com>
> **Subject: FW: Response to Corrective Action Form dated 2/19/20**

> **From:** Carter, Charles
> **Sent:** Wednesday, February 19, 2020 10:16 AM
> **To:** Siwek, Thomas <Thomas.Siwek@carefirst.com>
> **Subject:** FW: Response to Corrective Action Form dated 2/19/20

> **From:** Carter, Charles
> **Sent:** Wednesday, February 19, 2020 10:14 AM
> **To:** Mingle Jr, James <James.MingleJr@carefirst.com>
> **Subject:** Response to Corrective Action Form dated 2/19/20

Sir,

As you know I was recently charged with the below listed administrative offense:

**On 2/14/20 S/O Charles Carter called off for his 2/14/20 0600 – 1400 RR715B shift stating he was ill.**
**On 2/18/20 S/O Carter responded back to work but did not bring a note from a doctor's note.**
**When asked, he advised that he did not have one.**

*All unexcused absences are in violation of Company policy. A doctor's note is required for every absence due to illness. Any further infractions will result in progressive disciplinary action.*

A more accurate account of this event is as follows: On 2/13/20 at approximately 2100 hours, Charles H. Carter called the Gardaworld Command Center and spoke with Cpl. Keys. Carter

   1   E.43

advised that he could not make it to his upcoming shift because he was feeling ill, having what appeared to be flu like symptoms. Later, the next day, at approximately 1100 hours, on the 14th of February 2020, several hours after the aforementioned call, Carter notified his immediate supervisor (i.e., Lt. Young and Cpl. Mingle). via telephone, that he would be in for his tour of duty on his next scheduled day to work. Since the 15th (Saturday) and 16th (Sunday), were Carter's scheduled days off and the 17th was a holiday, Carter naturally did not show up to work on his days off. Again, naturally, Carter did not return to work until and on the 18th of February 2020, his first scheduled work day. There was only one absentee day utilized in this event, not for (4) as this writing infers. (Noting that this 'not out on medical status' was widely known to management because on the 16th of February 2020, management (Sgt. F. Raines) contacted Carter to see if he would work an overtime for that day, on the 3 to 11 shift. Carter's immediate supervisor, Lt. Young, was at the worksite on this particular day, which is not her regularly scheduled work day. She was made aware that Carter had refused to come in and work that particular day.

The listed witness to the 'Corrective Action Form" and possibly the motivating force behind its generation, when asked, "Where in the GardaWorld policy book does it say that we have to obtain a medical slip under the mentioned circumstances?" Her response was, **"Carefirst's policy**, dictates you must have a medical slip after being on medical for three days. (Noting: That if Carter had been on medical it would have only been for one day and Carefirst's policy does not supersede GardaWorld's policy because GardaWorld is my employer.)

Still, GardaWorld's Employee Handbook` addresses the above mentioned event, under **Attendance and Punctuality, page 83:**

Last paragraph:

**If the absence/tardiness is foreseeable, the employee must notify their immediate supervisor at least four (4) hours prior to the start of their shift the employee will be absent or tardy. If the need for the absence/tardiness is unforeseeable, the employee must provide notice of the need for the absence/tardiness as soon as practical to their immediate supervisor.   Poor attendance and excessive tardiness is disruptive. Repeated absences/tardiness or other failure to comply with this policy may result in discipline up to and including termination.**
2019   cite'
1.  Carter's entry on duty date is May 19, 2020. This is his first time calling in because he felt ill. Actually, it Carter's first absentee event and only been late twice in his nine (9) months of employment.

2.  GardaWorld's Employee Handbook makes no mention, from cover to cover, of any medical absences and the need for a doctor's slip.

3.  As to Carefirst's involvement in this event, the only connection I can find is that in a recent Carefirst publication, the head doctor for Carefirst recently wrote about oncoming flu like symptoms and his documented advice to all employees and associates is that if you feel these symptoms coming on stay home, do not help in the spread of this event.

4.  Lastly, Carter did not violate GardaWorld's policy, as it pertains to this event, he did as the policy prescribes/orders. (i.e., he called in within the set time limit, made the appropriate notifications and he returned to work the next scheduled work day).

E. 44

5. Under Gardaworld's Drug and Alcohol Policy it advises, in part (p. 43): Employees are required to report to work in appropriate mental and physical condition to perform their jobs in a satisfactory manner. Should I have taken, for example, an over the counter sleeping medication like Night Quill and come to work?

6. What is the motivating force behind this impulsive administrative charge?


Respectfully,
*****************************************************************************
*

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*****************************************************************************

E·45

**usa0903@fedex.com**

| | |
|---|---|
| **From:** | Charles Carter <ccharlescarterb@icloud.com> |
| **Sent:** | Friday, February 21, 2020 3:46 PM |
| **To:** | usa0903@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Questioning my breaks or break |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 20, 2020 at 6:15:22 AM EST
> **To:** "CCharlescarterb@icloud.com" <CCharlescarterb@icloud.com>
> **Subject: FW: Questioning my breaks or break**

> **From:** Hamrick, James (CWR) <James.Hamrick@carefirst.com>
> **Sent:** Thursday, October 17, 2019 1:07 PM
> **To:** Carter, Charles <Charles.Carter@carefirst.com>
> **Subject:** FW: Questioning my breaks or break

Charles,

Donna forwarded your email thread with Marcella to me and asked me to address it.

I intend to stop over this afternoon to talk to you in person about this. And while I realize that I will not be here after tomorrow, I want to give you some very strong and pointed advice (outside of the actual issue at hand).

Lt. Young recently told me that things were going well with you (and I heard the same thing from others), but I cannot imagine that such email communications are endearing yourself to her or to the management staff (because after reading them, they created a strong negative reaction in me). Even if you have a valid grievance, your emails are coming across as very adversarial, judgmental, and condescending. In short, it's making you look like an intellectual bully with Marcella (I'm not judging your motives—just being candid about how your email exchange appears). And consequently, the message is lost in the medium—that is, I'm seeing your communication as a diatribe about how you are right and she is wrong.

My suggestion is to quit playing attorney (quoting chapter and verse) and simply talk to Marcella face-to-face about your issue(s). This ain't the PD! And if you feel that your concerns are not being addressed, or you're being misunderstood, then take it up the chain of command.

I can respect if this your natural style or inclination, but I'm being honest in telling you that **it doesn't fly here!** If you're going to be successful, you need to be building bridges, not fences—start bringing light, not heat! I'm telling you this, not to be unduly critical, but to help you know the best way to address concerns without pitting yourself against the folks who are trying to support you.

1

7

E. 46

Please take it for what it's worth, and you can certainly give me your reactions/reflections when I stop over in a little while.

Thanks!

Jim

**From:** Young, Marcella <Marcella.Young@Carefirst.com>
**Sent:** Thursday, October 17, 2019 10:42 AM
**To:** Kile, Donna <Donna.Kile@carefirst.com>
**Subject:** FW: Questioning my breaks or break


**From:** Carter, Charles <Charles.Carter@carefirst.com>
**Sent:** Thursday, October 17, 2019 10:27 AM
**To:** Carter, Charles <Charles.Carter@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>
**Subject:** Questioning my breaks or break

**Question: Does it appear that when you're not trying to create, develop or generate a situation in which you can penalize me, you're unfairly and continuously directing personalized and individualized injurious versions of the rules at me?   For example, and one of the reasons why I try to limit my verbal communications with you):**

**Previous attempts at attempting to resolve issues, verbally, between you and I have always been unproductive, mostly because your verbal responses usually have nothing to do with the issues at hand. The following communications was shared between us:**

Lt. Young,

On Tuesday, 9/10/19, you wrote:

Ofc. Carter,

On Wednesday your relief will be coming from OM1 the person generally gets off at 2p so they may or may not be a little late.

E, 47

2

*Lt Marcella Young*
*Site Supervisor*
*10802 Red Run Blvd*
*Owings Mills, Maryland 21117*
*W: 443-738-7525 C: 443-844-9230*
*Email: Marcella.Young@carefirst.com*
www.garda.com

**My response:**  With all due respect, what this email says to me is, *if your relief is late, live with it.* Keeping in mind this is not an emergency situation so there were various options available (e.g., Have 715A watch 715B, on camera, until relief arrives; have Mobile One standby until relief arrives; or, have the supervisor man or woman the post until relief arrives), but I am given the aforementioned option: *Live with it.* You said in the meeting that we had that the lateness "was only a couple of minutes." They were my minutes and respectfully again, GardaWorld has no right to unreasonable dictate my minutes. Note: I hope that the written email isn't inferring a policy that is in effect during my entire tenure here, no matter how short or long.

Yesterday, 9/19/19, at two o'clock I had no relief and heard no words pertaining to relief. I waited until 2:30 PM., waiting for word of relief. I then called you and you advised who my relief was and you called them. They arrived at about 2:40 PM., and advised that your reasoning for the lateness was that 'I didn't notify you about 'no relief ' until 2:30 pm." The day before this event, 9/18/19, when I got off I was at my twin granddaughters volleyball game at Parkville High School which started at 3:45 PM. Afterwards my sons and I went to Mo's and acted like fools. My point, I have things to do with my time. Yesterday, 9/19/19, I was supposed to meet the exterminator at my home at 3:00. I had to reschedule until 8:00 PM, last night. Since he exterminated so late and I couldn't stay in my home I had to sleep somewhere else and I did. My point, these untimely, unscheduled misuses of my time oftentimes has snowballing effects, as well as improperly utilized..

Respectfully, in the future, could you please give some consideration for events such as the aforementioned.

Respectfully,

S/O Charles Carter

**When, you and I discussed the aforementioned event your verbal response, when I told you that my 'Live with it" beliefs, after reading your email, was because that's how I perceived the email. Your verbal response was that "I need to stop perceiving." You further added, that "you knew I was up to something because I waited until two thirty to call you about my no**

E. 48

relief." Again, verbal communications between you and I are unproductive and leaves to much room for added confusion. Therefore, if I have an issue that needs to be addressed it will be shared in writing. This minimizes confusion and provides clarity of the communication.

It appears that you have now resorted to the utilization of tactics geared towards penalizing those of choice without your fingerprints attached to the event. Meaning, you choose a target and your subordinates or staff members inflict created, developed or generated events with penalties under their names. I wrote the following on 9/26/19 and emailed it to myself because the circumstances were strangely unique and I needed to document the event:

Today is 9/26/19 but yesterday (9/25/19), just before the end of my shift PFC Burrell, who had come to RR715B earlier to pick up the Daily Activity Log book, called me on the telephone. She immediately asked, "What time do you do your 'Tours'?" I advised the times are written on all my Daily y Activity Reports (DAR), which she has in her possession. She then asked about what time do you do them because we're redoing post orders and need the information. I advised that I usually do them once the radio and keys are dropped off by Mobile One. Once and awhile, if Mobile One is delayed, I conduct the 'Tour' without waiting but it's always conducted between six and six thirty in the morning. The communication was then ended. Note: LT. Young had been on duty all day and said nothing about the aforementioned and/or anything to me.

This event comes atop the recent rumor that the individual who was just fired was fired because he did not conduct the required 'Tours" and advised he did. An additional part of this rumor is that his actions were detected by PFC. Burrell who then appropriately notified command.

I find this inquiry suspect because my 'Tour' times are documented daily, on several organizational documents, which includes my DAR. This information is clearly documented (e.g., Foot Patrol (Tour: 715A and B), Initiated and Foot Patrol (Tour 715A and B), concluded), with the times started and concluded documented beside this information. This raises the question: Is my integrity being question or am I being investigated by PFC. Burrell?

Keeping in mind that this event comes after the below listed communication I shared with you:

I have had two interactions with Lt. Young:

E. 49

The other day, at about 0545 hours, I was at the desk at 715B, preparing for my tour of duty, before my shift started. I received a call from the sergeant over at RR800. He advised that Lt. Young, he called her Marcella, wanted me to check and see if you're doing the 'tours' in the morning. I advised him that the performance of my tour hours are, on a daily basis, noted on my daily activity report, the tour checklist forms are filled out and filed,  and doing my actual tour I scan security scans, throughout the location, without opening doors so as to clock my movements. The same information was placed in an instant message and sent to Lt. Young, when she arrived at work,  asking if there was some reason that she believed my activities or reporting's were believed to be deceptive. Her written response was, "No. I'm just checking".

**You being the site supervisor, was PFC. Burrell acting outside of you directions?**

On Monday, October 14, 2019, during the early morning hours, I was given relief by Mobile One. As a result of this given relief, You, Site Supervisor, now questions me about this break; not because I was late returning, drunk or under the influence of drugs when I returned; did not return from the break or became involved in an illegal act while on break, you question me, investigate me because I was on break and may have left the parking lot. As a result of this investigation, the site supervisor for OM1 advises Mobile One that there will be no more 15 minute breaks for individuals working at RR715. This newly instituted 'verbal' directions or policy comes in spite of OM1's site supervisor's below listed September's directive. (Not in its entirety)

Hello Team,

Just a reminder, We have a 15 min. morning break and a 30 min. lunch break. Most of the time it is given, at a timely manner. At times due to circumstances, you may not be relieve at the scheduled time.

Lt. Lamont Green
Site Supervisor
Garda World Security Sevices
10455 Mill Run Blvd | Owings Mills, MD 21117
W: 410-998-4966 | C: 443-381-3270 Lamont.Green@carefirst.com

5

*E. 50*



Is OM1's site supervisor acting outside his supervisory boundaries when verbally dictating new policy for the area in which you are the site supervisor or was he acting under your directions when he removed/ended 715's morning 15 minute break, a break that all others enjoy as a result of policy?

It is apparent that You, Lt. Young, have been and are continuing to create, generate, develop situation in which you can find a manner in which to penalize me in various forms.

On 10/16/19 at approximately 1000 hours, you, Lt. Young,  personally and verbally advised that there are no longer any 15 minute breaks in the morning because they were optional. (Note: Md. Labor Law dictates that "an employee who works 8 or more hours must be given the 30-minute break plus a non-working break of 15 minutes for every four additional consecutive hours. For example, an employee who works 16 consecutive hours must be given the 30-minute break, plus two 15-minute non-working breaks. Under the federal Fair Labor Standards Act (FLSA), employees are entitled to payment for any break that is less than 20 minutes, so the 15-minute break must be paid.) **This applies to on or off-duty meal periods.** And, security officers, per this contract, do not appear to be one of the listed *exempt* categories of this law.) Per policy, *GardaWorld's*

E. 51

position on matters of this nature is that their policy does not supersede federal or state law. Also see newly issued handbook and Complaint Resolution page 26, Supervisors Responsibilities page 37, and Retaliation page 59.

You further advised that I cannot leave the post during my tour of duty. You say you've seen me leaving the building and then asked was I going to my car? I replied yes and you assured me that to leave the post is a violation of policy. Same date (10/16/19) at 1112 hours I spoke with you, Lt. Young for clarity sake. I asked her, "So not leaving the post means I can no longer go to OM1 for lunch?" Her response was "no you can't, sorry". Minutes later you called me back and said but you can come to 802 for lunch and use their cafeteria.

I have no problems with abiding by any and all rules and policies. I do have a problem with rules and policies being knowingly and deliberately altered in their design, so as to personalize and individualize negative effects on me. Meaning, the utilization of certain re-designed rules to knowingly and deliberately injure or penalize me.

Does the above-mentioned, in its entity, give you the impression that I have been targeted by you?


Respectfully,

Charles Carter

************************************************************************

7

E.52

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*************************************************************************

E. 53

**usa0903@fedex.com**

| | |
|---|---|
| **From:** | Charles Carter <ccharlescarterb@icloud.com> |
| **Sent:** | Friday, February 21, 2020 3:43 PM |
| **To:** | usa0903@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: OM-1 1st Shift Breaks and Lunch Reliefs. |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 20, 2020 at 6:24:38 AM EST
> **To:** "Ccharlescarterb@icloud.com" <Ccharlescarterb@icloud.com>
> **Subject: FW: OM-1 1st Shift Breaks and Lunch Reliefs.**

> **From:** Carter, Charles
> **Sent:** Friday, October 11, 2019 11:59 AM
> **To:** Robinson, Troy (CWR) <Troy.Robinson@carefirst.com>
> **Subject:** FW: OM-1 1st Shift Breaks and Lunch Reliefs.

> **From:** Peart, Benjamin (CWR) <Benjamin.Peart@carefirst.com>
> **Sent:** Friday, October 11, 2019 11:55 AM
> **To:** Carter, Charles <Charles.Carter@carefirst.com>
> **Subject:** FW: OM-1 1st Shift Breaks and Lunch Reliefs.

> **From:** Green, Lamont <Lamont.Green@Carefirst.com>
> **Sent:** Friday, September 06, 2019 8:32 AM
> **To:** Addison, Lorie <Lorie.Addison@carefirst.com>; Anderson, Alvin (CWR)
> <Alvin.Anderson@carefirst.com>; Austin, Julia <Julia.Austin@Carefirst.com>; Banks, Ja'Lil (CWR)
> <Ja'Lil.Banks@carefirst.com>; Bosley III, Samuel (CWR) <Samuel.BosleyIii@carefirst.com>; Brock, Gail
> (CWR) <Gail.Brock@carefirst.com>; Brock, Kachet (CWR) <Kachet.Brock@carefirst.com>; Cornish, Taishi
> (CWR) <Taishi.Cornish@carefirst.com>; Crampton, Shenita (CWR) <Shenita.Crampton@carefirst.com>;
> Crest, Stacey <Stacey.Crest@carefirst.com>; Davis, Vernon S (CWR) <VernonS.Davis@carefirst.com>;
> Grob, Jason (CWR) <Jason.Grob@carefirst.com>; Hodges, Robert (CWR)
> <Robert.Hodges@carefirst.com>; Hopkins, Michael (CWR) <Michael.Hopkins@carefirst.com>; Jackson,
> Julian (CWR) <Julian.Jackson@carefirst.com>; Johnson, James <James.Johnson@carefirst.com>; Jones
> III, Jack (CWR) <Jack.JonesIII@carefirst.com>; Key, Tanisha (CWR) <Tanisha.Key@carefirst.com>; Leptic,
> Michael (CWR) <Michael.S.Leptic@carefirst.com>; McKinney, Samuel
> <Samuel.Mckinney@carefirst.com>; McNamee, Kelly (CWR) <Kelly.Mcnamee@carefirst.com>; Millings-
> May, Matthew (CWR) <Matthew.Millings-May@carefirst.com>; Nelson, Shawna (CWR)
> <Shawna.Nelson@carefirst.com>; Payton, Edgar (CWR) <Edgar.Payton@carefirst.com>; Peart, Benjamin

1



E·54

(CWR) <Benjamin.Peart@carefirst.com>; Pugh, Latanya (CWR) <Latanya.Pugh@carefirst.com>; Raines, Frances <Frances.Raines@Carefirst.com>; Rich, Sharon (CWR) <Sharon.Rich@carefirst.com>; Robinson, Troy (CWR) <Troy.Robinson@carefirst.com>; Seaberry, Donovan (CWR) <Donovan.Seaberry@carefirst.com>; Slappy, Adrian (CWR) <Adrian.Slappy@carefirst.com>; Watson, Brittany (CWR) <Brittany.Watson@carefirst.com>; Williams, Ryshira (CWR) <Ryshira.Williams@carefirst.com>; Young, Marvin <Marvin.Young@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Hamrick, James (CWR) <James.Hamrick@carefirst.com>; Weems, James (CWR) <James.WeemsIII@carefirst.com>
**Subject:** OM-1 1st Shift Breaks and Lunch Reliefs.

Hello Team,

Just a reminder, We have a 15 min. morning break and a 30 min. lunch break. Most of the time it is given, at a timely manner. At times due to circumstances, you may not be relieve at the scheduled time.

OM-1 main lobby morning break starts at 9 a.m. The two officers relieve each other.
Lunch breaks, one officer goes at 11:30 a.m. and the other officer goes at 12:30 p.m.

Employee Entrance morning break starts at 9 a.m. The two officers relieve each other.
Lunch break starts at 12 noon. The two officers relieve each other.

Loading Dock morning break start at 8:30 a.m. It is given by the second officer at the EE.
Lunch break start at 11:30 a.m. it is given by the second officers at the EE.

OM-2 Lobby morning break start at 10 a.m. It is given by the Mobile Unit if available. If not, it is given by 2nd officer at OM-1 lobby.
Lunch break start at 12 noon. It is given by the Mobile Unit if available. If not, it is given by 2nd officer at OM-1 lobby.


Lt. Lamont Green
Site Supervisor
Garda World Security Sevices
10455 Mill Run Blvd | Owings Mills, MD 21117
W: 410-998-4966 | C: 443-381-3270 Lamont.Green@carefirst.com



*****************************************************************************
*
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in

E.55

reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*************************************************************************
*

3

E·56

**From:**  Charles Carter
**To:**  usa0903@fedex.com
**Subject:**  [EXTERNAL] Fwd: Respectful Request
**Date:**  Friday, February 21, 2020 3:41:27 PM

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 20, 2020 at 7:26:11 AM EST
> **To:** "Ccharlescarterb@icloud.com" <Ccharlescarterb@icloud.com>
> **Subject:** FW: Respectful Request

> **From:** Carter, Charles
> **Sent:** Saturday, October 12, 2019 3:07 PM
> **To:** Davis, Vernon S (CWR) <VernonS.Davis@carefirst.com>
> **Subject:** FW: Respectful Request

> **From:** Carter, Charles
> **Sent:** Friday, September 20, 2019 6:09 AM
> **To:** Young, Marcella <Marcella.Young@Carefirst.com>
> **Subject:** Respectful Request

> Lt. Young,
>
>   On Tuesday, 9/10/19, you wrote:
>
> Ofc. Carter,
>
>
>           On Wednesday your relief will be coming from OM1 the person generally gets off at 2p so they may or may not be a little late.
>
>
> *Lt Marcella Young*
> *Site Supervisor*
> *10802 Red Run Blvd*
> *Owings Mills, Maryland 21117*
> *W: 443-738-7525 C: 443-844-9230*
> *Email: Marcella.Young@carefirst.com*

9

E·57

www.garda.com

    With all due respect. what this email says to me is, *if your relief is late, live with it.* Keeping in mind this is not an emergency situation so there were various options available (e.g., Have 715A watch 715B, on camera, until relief arrives; have Mobile One standby until relief arrives; or, have the supervisor man or woman the post until relief arrives), but I am given the aforementioned option: *Live with it.* You said in the meeting that we had that the lateness "was only a couple of minutes." They were my minutes and respectfully again, GardaWorld has no right to unreasonable dictate my minutes. Note: I hope that the written email isn't inferring a policy that is in effect during my entire tenure here, no matter how short or long.

    Yesterday, 9/19/19, at two o'clock I had no relief and heard no words pertaining to relief. I waited until 2:30 PM., waiting for word of relief. I then called you and you advised who my relief was and you called them. They arrived at about 2:40 PM., and advised that your reasoning for the lateness was that 'I didn't notify you about 'no relief' until 2:30 pm." The day before this event, 9/18/19, when I got off I was at my twin granddaughters volleyball game at Parkville High School which started at 3:45 PM. Afterwards my sons and I went to Mo's and acted like fools. My point, I have things to do with my time. Yesterday, 9/19/19, I was supposed to meet the exterminator at my home at 3:00. I had to reschedule until 8:00 PM, last night. Since he exterminated so late and I couldn't stay in my home I had to sleep somewhere else and I did. My point, these untimely, unscheduled misuses of my time oftentimes has snowballing effects, as well as improperly utilized..

    Respectfully, in the future, could you please give some consideration for events such as the aforementioned.


Respectfully,

S/O Charles Carter
********************************************************************************

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意:如果您使用繁體中文,您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
********************************************************************************

E. 58

require it will be subsequently made available, per already established policy; (2) when an emergency or non-emergency situation or event arises it should be addressed as soon as possible, not hindered by a non-time sensitive notification; and, (3) what is the purpose of adults who are functioning in a professional arena having to stop and contact another entity to ask permission to 'pee'? (This decreases moral, insults professionals, insults the security profession: We can guard and protect lives but not manage to go to the bathroom without oversight or permission.) Are you familiar with the level of insult involved in someone asking this trained, experienced professional to unlock a door and that individual has to contact a supervisor, via telephone, in front of this entity. . . . . In any discipline of study or work, presentation is just as important as the product you're selling. This is the reasoning for dress codes, cleanliness, etc.. In this work arena (security), the presentation of GardaWorld's security reflects what level of competency to the client(s) when they have to observe their protective entities reflect incompetency at its lowest level.

Disregards all of the above mentioned questions and just answer this one: What positive purpose or benefit to the organization or its team members does this notification to supervisors before movement, instead of the team member sitting right next to me accomplish?

Respectfully,

Lastly, I know of no time or event where one of the officers here "just get up and randomly walk away from the desk at your leisure," as noted in your email. One always advises the other to watch their post, per policy.

**From:** Burrell, Shawan <Shawan.Burrell@carefirst.com>
**Sent:** Wednesday, February 05, 2020 6:07 PM
**To:** Davis, Kori (CWR) <Kori.Davis@carefirst.com>; Von Johnson, Rodney (CWR) <Rodney.VonJohnson@carefirst.com>; Brown, Ciara <Ciara.Brown@carefirst.com>; Peart, Benjamin <Benjamin.Peart@carefirst.com>; Jackson, Anthony <Anthony.Jackson@carefirst.com>; Mitchell, LaShay <Lashay.Mitchell@carefirst.com>; Carter, Charles <Charles.Carter@carefirst.com>; Roberts, Troi <Troi.Roberts@carefirst.com>; Banks, Regina <Regina.Banks@carefirst.com>; Green, Gregory <Gregory.Green@carefirst.com>; Siwek, Thomas <Thomas.Siwek@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** Team Red Run

Hello, Red Run Team!

There are a few things that I will be addressing in this email.

1) Proper telephone etiquette, when you are answering the desk phones you must state your location, name and rank. For Example; " Good evening CareFirst Cpl. Burrell" you cannot answer the phone like you are at home.
2) If you work a one man post, you cannot just get up and randomly walk away from the desk at your leisure. When you need a relief or if you need to use the restroom then you must call and let your supervisor know so they can watch your lobby. When someone is entering into the building, you should not be away from your desk or not paying attention to your galaxy. If you are not paying attention to your galaxy and someone get into the building by using someone else's badge then that will require disciplinary action up to and including termination.
3) We have a chain of command that you MUST follow;

PFC Jim Mingle

2        $10$

E.59

Cpl. Shawan Burrell
Sgt. Madison Crosby
LT. Marcella Young

You should not be contacting Colonel Steve Martin or Mrs. Donna Kile if you was not instructed to do so by a supervisor. PFC Jim Mingle is now one of the supervisor's here at Red Run. PFC Mingle is to be respected as a supervisor. From this day on, ALL "END OF SHIFT REPORTS" will be sent to all of your Red Run supervisor's. All items listed above must adhered too with no deviations. If you have any questions or concerns please feel free to reach out to me.



CPL. SHAWAN BURRELL
10662 RED RUN BLVD
OWINGS MILLS, MARYLAND
W: 443-738-7525 EMAIL shawan.burrell@carefirst.com

GARDAWORLD

*************************************************************************************
*
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*************************************************************************************
*

E. 60

**usa0903@fedex.com**

| | |
|---|---|
| From: | Charles Carter <ccharlescarterb@icloud.com> |
| Sent: | Friday, February 21, 2020 3:47 PM |
| To: | usa0903@fedex.com |
| Subject: | [EXTERNAL] Fwd: Expectations Revision |
| Attachments: | image001.png; Untitled attachment 00497.html; Expectations.docx; Untitled attachment 00500.html |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 20, 2020 at 6:11:07 AM EST
> **To:** "CCharlescarterb@icloud.com" <CCharlescarterb@icloud.com>
> **Subject: FW: Expectations Revision**

> **From:** Young, Marcella <Marcella.Young@Carefirst.com>
> **Sent:** Thursday, February 13, 2020 10:42 AM
> **To:** Davis, Kori (CWR) <Kori.Davis@carefirst.com>; Von Johnson, Rodney (CWR)
> <Rodney.VonJohnson@carefirst.com>; Brown, Ciara <Ciara.Brown@carefirst.com>; Peart, Benjamin
> <Benjamin.Peart@carefirst.com>; Jackson, Anthony <Anthony.Jackson@carefirst.com>; Mitchell, LaShay
> <Lashay.Mitchell@carefirst.com>; Green, Gregory <Gregory.Green@carefirst.com>; Banks, Regina
> <Regina.Banks@carefirst.com>; Carter, Charles <Charles.Carter@carefirst.com>; Siwek, Thomas
> <Thomas.Siwek@carefirst.com>
> **Cc:** Burrell, Shawan <Shawan.Burrell@carefirst.com>; Crosby, Madison
> <Madison.Crosby@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
> **Subject: FW: Expectations Revision**

> **From:** Mingle Jr, James <James.MingleJr@carefirst.com>
> **Sent:** Thursday, February 13, 2020 9:50 AM
> **To:** Young, Marcella <Marcella.Young@Carefirst.com>
> **Subject: Expectations**

> R/S

> # PFC James Mingle
> # RR802 0700-1500
> **GardaWorld**
> 10802 Red Run Blvd | Owings Mills, MD 21117
> 443-738-7525

1

E·61

## Expectations

Whenever an officer leaves his post without relief, it is incumbent upon that officer to notify their supervisor and advise them of their need to leave the post and the reason for such action. Officers are advised that they must contact supervision or RR802 in all instances when they need to leave their post. As an additional security measure, officers may also contact adjacent security entities or mobile, via phone or skype, and advise that officer of the situation. This will ensure, at the minimum, visual coverage of the post. Lastly, officers must always equip themselves with the security radio to ensure reliable and immediate contact.

Officers are required to man their posts from the beginning to the end of their shift. Officers are to sign in, scan in and call in at the beginning of their shift and at the end of their shift from their assigned post.

During times when calls go unanswered to supervisors, officers are encouraged to make additional efforts to re-contact their supervisors or relay messages to the Security Command Center (SCC). Additionally, alternate communications such as skype and email may be utilized to communicate. Officers are also encouraged to make themselves familiar with the phone numbers of all posts, to include both the RR802 numbers of 443-738-7525 and 443-738-7524.

Presentation is very important. Officers are reminded that a professional presentation to both associates and fellow Security Officer colleagues is of paramount importance. Ensuring proper phone etiquette as well as a professional demeanor is required as a Garda World Security Officer.

Officers are advised that they are not to leave their post and walk out of the building into the parking lot area unless they are properly relieved, or it is necessary to do so to ensure building security and associate safety. Unless there is an issue in the parking lot that requires security attention, Officers are not to leave their posts unmanned to surveil the parking lot. Surveillance can be accomplished from the windows. Additionally, officers are to maintain visual contact with the computer while manning the duty desk to ensuring the Galaxy Photo Verification matches the associate as the associate scans through the turnstiles. This is imperative to ensure proper badge usage and authorization. Officers should make every attempt to continuously monitor the Galaxy system at all times.

Officers are advised that any time they find a leak or other maintenance issue within the building they are to contact RR802 supervision to both make them aware of the situation and obtain guidance for reporting issues. Also, an email should be immediately sent to the SCC informing them of the situation.

Officers are reminded to hit the "#" after the last 4 Social Security numbers when entering facilities that require both a badge scan and a personal 4-digit code to enter.

Officers are reminded they are not to acknowledge any alarms that are not in their building or under their accountability without first investigating the alarm or notifying the accountable entity. It there comes a time when an alarm prevents the officer from logging out of the system or from logging off Galaxy, officers can either contact the accountable entity or hit "CNTL+ALT+DEL" and log off that way.

E·62

Hello, Red Run Team!

1) We have a chain of command that you MUST follow;

PFC Jim Mingle
Cpl. Shawan Burrell
Sgt. Madison Crosby
LT. Marcella Young

You should not contact Colonel Steve Martin or Mrs. Donna Kile unless instructed to do so by a supervisor. PFC Jim Mingle is now one of the supervisors here at Red Run. PFC Mingle is to be respected as a supervisor. From this day on, ALL "END OF SHIFT REPORTS" will be sent to all your Red Run supervisors. All items listed above must be followed. If you have any questions or concerns, please feel free to reach out to your supervisor.

E·63

**usa0903@fedex.com**

| | |
|---|---|
| From: | Charles Carter <ccharlescarterb@icloud.com> |
| Sent: | Friday, February 21, 2020 3:49 PM |
| To: | usa0903@fedex.com |
| Subject: | [EXTERNAL] Fwd: Using Cell Phone on post |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 13, 2020 at 1:29:29 PM EST
> **To:** "ccharlescarterb@icloud.com" <ccharlescarterb@icloud.com>
> **Subject: FW: Using Cell Phone on post**

**From:** Green, Lamont <Lamont.Green@Carefirst.com>
**Sent:** Thursday, February 13, 2020 1:06 PM
**To:** Ahmad, Farooq <Farooq.Ahmad@carefirst.com>; Anderson, Alvin <Alvin.Anderson@carefirst.com>; Austin, Julia <Julia.Austin@Carefirst.com>; Brinkmeyer, Jessica (CWR) <Jessica.Brinkmeyer@carefirst.com>; Brock, Gail (CWR) <Gail.Brock@carefirst.com>; Brock, Kachet <Kachet.Brock@carefirst.com>; Brown, Ciara <Ciara.Brown@carefirst.com>; Brown, Seqoyahe (CWR) <Seqoyahe.Brown@carefirst.com>; Buracker, Donald <Donald.Buracker@carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Butler, Jamia <Jamia.Butler@carefirst.com>; Carter, Charles <Charles.Carter@carefirst.com>; Cornish, Taishi <Taishi.Cornish@carefirst.com>; Crest, Stacey <Stacey.Crest@carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Davis, Kori (CWR) <Kori.Davis@carefirst.com>; Davis, Vernon S (CWR) <VernonS.Davis@carefirst.com>; Deachilla, Paul <Paul.Deachilla@carefirst.com>; Fisher, Stacey <Stacey.Fisher@carefirst.com>; Green, Gregory <Gregory.Green@carefirst.com>; Green, Lamont <Lamont.Green@Carefirst.com>; Grewe, Timothy Allen <TimothyAllen.Grewe@carefirst.com>; Grob, Jason <Jason.Grob@carefirst.com>; Hagans, Warnishia <Warnishia.Hagans@carefirst.com>; Haynes, Deion (CWR) <Deion.Haynes@carefirst.com>; Hodges, Robert (CWR) <Robert.Hodges@carefirst.com>; Hopkins, Michael (CWR) <Michael.Hopkins@carefirst.com>; Jackson, Julian (CWR) <Julian.Jackson@carefirst.com>; Jackson, Kavonte (CWR) <Kavonte.Jackson@carefirst.com>; Johnson, Alexis <Alexis.Johnson@carefirst.com>; Johnson, James <James.Johnson@carefirst.com>; Jones III, Jack <Jack.JonesIII@carefirst.com>; Key, Tanisha (CWR) <Tanisha.Key@carefirst.com>; Kile, Donna <Donna.Kile@carefirst.com>; Kimble, Carol <Carol.Kimble@carefirst.com>; Klinke, Karl <Karl.Klinke@carefirst.com>; Lease, David <David.Lease@carefirst.com>; Leptic, Michael <Michael.S.Leptic@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>; McCartin Jr, James <James.MccartinJr@carefirst.com>; McCarty, Sean (CWR) <Sean.Mccarty@carefirst.com>; McKinney, Samuel <Samuel.Mckinney@carefirst.com>; McNamee, Kelly <Kelly.Mcnamee@carefirst.com>; Meniefield, Arreonna <Arreonna.Meniefield@carefirst.com>; Millings-May, Matthew <Matthew.Millings-May@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>; Mitchell, LaShay <Lashay.Mitchell@carefirst.com>; Mutua, Robert (CWR) <Robert.Mutua@carefirst.com>; Myers, Tonia (CWR) <Tonia.Myers@carefirst.com>; Nelson, Carletta <Carletta.Nelson@carefirst.com>; Nelson, Shawna (CWR) <Shawna.Nelson@carefirst.com>; Odendhal, Donna <Donna.Odendhal@carefirst.com>;

1

12

E·64

Parker, Cletis <Cletis.Parker@Carefirst.com>; Payton, Edgar <Edgar.Payton@carefirst.com>; Peart, Benjamin <Benjamin.Peart@carefirst.com>; Peck, Nathanael <Nathanael.Peck@carefirst.com>; Phillips, Ronald <Ronald.Phillips@carefirst.com>; Pugh, Latanya <Latanya.Pugh@carefirst.com>; Raines, Frances <Frances.Raines@Carefirst.com>; Rich, Sharon (CWR) <Sharon.Rich@carefirst.com>; Rispus, Sardae (CWR) <Sardae.Rispus@carefirst.com>; Roberts, Troi <Troi.Roberts@carefirst.com>; Robinson, Troy <Troy.Robinson@carefirst.com>; Sarpong, Frederick (CWR) <Frederick.Sarpong@carefirst.com>; Scott, Rodger <Rodger.Scott@carefirst.com>; Seaberry, Donovan (CWR) <Donovan.Seaberry@carefirst.com>; Sease, Richard (CWR) <Richard.Sease@carefirst.com>; Sharif, Rabab (CWR) <Rabab.Sharif@carefirst.com>; Shorter, Jenson <Jenson.Shorter@carefirst.com>; Siwek, Thomas <Thomas.Siwek@carefirst.com>; Slappy, Adrian <Adrian.Slappy@carefirst.com>; Von Johnson, Rodney (CWR) <Rodney.VonJohnson@carefirst.com>; Watlington, Anthony <Anthony.Watlington@carefirst.com>; Watson, Brittany <Brittany.Watson@carefirst.com>; Welsh, Timothy (CWR) <Timothy.Welsh@carefirst.com>; Williams, Ryshira (CWR) <Ryshira.Williams@carefirst.com>; Yarborough, Nathan <Nathan.Yarborough@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>; Young, Marvin <Marvin.Young@carefirst.com>; Crampton, Tyrell <Tyrell.Crampton@carefirst.com>; Dotson, Roderick <Roderick.Dotson@carefirst.com>; Jackson, Anthony <Anthony.Jackson@carefirst.com>; Best, Kevin <Kevin.Best@carefirst.com>; Langston, Steven <Steven.Langston@carefirst.com>; Folks, Teresa <Teresa.Folks@carefirst.com>; Wallace, Niya <Niya.Wallace@carefirst.com>; Reed, Therman <Therman.Reed@carefirst.com>; Hall, Jasmine <Jasmine.Hall@carefirst.com>
**Subject:** Using Cell Phone on post

Officers,

This email is going to be short and sweet. No officer should be observed at any time using their cell phone while on post for any reason, this includes, talking on the phone, having earbuds in your ear, watching videos, constantly checking messages, emails, etc. All of that can be done on your break or on your personal time. This has been an issue at all locations. We (Management) no longer have any patience left for this subject. The complaints the past few weeks luckily came to our attention and not Marco or Joel's who is Marco's boss. We have an obligation to the client to maintain great customer service and to be professional and alert at all times. You all know better, you signed for a handbook stating that you shouldn't be using cell phones while on duty, and we have personally spoken to almost every one of you about this problem. We have been kind enough to let you carry them and keep them on you for emergency situations, there are many companies that do not allow that. You are all adults and it is time to act accordingly, do not make us speak to you about the same thing repeatedly. If you are caught on your cell phone while on post you will at the very minimum be written up. If for some reason you are using your cell phone to contact your supervisor (such as sending us a text message,) I would prefer it to not be when you are at your post, but if it is necessary I expect you to log this information in your Post Activity Report so there will be no discrepancies.

Lt. Lamont Green
Site Supervisor
Garda World Security Sevices
10455 Mill Run Blvd | Owings Mills, MD 21117
W: 410-998-4966 | C: 443-314-6543 **Lamont.Green@carefirst.com**

E·65



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

E.66

**usa0903@fedex.com**

| | |
|---|---|
| **From:** | Charles Carter <ccharlescarterb@icloud.com> |
| **Sent:** | Friday, February 21, 2020 3:45 PM |
| **To:** | usa0903@fedex.com |
| **Subject:** | [EXTERNAL] Fwd: Hinderance of the Efficiency and Effectiveness of Security at RR715 |

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 20, 2020 at 6:20:00 AM EST
> **To:** "CCharlescarterb@icloud.com" <CCharlescarterb@icloud.com>
> **Subject: FW: Hinderance of the Efficiency and Effectiveness of Security at RR715**

**From:** Carter, Charles
**Sent:** Wednesday, January 08, 2020 12:13 PM
**To:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>; Young, Marcella <Marcella.Young@carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>
**Subject:** Hinderance of the Efficiency and Effectiveness of Security at RR715

Good Morning,

    The below listed is the recent email/directions/order sent to security. It is believed, by the undersigned, that the enforcement of this order, as written, inadvertently decreases the efficiency and effectiveness of security and the performance of their duties:

> *Officer,*
>     *I have noticed that officers are leaving their posts unattended without notifying supervision and leaving their computers unlocked. Policy is that you are not to leave your post unattended or your computer unlocked when you are absent. Effective immediately officers will not leave their posts for any reason other than an extreme emergency or when you are properly relieved. Mobile one can be called for relief if a need arises, if mobile one is not available call your supervisor who will instruct you. Please remember we are to maintain the security of personnel as well as information. Officer found in violation will reprimanded.*

    *" will not leave their posts for any reason other than an extreme emergency or when you are properly relieved."* Realistically, because of the ongoing manpower shortage, Mobile One's inability to handle his present call-duties volume/responsibilities and the individualized special circumstances of each location............

*13*

*E.67*

1

1.   There is a present and ongoing manpower shortage. There are problems filling post, let alone, waiting for some form of relief to arrive. This is reflected by the ongoing need for officers to work overtime.

2.   On a daily basis Mobile One is fulfilling one of his duties and is called to fulfill another and another. Because of this, waiting for a relief or Mobile One is like waiting for the shuttle in snowy conditions.

3.   Calling the supervisor, in most daily operational duties, usually, time-wise, hinders bringing an issue to an expedient, swift and rational conclusion.

4.   Individualized special circumstances are present at most CareFirst locations but few like RR715. For Example:

> One day I was standing out front of 715B. Lt. Young walked up the street towards me. Once she was in speaking range she said, "I thought something was wrong because you were standing outside." She immediately repeated the statement, not because she believed I did not hear her but because she wanted to highlight the fact that I was standing outside. Why would I not be back there behind the desk looking at the monitors? Part of the problem here: A desire to restrain MY actions based on HER experience level. (E.g., how can you know what a suspicious vehicle looks like on the parking lot if you don't know what's usually on that lot?) Security of this nature can't be effectively and efficiently conducted from a fixed position behind a desk. Yes, I was outside and there was no problems, because I was outside. (I usually greet associates at the door of the facility and greet them good morning but I am also visually scanning them for security reasons.) Still, its difficult to stand outside at most other CareFirst facilities and monitor incoming and departing vehicles, but you can at RR715.

Another individualized special circumstance is:

> Per policy, guards have to stand between 0800 and 0930 hours so as to be attentive during the arrival of associates and visitors. Here at RR715, associates began to arrive at 0600 hours. By 0800 hours, almost 60% of the individuals who are arriving for their tour of duty are there by 0800 hours.   The next wave of associates usually arrive between 0930 hours and 1000 hours. I begin standing,  greeting and visually scanning at 0600 hours. This event is a RR715 A & B event only.

Officers *"will not leave their posts for any reason other than an extreme emergency or when you are properly relieved."*

> A couple of days ago, a guard was working overtime at RR715A, dayshift. This guard, who was not familiar with RR715A ran out of printing paper. She called me to help her find and reload printer because she didn't know how to load it if she found it. Noting that she already had two individuals standing in front of her that needed badging. I immediately responded to 715A. During our search for the printer paper Lt. Young called on the telephone. She advised we should

2

E.68

have called her. She also advised she has all the printing paper, so she'll send Mobile One over with it and have him reload printer. I responded with the associates who needed badging to RR715B and badged them. When Mobile One arrived with the printing paper he was unable to reload printer. I again responded to RR715A and reloaded the printing machine, then responded back to RR715B. (Noting: To avoid a situation of this nature from revisiting RR715 or any other printing location one could leave a spare roll of printing paper at each location. To date, this has not been done so the problem will again arise.)

The other day Donna Kile sent out a simple email in reference to subjects coming to RR715 to work on the generator and they will be using the rear door. One subject has a CareFirst badge and the other doesn't. I asked, in writing, if the one without a badge would be coming around to the front so be badged into the facility. I was advised he would. When the two individuals subsequently arrived, through the rear door, I saw on camera that they had both entered the rear. I locked my computer screen and responded to their location to address the issue. Still, this is not an extreme emergency.

It wasn't until this morning, during my "Tour", that I realized that I was in violation of this order, as written. I should have conducted 'tours' after notifying my supervisor or waiting for a relief. As written, this order advises that the guards at RR715 cannot use the restroom unless they call a supervisor or wait for a relief. When we need to make copies of needed reports, when an associate request assistance and a host of other events or circumstances, we must call the supervisor or wait for a relief. This does not apply to other non-RR715 post because they are usually two men or women post or another manned post is nearby. Additionally, other non-RR715 Carefirst facilities have cafeterias with hot food, accessible for guards, or for guards in neighboring buildings. Not RR715. My point: there are various elements of security that makes RR715 unique in its design, duties and responsibilities.

The other day and about 0605 hours, Marlo Zamora an associate, came in as he does every morning. He had, this morning, forgotten his badge. RR715A wasn't in yet and I could not make him a badge because I had yet to receive keys to draw from Mobile One. I checked 'cardholders' and found that his badge remained active and he produced valid identification, so I allowed him back to his workstation. Once Mobile One arrived I generated the associates badge and responded to Zamora's location and gave him the badge and his driver's license. This was not an extreme emergency but should I had penalized him because of security's mistake? My point, under this new order, as written, this event could not have been corrected until I waited for a relief that doesn't exist or call my supervisor who can do nothing about the situation except wait for Mobile One as I was doing. Lastly, should I have made this associate wait in lobby until security got itself together, knowing that securities function here is not to hinder or injure the associates in the performance of their duties?

3

E·69

(I get to work and hear something. I go check it out and find the below listed. Had I waited, under this order, as written, no telling what may have happen during this non-extreme non-emergency.)

From: Carter, Charles
Sent: Monday, December 30, 2019 5:52 AM
To: Hogan, Mark <Mark.Hogan@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>
Subject: Toilet overflow (Men's Handicap Restroom: 715B)

Sir,

The men's handicap restroom in 715B is stuck in the flush position causing the toilet to continuously flush and 'slightly' overflow. 'Slightly' because the water on floor is the result of the water splashing out of the continuous flushing process of the toilet. This officer was unable to shut off water at toilet and attempts to 'unstick' the flushing device failed. Respectfully,

There are often situations like the below listed, which appear to have the intent of depriving certain guards of privileges or initiating administrative penalties:

Note to Myself,

They have taken away our 15 minute break because Lt. Young said it was optional. On days like today (11/7/19), no break and advised that lunch will be late because it was exceptionally busy for Mobile One/had to pick up Burrell to take to work, etc. Its presently 1147 hours and still no lunch break. Time to go home is 1400 hours.

This 'break removal of those at RR715 came during the enforcement of the below listed policy:

Subject: OM-1 1st Shift Breaks and Lunch Reliefs.
Hello Team,
Just a reminder, We have a 15 min. morning break and a 30 min. lunch break. Most of the time it is given, at a timely manner. At times due to circumstances, you may not be relieve at the scheduled time.
OM-1 main lobby morning break starts at 9 a.m. The two officers relieve each other.
Lunch breaks, one officer goes at 11:30 a.m. and the other officer goes at 12:30 p.m.

Employee Entrance morning break starts at 9 a.m. The two officers relieve each other.
Lunch break starts at 12 noon. The two officers relieve each other.

Loading Dock morning break start at 8:30 a.m. It is given by the second officer at the EE.
Lunch break start at 11:30 a.m. it is given by the second officers at the EE.

4

E·70

OM-2 Lobby morning break start at 10 a.m. It is given by the
Mobile Unit if available. If not, it is given by 2nd officer at
OM-1 lobby.
Lunch break start at 12 noon. It is given by the Mobile Unit if
available. If not, it is given by 2nd officer at OM-1 lobby.

Lt. Lamont Green
Site Supervisor
Garda World Security Sevices
10455 Mill Run Blvd | Owings Mills, MD 21117
W: 410-998-4966 | C: 443-381-3270 **Lamont.Green@carefirst.com**

Or:

**From:** Carter, Charles
**Sent:** Thursday, January 02, 2020 5:38 AM
**To:** Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison
<Madison.Crosby@carefirst.com>
**Subject:** Question

Good Morning,
       A couple of days ago you (Lt. Young), called me, via telephone,  at
RR715B to advise me that the last couple of individuals who I had
just issued temporary associate badges to were not supposed to get
them. Their regular badges were expired and they should be given
'visitor' badges and be escorted into the facility. I immediately
responded to each individuals location, retrieved their temporary
badges and issued them 'visitor' badges.

       The next day you appeared at RR715B and made inquiries to me as
to why I issued them temporary associate badges. I advised you that:

       I spoke with officer Watson, in the badging room, who assured me
that these individuals were not suspended or terminated, their badges
were just procedurally and annually expired. I checked my card holder
files and found the same information. Actually, during her investigation
into this matter Officer Watson found a 'one stop' which had been
submitted for one of the individuals (Ellia Ally: Expreis) and that badge
was immediately reinstated. Officer Watson sent me an email to that
effect.  Additionally, Steve Kelleher (CareFirst's FEP Lean Evacuation
Coordinator), you may have seen him at the desk with the group (white
male, white hair), advised me that these individuals badges should have
not expired. He also advised that he had spoken with someone in
authority at CareFirst who advised that this mass expiration issue would
not occur and the subjects should be allowed in. Lastly, Mr. Kelleher
immediately made a list  of those effected by the mass expiration event
and sent it to somewhere unknown to this officer and the effected
individuals badges were reinstated.

       After this discussion was over you showed me a piece of paper with
the handwritten name of Hari (Last name started with a 'P') on it. You
then asked if he was one of the individuals I had allowed in the facility
or had given a temporary associates badge to. I immediately advised no

5

E. 71

and then showed you my Temporary Badge Holder List that reflected that he was not among any of those issued badges.

Even though the nature of your inquiries appeared, to me, to be geared towards collecting information that would support some form of administrative penalty for my actions, I remain concerned about the individual on the handwritten piece of paper. My question is, who is the Hari individual? Is he someone that I should know about here at RR715B? I couldn't find anything on him in the rear file.
Respectfully,
S/O Carter

There is a recent event where the supervisor observed me, on camera, stretching. She called it 'exercising' and immediately called me on the telephone and advised me that there is no 'exercising' on camera. How else does one stretch when seated to long or tired? It has a lot to do with maintaining alertness. The totality of her above listed actions appear to be geared towards making the armed guards inefficient. Meaning, don't move and sit behind the desk and fall asleep, (i.e., No coffee, no  breaks, no food, rules that are inefficient, etc.).

There is a plethora of valid  reasons and situations that would merit a guard at RR715 to properly leave his or her post without it being an 'extreme emergency'. There are various elements that create circumstances at RR715 that give rise to numerous individualized special circumstances. There is an on-going attempt, inadvertently or not, to hinder the efficiency and effectiveness of the armed guards at this location. It appears, based on supervisions experience and training, they are attempting to hinder or stifle the armed guards acts or actions which are based on their (e.g., armed guards), experience and training.

*********************************************************************************
*
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*********************************************************************************

E.72

# SUPPLEMENTAL TO EXISTING COMPLAINT

**Please Attach to My Existing Complaint # 587999286301**

1. **Corrective Action Form dated February 6, 2020**: Rules of Conduct (Failing to obtain permission to leave work early).

2. **Corrective Action Form dated February 6, 2020**: Failure to perform duties satisfactorily (Looking at something on telephone).

3. **Inequitable Treatment at the Workplace**: A synopsis of the recently filed administrative changes was emailed to PFC. Mingle, to forward up the chain of command. There was also this typed, hard copy, of a detailed explanation of the fraudulent charges left for this supervisor. He acknowledged receiving same. Note: attached to the email was a picture (3A) of what this writer was alleged to be looking at on his phone, as the security cameras should reflect.

4. **Email dated February 13, 2020**: This email was sent to PFC. James Mingle and was making inquiries as to what is the status of submitted above item number 3. He advised, in his response, he'd speak with me soon.

5. **Corrective Action Form dated February 19, 2020**: Administrative charges concerning medical issues. Charges that are based on another company's policy, not GaradaWorld's.

6. **Email dated February 19, 2020**: A detailed explanation of why these charges are not valid based on policy.

Blatantly inflicted individualized penalties, directed at this writer, are not new. They have been inflicted dating back to my first day of being assigned to this one man post, which is located off-site of the original neighboring site, which is across the street from where management is located.

7. **Email dated October 17, 2019**: Questioning my breaks or break resulted in the former assistant account manager, James Hamrick, to respond to my location and discus the contents of my concerns. This is when he told me about management's direction of putting together a packet and terminating me.

8. **Email dated October 11, 2019**: This email advises employees at the neighboring facilities of their break schedules. It was during the notification of this 'Break Schedule' that management stripped me, at this one man post, of his breaks.

9. **Email dated September 20, 2019**: Issues over tour of duty relief lateness and the non-concern of management.

Policies imposed on me as a result of my desires to exercise my rights that were generated during my 2020 concern filings and administrative charges:

E.73

10.   **Email dated February 5, 2020:** This individual, the author of most of my recently received administrative charges, sends out acknowledgment of her authority.

11.   **Email dated February 13, 2020:** Notice from management re-advising of policy and what appears to be addressing my concern filing and complaints publicly.

12.   **Email dated February 13, 2020:** Management re-advising that phone are not to be used on post at anytime.

13.   **Email dated January 8, 2020:** Hindrance of the Efficiency and Effectiveness of Security at RR715.

There is a plethora of documented evidence that validates that those involved in creating a continuing course of conduct that has generated acts of discrimination, harassment, creating a hostile working environment and unfair labor practices events, all of which are named in the generated above listed documents,  knowingly and deliberately, with malice, have acted to be injurious to this writer. Numerous verification documents have not been submitted because of fax cost but they do exist, as well as continue to verify management's sanctioning of the aforementioned acts or actions.

Respectfully,

Charles H. Carter

**PLEASE ATTACH THESE ATTACHMENTS TO MY EXISTING
COMPLAINT/REPORT # 587999286301.**

E.74

Mail body: Fwd: Response to Corrective Action Form dated 2/19/20

Sent from my iPhone

Begin forwarded message:

> From: "Carter, Charles" <Charles.Carter@carefirst.com>
> Date: February 19, 2020 at 10:29:34 AM EST
> To: "CCharlescarterb@icloud.com" <CCharlescarterb@icloud.com>
> Subject: FW: Response to Corrective Action Form dated 2/19/20

From: Carter, Charles
Sent: Wednesday, February 19, 2020 10:16 AM
To: Siwek, Thomas <Thomas.Siwek@carefirst.com>
Subject: FW: Response to Corrective Action Form dated 2/19/20

From: Carter, Charles
Sent: Wednesday, February 19, 2020 10:14 AM
To: Mingle Jr, James <James.MingleJr@carefirst.com>
Subject: Response to Corrective Action Form dated 2/19/20

Sir,

As you know I was recently charged with the below listed administrative offense:

**On 2/14/20 S/O Charles Carter called off for his 2/14/20 0600 – 1400 RR715B shift stating he was ill.**
**On 2/18/20 S/O Carter responded back to work but did not bring a note from a doctor's note.**
**When asked, he advised that he did not have one.**

*All unexcused absences are in violation of Company policy. A doctor's note is required for every absence due to illness.*
*Any further infractions will result in progressive disciplinary action.*

A more accurate account of this event is as follows: On 2/13/20 at approximately 2100 hours, Charles H. Carter called the Gardaworld Command Center and spoke with Cpl. Keys. Carter advised that he could not make it to his upcoming shift because he was feeling ill, having what appeared to be flu like symptoms. Later, the next day, at approximately 1100 hours, on the 14th of February 2020, several hours after the aforementioned call, Carter notified his immediate supervisor (i.e., Lt. Young and Cpl. Mingle). via telephone, that he would be in for his tour of duty on his next scheduled day to work. Since the 15th (Saturday) and 16th (Sunday), were Carter's scheduled days off and the 17th was a holiday, Carter naturally did not show up to work on his days off. Again, naturally, Carter did not return to work until and on the 18th of February 2020, his first scheduled work day. There was only one absentee day utilized in this event, not for (4) as this writing infers. (Noting that this 'not out on medical status' was widely known to management because on the 16th of February 2020, management (Sgt. F. Raines) contacted Carter to see if he would work an overtime for that day, on the 3 to 11 shift. Carter's immediate supervisor, Lt. Young, was at the worksite on this particular day, which is not her regularly scheduled work day. She was made aware that Carter had refused to come in and work that particular day.

The listed witness to the 'Corrective Action Form' and possibly the motivating force behind its generation, when asked, "Where in the GardaWorld policy book does it say that we have to obtain a medical slip under the mentioned circumstances?" Her response was, "Carefirst's policy, dictates you must have a medical slip after being on medical for three days. (Noting: That if Carter had been on medical it would have only been for one day and Carefirst's policy does not supersede GardaWorld's policy because GardaWorld is my employer.)

E. 75

Still, GardaWorld's Employee Handbook` addresses the above mentioned event, under **Attendance and Punctuality, page 83:**

Last paragraph:

**If the absence/tardiness is foreseeable, the employee must notify their immediate supervisor at least four (4) hours prior to the start of their shift the employee will be absent or tardy. If the need for the absence/tardiness is unforeseeable, the employee must provide notice of the need for the absence/tardiness as soon as practical to their immediate supervisor. Poor attendance and excessive tardiness is disruptive. Repeated absences/tardiness or other failure to comply with this policy may result in discipline up to and including termination.**

1. Carter's entry on duty date is May 19, 2020. This is his first time calling in because he felt ill. Actually, it Carter's first absentee event and only been late twice in his nine (9) months of employment.

2. GardaWorld's Employee Handbook makes no mention, from cover to cover, of any medical absences and the need for a doctor's slip.

3. As to Carefirst's involvement in this event, the only connection I can find is that in a recent Carefirst publication, the head doctor for Carefirst recently wrote about oncoming flu like symptoms and his documented advice to all employees and associates is that if you feel these symptoms coming on stay home, do not help in the spread of this event.

4. Lastly, Carter did not violate GardaWorld's policy, as it pertains to this event, he did as the policy prescribes/orders. (i.e., he called in within the set time limit, made the appropriate notifications and he returned to work the next scheduled work day).

5. Under Gardaworld's Drug and Alcohol Policy it advises, in part (p. 43): Employees are required to report to work in appropriate mental and physical condition to perform their jobs in a satisfactory manner. Should I have taken, for example, an over the counter sleeping medication like Night Quill and come to work?

6. What is the motivating force behind this impulsive administrative charge?

Respectfully,

*******************************************************************************
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*******************************************************************************

E. 76



# Fax Cover Sheet

Date __3/1/20__          Number of pages __11__ _(including cover page)_

**To:**

Name __GARdAWoRld__

Company __WHE IAN'S__

Telephone __1-866-614-2758__

Fax __1-971-250-4125__

**From:**

Name __CHARLES CARETOR__

Company __GARdA WoRld__

Telephone __443-760-2225__

Comments __Please Attach To my Existing Complaint # 58799928630 1__

Fax · Local Send          Fax · Domestic Send          Fax · International Send

7 90363 00711 1    7 90363 00714 2    7 90363 00720 3

fedex.com 1.800.GoFedEx 1.800.463.3339

© 2015 FedEx. All rights reserved. Products, services and hours vary by location. 615.OP00.002          0017745PM

E·77

TRANSMISSION VERIFICATION REPORT

```
TIME  : 03/01/2020 10:16
NAME  : FEDEX OFFICE      0903
FAX   : 410-467-4585
TEL   :
SER.# : U53314A5J210686
```

```
DATE,TIME          03/01  10:11
FAX NO./NAME       19712504125
DURATION           00:05:50
PAGE(S)            11
RESULT             OK
MODE               STANDARD
```

E·78

SUPPLEMENTAL TO EXISTING COMPLAINT

Please Attach to My Existing Complaint #587999286301

1. Business records reflecting Charles H. Carter being interrogated/investigated for *Lunchtime whereabouts*.  There has been no one interrogated/investigated for lunchtime whereabouts throughout 2019 or 2020, at this job.

2.   Gardaworld's Corrective Action Form for medical abuse: Exoneration.

3.   Letter dated February 24, 2019, addressed to Donna Kile, Account Manager at Gardaworld, requesting that discriminatory and harassing acts and actions stop. (Same has yet to be submitted.)

Charles H. Carter

PlEASE    ATTACH   To   My

Existing Complaint #

587999286301

E. 79

Mail body: Fwd: Working Lunch

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 28, 2020 at 12:55:13 PM EST
> **To:** "Ccharlescarterb@icloud.com" <Ccharlescarterb@icloud.com>
> **Subject:** FW: Working Lunch

**From:** Carter, Charles
**Sent:** Friday, February 28, 2020 12:49 PM
**To:** Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** Working Lunch

At 1238 hours, on todays date, I received a telephone call from Lt. Marcella Young, as I was eating lunch on my post. She immediately advised, "Its my understanding that you left the property to go to lunch." I advised that I did not leave the property to go to lunch. She then asked, "Then where did you go?" I reiterated my first answer, "I did not leave the property to go to lunch." She then reiterated the rules about my not leaving the property and further advised that if I needed lunch I could come to her location and eat.

Just for the records, I was relieved for lunch at 1125 hours, by PFC. Mingle. I drove around to the side of the building, 10715 Red Run Blvd., and as usual, parked in front of Merit Properties, where I made several telephone calls, brushed my teeth and then returned to RR715B at 1144 hours. I then ordered food from Red Run Deli, that cost me $15.02 cents for the delivered food. Please advise, so that we may avoid additional capricious and baseless administrative charges.

Respectfully,
*****************************************************************************

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意: 如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*****************************************************************************

E. 80

Mail body: Fwd: Working Lunch

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 28, 2020 at 1:36:27 PM EST
> **To:** "Ccharlescarterb@icloud.com" <Ccharlescarterb@icloud.com>
> **Subject:** FW: Working Lunch

**From:** Carter, Charles
**Sent:** Friday, February 28, 2020 1:35 PM
**To:** Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>
**Subject:** FW: Working Lunch

It may not be well known but I smoke cigarettes and have done so for the last 35 years. This information appears to be needed since I was just questioned about my working lunch whereabouts. Per Gardaworld's Smoking Policy, pg. 46.

*In keeping with Gardaworld's intent to provide a safe and healthful work environment, smoking in the workplace, including use of e-cigarettes (vaping) and other tobacco products, is prohibited except during an employee's authorized break time in those locations specifically designated as smoking areas.*
*Security personnel shall not smoke or use other tobacco products while On-duty, not while Off-duty in a Gardaworld uniform where they could be observed by others unless expressly authorized by a supervisor, a Human Resources representative or the Chief Human Resources Officer. Security personnel shall not under any circumstances smoke in company vehicles.*

After I take my smoke where mentioned in the preceding email I drink some of the bottle of mouthwash, which is kept in my vehicle, brush teeth with it and move on, as was done on this date. Additionally, I have a copy of the food delivery food order with dates and times and food ordered. I had to retrieve it from the trash, in an attempt to possibly avoid more administrative charges. I'm sure an investigation is going on as I write.

Respectfully,

**From:** Carter, Charles
**Sent:** Friday, February 28, 2020 12:55 PM
**To:** Ccharlescarterb@icloud.com
**Subject:** FW: Working Lunch

**From:** Carter, Charles
**Sent:** Friday, February 28, 2020 12:49 PM
**To:** Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** Working Lunch

At 1238 hours, on todays date, I received a telephone call from Lt. Marcella Young, as I was eating lunch on my post. She immediately advised, "Its my understanding that you left the property to go to lunch." I advised that I did not leave the property to go to lunch. She then asked, "Then where did you go?" I reiterated my first answer, "I did not leave the property to go to lunch." She then reiterated the rules about my not leaving the property and further advised that if I needed lunch I could come to her location and eat.

Just for the records, I was relieved for lunch at 1125 hours, by PFC. Mingle. I drove around to the side of the building, 10715 Red Run Blvd., and as usual, parked in front of Merit Properties, where I made several telephone calls, brushed my teeth and then returned to RR715B at 1144 hours. I then ordered food from Red Run Deli, that cost me $15.02 cents for the delivered food. Please advise, so that we may avoid additional capricious and baseless administrative charges.

E.81

Respectfully,
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

E. 8Z

Mail body: Fwd: Administrative Charge(s) Inquiries

'Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** February 28, 2020 at 6:52:27 AM EST
> **To:** "ccharlescarterb@icloud.com" <ccharlescarterb@icloud.com>
> **Subject: FW: Administrative Charge(s) Inquiries**

**From:** Crosby, Madison <Madison.Crosby@carefirst.com>
**Sent:** Friday, February 28, 2020 5:25 AM
**To:** Carter, Charles <Charles.Carter@carefirst.com>
**Cc:** Young, Marcella <Marcella.Young@Carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>; Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>
**Subject:** RE: Administrative Charge(s) Inquiries

Good Morning Officer Carter,
Thank you for the response. I understand now that your issue is with your perception that supervisor approval is needed in order to proceed through the Chain of Command to get issues resolved. Let me assure you that no one will hinder your efforts to get issues resolved as long as you as you go through the proper channels and follow the Chain of Command as stated. Cpl. Burrell did not state that you needed supervisor approval. Her actual words are "Instructed to do so by a supervisor." An example of that is when it has been determined that the issue cannot be resolved at that level and the supervisor says that it needs to be taken to the next level. Once you have gone to your supervisor and it is clear that the both of you cannot obtain an acceptable result and you are at an impasse then you can proceed to take it to the next level in order to try and get it resolved. The main goal here is for all of us to work together and be on the same page in order to obtain the desired results. Thanks again Officer Carter and have a blessed day and weekend.

**From:** Carter, Charles <Charles.Carter@carefirst.com>
**Sent:** Thursday, February 27, 2020 6:43 AM
**To:** Crosby, Madison <Madison.Crosby@carefirst.com>
**Cc:** Young, Marcella <Marcella.Young@Carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** RE: Administrative Charge(s) Inquiries

Good Morning Sir,

        I agree wholeheartedly as it pertains to your views on the Chain of Command. Not only do I agree with your words on the chain of command issue, having spent years in the military and various paramilitary organizations, but I have and will continue to have a great deal of respect for the unwavering utilization of the Chain of Command. I also agree with the concept of "successive order", in part, as it pertains to this issue. Part of my concern with the email, as written, infers that the chain of command ends with the four mentioned individuals and the element of *supervisory approval is needed to move forward up the chain of command* (i.e., "You should not be contacting Colonel Steve Martin or Mrs. Donna Kile if you was not instructed to do so by a supervisor.") This I believe would be in violation of the mentioned Open Door Policy. No supervisory approval is needed to move forward up and through the Chain of Command. If this were the case a supervisor could stop any and all complaints or concerns, at their level, especially those complaints or issues they elect to not be placed before superiors.

Respectfully,

**From:** Crosby, Madison <Madison.Crosby@carefirst.com>
**Sent:** Thursday, February 27, 2020 2:00 AM
**To:** Carter, Charles <Charles.Carter@carefirst.com>; Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>; Burrell, Shawan

E·83

<Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** RE: Administrative Charge(s) Inquiries

Hello Everyone,
I have examined all the information submitted below regarding the Chain of Command Policy that was sent out by Cpl. Shawan Burrell. A policy that is strictly enforced in the military and most companies. The policy of following the Chain of Command does not in any way violate the open door policy. GardaWorld clearly states "you are welcome to discuss your concerns with every level of management at Gardaworld in successive order, up to and including the COO of Gardaworld." The keywording is "successive order" which indicates any issues can be discussed with any level of management as long as you take the required steps of following each level of the chain of command first. Let me know if you have any further questions or concerns on this matter.

**Madison Crosby**
Shift Supervisor
**GardaWorld Security**
10802 Red Run Blvd | Owings Mills, MD 21117
W: 443-738-7525 | C: 410-218-4102 | Madison.Crosby@CareFirst.com
www.garda.com

**From:** Carter, Charles <Charles.Carter@carefirst.com>
**Sent:** Wednesday, February 26, 2020 10:01 AM
**To:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Burrell, Shawan <Shawan.Burrell@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** Administrative Charge(s) Inquiries

On the below listed date (Wednesday, February 5, 2020), Cpl. Burrell generated and distributed the below listed directions to various subordinates. In this writing she orders subordinates to not disregard her chain of command, which uniquely includes only four supervisors. Cpl. Burrell also advises, in this writing, that these subordinates should not contact upper management unless approved by one of the individuals listed in her provided chain of command.

**From:** Burrell, Shawan <Shawan.Burrell@carefirst.com>
**Sent:** Wednesday, February 05, 2020 6:07 PM
**To:** Davis, Kori (CWR) <Kori.Davis@carefirst.com>; Von Johnson, Rodney (CWR) <Rodney.VonJohnson@carefirst.com>; Brown, Ciara <Ciara.Brown@carefirst.com>; Peart, Benjamin <Benjamin.Peart@carefirst.com>; Jackson, Anthony <Anthony.Jackson@carefirst.com>; Mitchell, LaShay <Lashay.Mitchell@carefirst.com>; Carter, Charles <Charles.Carter@carefirst.com>; Roberts, Trol <Trol.Roberts@carefirst.com>; Banks, Regina <Regina.Banks@carefirst.com>; Green, Gregory <Gregory.Green@carefirst.com>; Siwek, Thomas <Thomas.Siwek@carefirst.com>
**Cc:** Kile, Donna <Donna.Kile@carefirst.com>; Martin, Steven <Steven.Martin2@carefirst.com>; Young, Marcella <Marcella.Young@Carefirst.com>; Crosby, Madison <Madison.Crosby@carefirst.com>; Mingle Jr, James <James.MingleJr@carefirst.com>
**Subject:** Team Red Run

Hello, Red Run Team!

There are a few things that I will be addressing in this email.

1. Proper telephone etiquette, when you are answering the desk phones you must state your location, name and rank. For Example; " Good evening CareFirst Cpl. Burrell" you cannot answer the phone like you are at home.
2. If you work a one man post, you cannot just get up and randomly walk away from the desk at your leisure. When you need a relief or if you need to use the restroom then you must call and let your supervisor know so they can watch your lobby. When someone is entering into the building, you should not be away from your desk or not paying attention to your galaxy. If you are not paying attention to your galaxy and someone get into the building by using someone else's badge then that will require disciplinary action up to and including termination.
3. We have a chain of command that you MUST follow;

PFC Jim Mingle
Cpl. Shawan Burrell
Sgt. Madison Crosby
LT. Marcella Young

E.84

You should not be contacting Colonel Steve Martin or Mrs. Donna Kile if you was not instructed to do so by a supervisor. PFC Jim Mingle is now one of the supervisor's here at Red Run. PFC Mingle is to be respected as a supervisor. From this day on, ALL "END OF SHIFT REPORTS" will be sent to all of your Red Run supervisor's. All items listed above must adhered too with no deviations. If you have any questions or concerns please feel free to reach out to me.

The COO of GardaWorld Security Services in the United States, Prentice Robertson, advises, in the recently issued Gardaworld Employee Handbook ,that Cpl. Burrell's chain-of-command structure and the described policy associated with it would be and is in violation of Gardaworld's policy, if utilized, enforced and/or sanctioned by supervision.  Gardaworld's policy actually advises, pgs. 25 and 26:

Open-Door Policy: Gardaworld encourages an open-door policy whenever someone has a criticism, complaint, compliment, suggestion or question. Your supervisor is often your best starting point and source of information. If the matter remains unsolved, any member of Gardaworld's management is available to discuss your problem........ (In Part).

As part of the policy, Gardaworld makes every effort to provide a positive work environment for our employees. If you are concerned about an issue, please contact your immediate supervisor or manager. If the issue is not resolved to your satisfaction, you are welcome to discuss your concerns with every level of management at Gardaworld in successive order, up to and including the COO of Gardaworld. (Also see Harassment pages. 26 – 29).

With that being said, this writer is again making inquiries as to the status of the previously filed administrative charges which name (Charles Carter)  as a violator of said charges.


Respectfully,

Charles H. Carter #188645
*****************************************************************************

Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you. ATENCIÓN: Si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 855-258-6518 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
*****************************************************************************

E.85

**GAR**

Note 1 reflects that Cpl. Burrell wrote up this Corrective Action Form to reflect I missed several days, Friday through Monday, when in fact I was only off one day, Friday. I was not scheduled to work the weekend and returned to duty on Monday, my scheduled work day.

**Today's Date:** 2/18/20

**Employee Name:** Carter, Charles    **Branch Location:** RR 10715B    **Account Name:** CareFirst

**Date of Policy Violation or Incident:** 2/18/20    **Reason for Notice:** Informal Warning

**Dates of Prior Counseling or Corrective Action:**

**Situation Statement:** *Describe the incident, event, or situation; use dates, times, names, and facts. If policy violation, reference specific policy violation.*

On 2/14/20 S/O Charles Carter called off for his 2/14/20 0600-1400 RR715B shift stating he was ill. On 2/18/20 S/O Carter responded back to work but did not bring a note from a doctor's note. When asked, he advised that he did not have one.

**Actions to be taken:** *Examples include items such as appropriate standards, training, time frames, additional assistance that will be provided, expectations of behavior, consequences for further violations, or failure to perform up to standards, etc.*

All unexcused absences are in violation of Company policy. A doctor's note is required for every absence due to illness. Any further infractions will result in progressive disciplinary action.

**Employee Remarks:** *Use additional sheet if more space is needed.*

SEE GARDA World's ABSENCE/TARDINESS POLICY,
PAGE 83. (Not Guilty) OF THIS OFFENSE

**Acknowledgement:** *I have read and understand this notice and have been given the opportunity to make appropriate remarks. I further understand that improvement must be immediate and sustained. Failure to take immediate corrective action may result in further corrective action, up to and including termination.*

_____    _____    2/18/22
Employee Printed Name    Employee Signed Name    Date

JAMES MINGLE    _____    2/19/20
Manager Printed Name    Manager Signed Name    Date

Shawan Burrell    _____    2/19/20
Witness Printed Name    Witness Signed Name    Date

EXONERATED

JAMES MINGO  PFC    _____    2/26/20    Updated: August 2019

E.86

From: Charles H. Carter # 188645                                    February 24, 2020
           10715 Red Run Blvd., Suite 120
           Owings Mills, Maryland 21117

To:  Donna Kile, Account Manager
       Gardaworld Security
       (Chain of Command)

Good Morning,

        I originally had hopes of finding a manner in which to have the Garadaworld's supervisory
entities discontinue what appears to be their unethical and unlawful interactions directed at me.
My every sincere attempt to avoid and/or professionally address their negative and at times
unlawful interactions has resulted in their increased and accelerated negative interactions (e.g.,
recent law foundationless, not policy based knowingly fabricated administrative charges).  This
leaves me with few options, since it appears that those involved are acting with impunity, to
revise the manner in which I attempt to address the ever-changing involved issues and their
knowingly and deliberately mishandled involvement of those issues.  *"How long should one
involved in a card game take to change the game plan when he or she knows that the game is
stacked against him or her?"*  Since this writer has not and does not violate any policy
management searches for reasons to penalize him. For example, I was previously *uniquely*
investigated and interrogated for '*excessive scanning*', which is clearly a unique event and I'm
sure 'no other guard' has ever been investigated for and/or administratively charged with.

        This weekend I filed, at great expense (i.e., expense meaning, it cost me $149.00 to fax
submitted documents, not counting my time), a complaint/report to the corporate office's human
resources requesting that they review, evaluate and make a determination on my views of
Gardaworld management's actions and/or inactions in the matters presently before us, that
directly are forced on this writer. My writings/complaint is validated by the organizational
business record trail and policy.

        As to matters before us: Administrative charges not based on facts, policy or factual actions;
the infliction of penalties based on supervisor's  personal feelings and not policy or law; and, the
deliberate and known law and policy violations that were generated and endured since 2019 up
to this date. There are a plethora of continuing violations, directed at this writer, that have
knowingly been allowed to be committed because they appear to have been sanctioned by upper
management. These violations and the presently submitted complaint include, but not limited to,
former assistant account manager, James Hamrick, who simply and improperly deemed one filed
complaint of harassment and discrimination as '*intellectual bullying*' and dismissed the
complaint (Attachment #7 of 14 in filed complaint). My submitted allegations include, but not
limited to, discrimination, unfair labor practices, harassment, retaliatory acts and a host of other
verifiable violations.

E. 87

As previously requested in various written submissions and/or complaints, I now, again, respectfully request that the not policy based/ fraudulent/ improper actions and/or inactions STOP!

Respectfully,

Charles H. Carter
ID #188645

E. 88

This is the Final Human Resources Report for the combination of all submitted allegations of harassment, discrimination and Hostile Working Environment.

# GARDAWORLD

## HUMAN RESOURCES DEPARTMENT
## MID-ATLANTIC

TO:        Charles H. Carter, Security Officer

FROM:    Jody E. Gaines, Human Resources Manager (HRM)

CC:        Donna M. Kile, Project Manager

DATE:     May 14, 2020

SUBJECT:  Final Report of Investigation

BACKGROUND:
Charles H. Carter is an Armed Security Officer working at the CareFirst location and filed a complaint siting discrimination, hostile work environment, and being harassed at his site location.

STATEMENT OF FACTS:
On April 10, 2020, Jody E. Gaines (HRM) called Mr. Carter to get a complete account of all alleged issues from filed complaint.  Mr. Carter had listed several issues that needed to be addressed.

Mr. Carter stated that he felt that he was being harassed when it comes to the smoking policy, personal use of technology, using the communication devices on site, eating on post and the completion of actual shift.

Another issue Mr. Carter had was with the scanned keypads located in the CareFirst building and felt he was being singled out to this process.

The last issue that Mr. Carter had was about Corrective Action Forms (CAF) and an email that was sent from Management to all personnel regarding expectations at the site.

On May 7, 2020, Mr. Carter emailed about needing further clarification on 15-minute breaks and on May 8, 2020, an email was submitted from Mr. Carter needing to know his discipline status.

E. 89

Page 2 – Final Report

During the fact-finding process, the HRM interviewed the CareFirst Management team, did site research, and utilized the GardaWorld Employee Handbook. After careful review, the following was determined and discussed with you:

1) The Smoking Policy that is outlined in the Employee Handbook on page 46 outlines that Security Personnel shall not smoke while-on-duty. While the CareFirst site location is a non-smoking building, two (2) smoking areas have been designated that is located behind the building and follows the 25ft. distance from the building. Smoking in front of the building is strictly prohibited. The GardaWorld Security Officers are not allowed to leave the site; therefore, both locations must be visited by walking. The first location is behind the building out back and is across the driveway/parking lot by the wooded area. The second location is at the end of the shopping center to the right. While these are listed as the two (2) designated areas, proper disposing of cigarettes is required and there are no exceptions to this rule.

2) The Communication Devices/Personal Use of Technology is outlined in the Employee Handbook on page 55 and 62. There must be authorization granted to utilize personal technology and communication devices are only allowed during meal and/or break times and never on post. Also discussed was making sure that while on post, no eating is allowed and is reserved during your meal and/or break period. The communication device at this site is strictly to be used for completing tour patrols and should not be laying on the desk at any time for any reason.

3) Completing your assigned shift is very important and leaving the post early without receiving approval from Supervision is prohibited and viewed upon as abandoning post. It was discussed that leaving a post early to make sure you do not incur overtime is not needed for TeamTime requirements. Therefore, no matter if you are working 7am-3pm; 6am-2pm; and/or 3pm-11pm, you must complete the entire shift. At the completion of the assigned shift, there is ample time to drive across the street to return all equipment without incurring any overtime. After Management clarification, the process is to pull in front of the building after the shift, return equipment, and clock out. This way, the shift is completed in its entirety, equipment is returned and then properly clocking out for the day should be the normal process.

4) The scanned keypads located at the CareFirst site are used by all personnel. No one is exempt from this policy. If you incorrectly enter the keypad three (3) times an explanation is required. If you incorrectly enter the keypad five (5) times an incident report must be generated and submitted to Management. As discussed, this procedure applies to all personnel and the required explanation and/or incident report must be generated and is a site-specific requirement that

E. 90

2

must be followed, and no deviations are accepted from anyone. To date, there have been no issues after consulting with Management on the process.

5) Corrective Action Forms (CAF) are a communication tool that assist Supervisors and Employees to improve work issues and/or performance. As a progressive discipline format is utilized, this means that there is a step ladder for discipline unless the offense is so egregious. As discussed, our steps are the following: a) Informal Warning; b) Formal Warning; c) Formal Final Warning; d) Suspension; and e) Termination. While the Management staff at CareFirst has implemented an appeal process, Officers are given the opportunity to provide additional information to have the CAF either downgraded and/or removed. This opportunity is given to all staff which means that no one is singled out and everyone given a fair due process.

Regarding the Management Expectations email, as discussed, all personnel working at the site should be given the same information. If an employee has questions that would be beneficial for all to know, that is not pointing any fingers but keeping everyone in the loop of what is expected at the site.

6) Breaks are granted differently at various sites. Some sites could incur a 15-minute break and then a 30-minute lunch and some may be a 45-minute break/lunch period. It is imperative to discuss with your Management team before assuming the post as each site is not the same.

CONCLUSION:
The HRM has determined that in reviewing all information there is no supporting evidence of harassment, discrimination or fostering a hostile environment by Management.

While every site has their own operating standards and/or procedures, it is imperative to utilize your Supervisor as a tool to make sure you have a clear understanding of what is expected and what is required to accomplish the mission at each site.

The Management staff has implemented a process that is above and beyond the CAF process to make sure there isn't any miscommunication and/or misunderstanding by implementing the appeal process. With this process being available to all staff, it encourages all officers to learn their site and constantly improve their performance.

E.91

Page 4 – Final Report

Lastly, when Management feels that addressing something could help every officer at the site it should be looked upon as assistance and making everyone better and not feeling singled out.

The guidelines that have been discussed with you as well as outlined in this final report must be followed and if there is ever a time that further discussion is needed, please make sure to reach out to Management to get the necessary clarification before assuming and making a wrong judgement call.

- END OF REPORT -

E. 92

Dear M'S Gaines, Human Resources Manager (HRM),                                        May 23, 2020

Albeit well written, the Finale Report of Investigation related to my filed complaint #717552118501, appears to have utilized this complaint as a creative writing exercise which is tainted with numerous well-crafted non-issues geared toward protecting those who have been accused. This investigation and its pseudo-fact findings are so void of answer to the complaint and, in part, the reasoning for the disproportionate treatment of this complaint is because Project Manager, Donna Kile has, in most cases, sanctioned and approved the unjust actions of her staff. This results in Mrs. Kile's inability to properly address the issues because she would subsequently have to investigate/penalize herself.

Except for the originally filed on-line submission application, my complaint and supplemental attachments to the complaints were either all faxed or emailed to your organization. This fortunately leaves me with a complete copy of the complaint filed, with receipts of these filings. Still, it appears that the information/attachments/exhibits were not utilized and/or addressed. Meaning, many of the primary issues were ignored and/or left unaddressed.

**Statement of Facts:**
**Mr. Carter states that he felt he was being harassed when it comes to the smoking policy, personal use of technology, using the communication devices on site, eating on post and the completion of actual shift.**

Smoking on post, personal use of technology, eating on post and completion of actual shifts was never an issue with me, nor was either the gist of my filed complaint. All of the above-mentioned issues were events used by management to penalize me. For example, the smoking issue became an issue that management used to explain their believed-to-be justifiable reasoning for interrogating me as to my actions during my lunch break, as the documents in my complaint reflects. Management didn't know I smoked until their interrogation of me about my actions during my lunch break. Noting that during this one and only 30-minute break this day, I only used twenty (20) minutes before I was back at my workstation. There were no negatives events that occurred before or during this twenty-minute lunch break, as my submitted complaint documentation reflects. The same applies to eating on post, it was an issued made by management to again explain their justification for the interrogation. The 'completion of actual shift' as written on page 46 of the Employee's Handbook is exactly what I did and still I was knowingly charged with abandoning post,[1] in an attempt to have me terminated.

Management advised, in a written directive, that 'You are not allowed to eat at your post'. This directive was included in my filed complaint but never was the issue addressed. *Why did I get interrogated about my actions during lunch and subsequently have to submit a written explanation, like no other?*

---

[1] Employee Handbook's Page 46. It was I who used this as the defense for my actions. It was also I who advised management of this policy. Management's utilized policy for the abandonment of post charges were based on and written surrounding personal feelings. Therefore, documentation of this event disappeared without any action. I still retain my copies of the event and they were included in the filed complaint.

E. 93

After several misdirecting statement, you and I concluded that what I advised you about this not being a non-smoking reservation was factual. I used, per GardaWorld's policy, page 46, to smoke. Simply put, your conclusion that **"The GardaWorld Security Officers are not allowed to leave the site; therefore, both locations must be visited by walking"** is incorrect at the highest level. Still, this was their reasoning for interrogating me on my lunch break about what I did during the break and why I entered my personal vehicle on that break. Again, all documentation included in complaint but not addressed.

I advised you, verbally, in a statistical manner, that 100% of security here were given the ability to utilize the Safestart feature here. This allows security and CareFirst Associates to log onto their computers, on a daily basis so as to begin their workday. Without a daily renewed Safestart log on number one can't began working on any computer. 75% of those who use this Safestart has the app on their personal telephone and cannot get a daily log on number without their personal telephone. Several times a day security is asked to log off because the system is backed up and needs to reboot. Management will tell you when to log back on. It can be in five minutes, ten minutes or longer but when you do log back on you need a new log on number and can only get it from your personal telephone, for those who have the app on their phones. Now, all new hires have to use their phone to get this app. I originally told you we oftentimes must have our personal phones on the worksite. They oftentimes must be used as the only source of communications during tours (Foot Patrol). For example: on 5/22/2020 at 0600 hours, I start my tour of duty. There was no radio provided to my site until 0804 hours. I usually do my tours shortly after I arrive so I can see if there is any damages that have occurred during the night. I conducted my tour on this date at 0631 hours.

After all the information that I provided to you about the utilization of cell telephone on post and the need for them, which is approved by management, they say these phones are prohibited and your Final Report of Investigation advises, *"The communication devices at this site is strictly to be used for completing tour patrols and should not be laying on the desk at any time for any reason."*

**Statements of Facts:**
**The last issue that Mr. Carter had about Corrective Action Forms (CAF) and an email that was sent from Management to all personnel regarding** *expectations* **at the site.**

My concerns were not about the CAF forms and the associated procedures in using them, it was about why this supervisor continues to generate and submit this bogus CAF, which are clearly the first stages in the disciplinary process. These CAF forms contain allegations that are not generated according to policy, fraudulent and with malice? For example: *On 2/14/20 S/O Carter called off from his 2/14/20 0600-1400 RR715B shift stating he was ill. On 2/18/20 S/O Carter responded back to work but did not bring a note from a doctor. When asked, he advised he did not have one.* (Noting: All unexcused absences are in violation of company policy).

This document deliberately reflects that Carter was off from work for four day to meet the believed-to-be three-day-need-a-doctor's slip policy, even though this is not GardaWorld's policy. (Note: 14th Friday called out, 15th and 16th Saturday and Sunday and 17th President's day, were my scheduled days off. I returned on the 18th my next scheduled workday. Additionally,

E. 94

this was my second day taking off in nine (9) months. Lastly, this was subsequently deemed not guilty, exonerated.)

Several days before this medical abuse allegation, the same supervisors generated and filed two (2) additional disciplinary documents (i.e., Abandonment of post, which is a termination able offense and using his telephone on post). Both, as I was told were dismissed but I was never given a copy of the end results. This was four (4) months ago. Again, my concerns and written complaints were in reference to how can a supervisory entity continue to generate these documents that are targeted at one individual. All the related documentation was submitted in the complaint but never addressed. Again, *my complaint complained about why is this supervisory entity allowed to continue to submit these allegations with malice and fraudulent intent, with apparent impunity?*

As to the Expectations, I provided you with a complaint that was given to upper management about the supervisor and most of the above mentioned, upper management gave the complaint to that particular supervisor and that supervisor addressed the complaint, under the colors of a directive deemed 'Expectations'. I also advised that if one placed the submitted complaint side by side with the mentioned directive, one would see that paragraph for paragraph, it was a response to the complaint. Additionally, any entity reviewing the submitted complaint will see that this 'Expectation' document wasn't submitted to all, as explained in the complaint. One must keep in mind that this CareFirst site is *one site and one contract*. It is improper to treat this any different.

**Statement of Facts:**
**On May 7, 2020, Mr. Carter emailed about needing further clarification on 15-minute breaks and on May 8, 2020, an email was submitted from Mr. Carter needing to know his discipline status.**

The above-mentioned email asked: Is it appropriate for one site to get the breaks and the other to not get one?  Your written response to this question, in the final report was (Not in its entirety) *Breaks are granted differently at various sites. Some sites could incur a 15-minute break and then a 30-minute lunch and some may be a 45-minute break/lunch period.* The documentation and statements I made to you were clear, Lt. Young advised us in *November 2019* that 15-minute breaks are optional, so she is abolishing/removing/stopping our 15-minute breaks and she did. Just recently the new person who gives up breaks gave us a 15-minute break and then a thirty-minute break. He was verbally advised, by Lt. Young that we here, at RR715 don't get a 15-minute break, just a thirty (30) minute break a day. The next day we went back to our 30-minute breaks per day. Documentation was submitted to validate this issue, but it was never addressed.

**Quick Story:**

On May 14th, 2020, you sent Donna Kile and I a copy of your Final Report of Investigation, as it pertains to my filed complaint (# 7175522118501). Management was notified of the outcome May 15th, 2020, during the morning hours. Later, that same day at approximately 1130

3

E. 95

hours, PFC Mingle, who had been working with Lt. Young all morning, arrived at my worksite and served me with a *Coaching Agreement* which advises:

*On Friday, 5/15/20 at 1015 hours., PFC Mingle was monitoring the Milestone CCTV camera and noticed S/O Carter was away from his post at RR715B and his computer was not locked. PFC Mingle attempted to contact S/O Carter via radio but did not get a response. Moments later, PFC Mingle noticed S/O Carter walking back to his post with papers in his hand. PFC Mingle called S/O Carter and informed him that he could not walk away from his computer without locking it. Subsequently, S/O Carter is required to contact supervision when he leaves his post and he must answer his radio when called. S/O Carter advises that he contacted S/O Siwek at RR715A and advised him of his departure from his post. S/O Carter was informed that he must contact supervision when leaving post, carry a radio and must lock his computer if he does leave his post. (Noting: Next course of action: That a write up will be issued without hesitation.)*

My written response:

I walked away from desk for less than 40 seconds to secure a print-out of mandatory Privacy Awareness 2020 Training. Retrieved print-out and immediately returned. Moments before going to retrieve the print-out, I contacted PFC. Mingle and asked for assistance with the Awareness 2020 training program, as I was having log-on problems. PFC. Mingle advised he would contact me later because he was busy. This is the reasoning I printed out 'Awareness Training' instructions and retrieved same. Lt. Young subsequently attempted to assisted with the log-on issue. When PFC. Mingle arrived at RR715B to serve S/O Carter with "Coaching Agreement" he then asked did I manage to log-on to Awareness Training site. One day prior to today and during the week (i.e., May 11th – May 14th), because an equipment assessment was needed it was acceptable and directed that I contact the officer at post next to me when I left post and vice-versa. (This written response also had an attached copy of the log-on print-out and the face sheet that reflects copy was made at 10:13:42 AM on 5/15/20.)

Synopsis: I speak with PFC. Mingle to get assistance with this CareFirst mandatory training that is due on the 22nd of this month. He's advised he was busy and told me he'd call back later to assist me. He must have talked to LT. Young about it because she called me on the telephone and asked about the log-on problem and attempted to offered assistance. I walked the 20 – 25 feet to the printer, grabbed printed-out pages and returned. As I arrived back at the desk PFC. Mingle called and advised of my wrongdoings.

Concerns:

1. How many *Coaching Agreements* were issued in the last year? (Even some management didn't know what these *coaching agreements* were.).
2. How many *Coaching Agreements* were issued by Lt. Young and/or PFC. Mingle in the last year? (I've been here for a little over one year and I've never heard of them, until now).
3. Could this be considered a form of Retaliation? (Since this event occurred shortly after they were made aware that the filed complaint's results were *written* in their favor and this action is the first stages of a wrongfully inflicted disciplinary process.

4

E. 96

**These attacks don't end, and their methods don't change and won't change because they are aware and reminded that there need not be any reasoning for their improper and unjust actions.**

A recount of what I have been told. I can't eat on post, leave post, use my personal vehicle while on my break, get a 15-minute break like others, etc. You advise, "While every site has their own operating standards and/or procedures. . .." Correct, in part, because this contract; this one contract on this CareFirst Campus is being treated like it a separate entity. It is not. You can't pay those on the east side of the campus one dollar and those on the south side three, if they are performing the same duties." We have new individuals that now provide us with our lunch breaks. He came, the other day and gave us a 15-minute morning break and a 30-minute lunch break. He was verbally instructed by LT. Young to not give us any morning breaks, we only get a 30-minute lunch break. (*See Daily Activity Reports.*) Naturally, I find it difficult to believe some of the writings and reasoning within your Final Repost of Investigation. I could go on and on about the non-utilization of any of the evidence I provided you with, but I won't. Based on the above, I believe that we have come as far as we can in the so-called resolution process, so I respectfully thank you for you time. I will waste no more of my time, energy, and money attempting to seek resolution within the GardaWorld entity.

**Charles H. Carter**
**Security Officer**
**Gardaworld Security**
**Email: Charles.Carter@carefirst.com**
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



5

$E \cdot 97$

Mail body: Fwd: Question About Final Report of Investigation (Response)

Sent from my iPhone

Begin forwarded message:

> **From:** "Carter, Charles" <Charles.Carter@carefirst.com>
> **Date:** May 28, 2020 at 6:59:55 AM EDT
> **To:** "Ccharlescarterb@icloud.com" <Ccharlescarterb@icloud.com>
> **Subject: FW:  Question About Final Report of Investigation (Response)**

ᵇ¿

> **From:** Jody Gaines <Jody.Gaines@garda.com>
> **Sent:** Wednesday, May 27, 2020 2:51 PM
> **To:** Carter, Charles <Charles.Carter@carefirst.com>
> **Subject:** RE: Question About Final Report of Investigation

CAUTION: This email is from an EXTERNAL source. Ensure you trust this sender before clicking on any links or attachments.

Greetings Mr. Carter,

I am surprised to hear that you have questions in light of my Final Report and lengthy phone conversation we had outlining all your issues. At that time, you advised that you were satisfied with our call and all issues had been addressed.

As we discussed, you are not to leave the site so therefore driving to the smoking area is in violation of the site. I provided you other means to get to the smoking area that does not violate the policy. In regards to the CAF, we both agreed that with you being given an opportunity to appeal there was no issue there.

In reviewing the Coaching document, you are still leaving your post without authorization and/or informing Supervision/Management. It needs to be understood that you cannot leave early, leave for a minute to pick anything up, without notifying Management. We discussed this on the call as to the importance of remaining on post unless you have notified your Supervisor or been given clear direction to leave the post. I am not understanding the confusion with this. Retaliation is not present when you continue to not follow the policies and procedures of the Operating Orders.

As far as site breaks, we discussed some sites may operate differently must be followed accordingly. It is the job of the Supervisor to correct anything that is not being done properly. As we discussed, it should not be viewed as you being singled out but being supportive that the team is carrying out the mission that we must accomplish every day.

If another call is needed, please feel free to let me know but I am unsure to what questions that I have not addressed.

Please let me know if you would like to schedule another meeting to discuss anything that you are either still unclear about or need additional guidance as to functioning as a Security Officer for GardaWorld.

I will await your response.

Thanks! J*E*G*

Jody Gaines
Human Resources Manager
Security Services – US

☎ +1 301 719 2018 | ☐ +1 202 308 2709 | 🖶 +1 301 459 2366
✉ Jody.Gaines@garda.com
8201 Corporate Drive, Suite 550, Landover, MD, 20785, United States

# GARDAWORLD

Facebook | LinkedIn | Twitter

**From:** Carter, Charles <Charles.Carter@carefirst.com>

E. 98

**Sent:** Wednesday, May 27, 2020 1:47 PM
**To:** Jody Gaines <Jody.Gaines@garda.com>
**Subject:** Question About Final Report of Investigation

Yes, I have a question about your recently submitted Final Report of Investigation.

Respectfully,

**Charles H. Carter**
**Security Officer**
**Gardaworld Security**
**Email:** Charles.Carter@carefirst.com
**10715 Red Run Blvd. | Owings Mills, MD 21117**
**W: 443-471-1971**



**********************************************************************
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of theperson or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the senderand destroy any and all copies. Thank you. ATENCIÃ"N: Si habla espaÃ±ol, tiene a su disposiciÃ³n servicios gratuitos de asistencia lingÃ¼Ãstica. llame al 855-258-6518ª ¨ æ¸ Ÿ¼šâ¦, æŽœæ¸ ¨â½¿ç" ¨ç' é€" ä¸ æ–‡ Ÿ¼Œæ¸ ¨ å ¯ä¾¥â¦ è'¾ç '⅜'â'⅔è ¨ €æ ´ åŠ¢æœ å‹™â€, è‹‹è ‡ ´ é›» 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminateon the basis of race, color, national origin, age, disability or sex.
**********************************************************************
***************************************************************************
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of theperson or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the senderand destroy any and all copies. Thank you. ATENCIÃ"N: Si habla espaÃ±ol, tiene a su disposiciÃ³n servicios gratuitos de asistencia lingÃ¼Ãstica. Llame al 855-258-6518 æ'"æ¸¼šâ¦æŽœæ¸¨â½¿ç"ç'é€"ä¸æ–¤ﾔⅪæ¸¨ ¯ä¾¥â¦è³¾ç²â¾¼è³¾è "€æ'²è Œæ´åŠ©æœå'™â€, è‹‹è‡´é›» 855-258-6518 CareFirst BlueCross BlueShield, CareFirst BlueChoice, Inc. and all of their corporate affiliates comply with applicable federal civil rights laws and do not discriminate on the basis of race, color, national origin, age, disability or sex.
***************************************************************************

E.99