IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CHARLES H. CARTER,** | * | |
| **Plaintiff,** | * | |
| v. | * | |
| | | **CIVIL NO. JKB-20-3700** |
| **GARDAWORLD SECURITY SERVICES,** *et al.*, | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Charles Carter, who worked as a security officer for Defendant GardaWorld Security Services ("GardaWorld"), brings various state and federal claims against GardaWorld and multiple former supervisors (collectively, "Defendants"), alleging that they created an unsafe and hostile work environment culminating in Carter's wrongful termination. (Compl., ECF No. 3.)[1] Carter originally filed this case in the Circuit Court for Baltimore County, and on December 21, 2020, Defendants removed the case to this Court, invoking this Court's federal question jurisdiction. (Not. Removal, ECF No. 1.) Currently pending before the Court is Defendants' Motion to Dismiss the entire Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss, ECF No. 10.) Defendants' motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendants' Motion to Dismiss will be granted in part because Carter fails to state plausible claims under federal law, and Carter's remaining state law claims will be remanded to the Circuit Court for Baltimore County.

---

[1] Carter also brings an additional claim under state law, which he designates "Count IX," in an Amended Complaint. (*See* Am. Compl., ECF No. 5.)

1

## I.     *Background*[2]

On May 7, 2019, Carter began working for Whelan Security. (Compl. ¶ 26(a).) Several months later, Whelan Security was purchased by GardaWorld, an international company that provides security services.[3] (*Id.* ¶¶ 2, 26(a).) While Carter was working at a GardaWorld site in Baltimore County, Maryland, his supervisors included Site Supervisors Lieutenant Lamont Green and Lieutenant Marcella Young, Shift Supervisor Corporal Shawan Burrell, Assistant Project Manager Colonel Steve Martin, and Project Manager Donna Kile. (*Id.* ¶¶ 4–8.) At the time, GardaWorld's Chief Operating Officer was Prentice Robertson and its Human Resources Manager was Jody E. Gaines. (*Id.* ¶¶ 3, 16(e).) Carter named all of these individuals as defendants in this action.

Several months after Carter's work at GardaWorld began, he alleges that Defendants began "a negative course of conduct" consisting of "fil[ing] numerous false, unfounded and unlawful administrative charges" against him. (*Id.* ¶ 15.) First, on February 7, 2020, Cpl. Burrell and Lt. Young allegedly administratively charged Carter with abandoning his post and leaving work early, and Cpl. Burrell also charged Carter with watching something on his phone. (*Id.* at ¶ 16(a)-(b).) Carter admits that, based on the security cameras facing him, he had opened his phone, but alleges there was no evidence that he was watching something on it. (Compl. ¶ 16(a) n.5.) It is unclear whether Carter made this argument to his supervisors. Nonetheless, Carter's supervisors allegedly

---

[2] The facts in this section are taken from the Amended Complaint and construed in the light most favorable to Plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Carter attaches multiple exhibits to his Complaint and references them throughout the Complaint, but apart from an exception discussed below, the Court will not consider this evidence at the motion to dismiss stage. *See infra* Part II. Similarly, the Court does not consider two documents that Carter submitted after filing his response to Defendants' Motion to Dismiss. (*See* ECF Nos. 21, 23.) These "supplements" to Carter's response were filed in error because Carter had not secured the Court's approval to file any surreply to Defendants' reply (ECF No. 22).

[3] Defendants point out that Plaintiff may be mistaken with respect to the exact corporate relationship between Whelan Security and GardaWorld. (*See* Mot. Dismiss at 1 n.1 ("The proper defendant, and Plaintiff's former employer, is Whelan Security Mid Atlantic, LLC d/b/a GardaWorld Security Services.").) Any error by Plaintiff in this regard is immaterial with respect to this Court's resolution of the currently pending motion.

dismissed those charges after he "provided documentation" that his actions were consistent with the "GardaWorld Employee Handbook Policy." (*Id.* at ¶ 16(b).)

On February 13, Carter alleges that Col. Martin provided Lt. Young with a written complaint, which led Lt. Young, Cpl. Burrell, and PFC. James Mingle to write a memorandum, titled "Expectations," that "explain[ed] Plaintiff's responsibilities and duties." (*Id.* ¶ 16(d).) According to Carter, this memorandum "advise[d] that Plaintiff is to sat [sic] at his desk and never take his eyes off his computer monitors." (*Id.*) Carter also alleges that the "Expectations" document prevented him from "going pass [sic]" Lt. Young, Sgt. Crosby, Cpl. Burrell, and PFC. Mingle[4] "without their permission." (*Id.*) Carter alleges that this disciplinary action led his coworkers to nickname his work post "Cell Block 120B."

Around that time, Cpl. Burrell and PFC. Mingle, under Lt. Young's supervision, allegedly charged Carter with taking medical leave on February 14 and 18, without "present[ing] a medical slip." (*Id.* at ¶ 16(c).) Carter alleges that it was appropriate for him to be out of the office through February 18 because he was not expected to work during President's Day weekend. (*Id.* at ¶ 16(c).) Based on the Complaint, it is unclear whether Carter made this argument directly to his supervisors at the time of that incident.

Carter does, however, allege that he filed a complaint—along with "documentation of most of the aforementioned issues and events"—with GardaWorld's Human Resources Department in April 2020. (*Id.* ¶ 16(e).) In a "Final Report of Investigation" issued on May 14, the Human Resources Department allegedly found "no wrongdoings on the part of GardaWorld's management or its supervisors" with respect to "the above described and submitted complaints." (*Id.*) On May 23, Carter allegedly sent a written response to Gaines, in which he conveyed his view that "the

---

[4] Although Sgt. Crosby and PFC. Mingle are named in the Complaint, Carter neither explains their roles at GardaWorld nor names them as defendants in this action.

3

final [Human Resources] report was written to side-with and support GardaWorld's management's communication." (*Id.*) Carter alleges that, "for example," his "complaint asked, why are Defendants allowed to continuously charge him with false administrative charges?," but the Human Resources Department merely responded by "explain[ing] what charging procedures are, [and] never answering the question." (*Id.*) Once Kile received a copy of Human Resources' "Final Report of Investigation," she allegedly "submitted a memorandum to Plaintiff that was deemed *Continued Expectations*, which had the goal of reinforcing the prison-like policies for Plaintiff at that which had now been deemed *Cell Block 120B*." (*Id.* (emphases in original).)

In July 2020, Carter allegedly clashed with his supervisors because of his medical absences. As a general matter, Carter alleges that he did not use any medical leave until February 19, 2020, "over 250 calendar days" after he began working for GardaWorld.[5] (*Id.* ¶ 16(g).) Based on the Complaint, however, it is unclear precisely when he began experiencing medical issues or missing work, or how much work Carter missed. On Sunday, July 19, Lt. Young, relying on Cpl. Burrell's report, allegedly wrote that Carter was using "two medical days for *personal reasons*." (*Id.* ¶ 16(h) (emphasis in original).) Kline allegedly followed up by informing Carter that, regardless of whether he had missed work for medical or personal issues, she was providing Carter with a "warning notice" because his absences "caused a need for coverage and overtime being accrued." (*Id.* ¶ 16(f) (emphases removed).) Around that time, Lt. Young allegedly sent some emails to Carter in which Lt. Young "complained that Plaintiff had called in and advised that he was sick, now he's saying he was injured." (*Id.* (emphases removed).)

---

[5] Carter also alleges, without specifying when this occurred, that he informed "management" that "he has never received any sick and safe leave days/pay and every time he took a medical day he was administratively charged instead of paid," and in response to this complaint, management paid him. (*Id.* ¶ 16(f) (emphases removed).) This interaction does not appear to give rise to any of the claims in Carter's Complaint.

4

On July 24, Cpl. Burrell allegedly "interrogated [Carter] in reference" to his absences. (*Id.*) On July 27, Lt. Young allegedly filed more administrative charges against Carter, providing Carter with a "Final Formal Warning" because he was absent due to "personal reasons." (*Id.* ¶ 16(h).) Carter alleges Lt. Young's use of the term "personal reasons" was a strategy for removing Carter's absence "from a policy-defensible medically-based and legally protected category" of leave. (*Id.* ¶ 16(f).)

Carter's workplace tensions allegedly reached a climax in September 2020. Cpl. Burrell was allegedly "out on medical leave for several weeks," which meant that Carter had to work overtime to cover her shifts. (*Id.* ¶¶ 18–19.) Carter heard rumors that Cpl. Burrell was on leave because she had contracted the COVID-19 virus, and later learned that Cpl. Burrell did indeed test positive for COVID-19, but "management had not informed anyone of the positive testing results per CDC's guideline policy or the Governor's Executive Order, and/or taken any precautionary measures to protect employees after the positive test result." (*Id.* ¶¶ 20–21.) Carter's management allegedly sent some employees emails about Cpl. Burrell's positive test result, but Carter was not informed that Cpl. Burrell had tested positive, despite the fact that Carter "filled in for Corporal Burrell at her worksite, on her first days of absence[.]" (*Id.*) Carter alleges that Cpl. Burrell returned to work on September 22. (*Id.* ¶ 18.) Without specifying when—or to whom—he made these verbal complaints, Carter alleges that he "was exceptionally verbal about the neglect of management to follow any employee Coronavirus protection policies[.]" (*Id.* ¶ 21.)

On September 25, 2020, the alleged pattern of accusations and complaints against Carter culminated in his termination due to an allegedly fabricated charge. (*Id.* ¶ 12.) Carter received a notice of termination allegedly stating that, on September 21, Carter had removed "a cell phone from a locked security desk draw [sic]," charged it with his charger, made "2 ½ hours of numerous

5

attempts" to unlock the phone, and eventually scrolled through its contents. (*Id.*) Plaintiff alleges that he provided a response to "management" explaining that he noticed his coworkers' cell phone was in the locked drawer at his post station, used an "Emergency Feature" to view the owner's contact information, and charged the phone until his coworker arrived later in the day, at which point she reclaimed her phone. (*Id.* ¶ 13.)

Carter alleges that his termination, which occurred four days after Cpl. Burrell's return from medical leave, constituted retaliation for Carter's complaints about his supervisors' failures to take legally mandated precautions regarding COVID-19. Carter alleges that as of November 15, 2020, he had not received any communications regarding the response he submitted to management on September 25. (*Id.* ¶ 28.) Carter also alleges that on October 2 and 4 of 2020, he faxed his termination notice, along with his explanation of his version of events, to Chief Operating Officer Robertson, who had a written policy of offering to discuss any employees' complaints. (*Id.* ¶ 27.) Robertson allegedly informed Carter that he "had received material included in [the] complaint and that he had given it to the Chief Human Resources Officer for investigation." (*Id.*) Carter alleges that he subsequently filed a claim for unemployment insurance with Maryland's Department of Labor ("DLLR"), which remains on hold because "GardaWorld management advised the DLLR that Plaintiff's termination was the results [sic] of his knowing and deliberate violations of organizational policy." (*Id.*)

Throughout his Complaint, Carter alleges that Defendants violated various federal and state laws by, *inter alia*, creating a hostile work environment and unlawfully terminating his employment. Carter alleges that Defendants' actions caused Carter "emotional anguish, loss of reputation, stress, humiliation, embarrassment, severe emotional distress and financial loss." (*Id.* ¶ 32.) As relief, Carter seeks $2.5 million, a sum that includes punitive damages, as well as

6

"immediate employment reinstatement with retroactive back-pay and full benefits and the removal of all termination related information from Plaintiff's employment records." (*Id.* at 30.)

## II.   *Legal Standard*

"In considering a motion to dismiss" pursuant to Rule 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

According to Federal Rule of Civil Procedure 12(d), "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In that event, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

## III.   *Analysis*

Construing Carter's *pro se* Complaint liberally, this Court considers all of the federal claims that he appears to be bringing in this suit. Even liberally construed, however, none of Carter's federal claims plausibly states a claim upon which relief can be granted.

7

### A. *Claim Discussing Federal COVID-19 Laws – Count III*

In Count III of his Complaint, Carter alleges that his termination violates "aspects of public policy laws," including "the CDC's Covid-19 Guidance: Business and Employers;" the Families First Coronavirus Response Act ("FFCRA"), Pub. L. No. 116-127, 134 Stat. 178 (2020); and the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 *et seq.* (Compl. ¶¶ 38, 38(a).)

In his response to Defendants' Motion to Dismiss, Carter clarifies that he does not bring a separate claim that Defendants breached guidelines issued by the Centers for Disease Control and Prevention ("CDC"), but rather cites Defendants' alleged violation of those guidelines as proof that they violated OSHA. (Opp'n Mot. Dismiss at 19, ECF No. 20-1.) However, in his response, Carter reiterates that he "does state a claim under the FFCRA for which relief can be granted" because the "FFCRA provides a private right of action only for discrimination, retaliation, interference with or denying FFCRA leave, or failure to pay wages." (*Id.* at 26.) Carter, however, does not explain how his actions or circumstances allegedly fell under the purview of the FFCRA.

The FFCRA, a law enacted in 2020 to address some consequences of the COVID-19 pandemic, requires employers to provide unpaid leave for employees who miss work due to the COVID-19 emergency, whether that involves illness or a need to care for an employee's minor children. *See* § 110(2)(A), 134 Stat. at 189–190. The FFCRA forbids retaliation by employers, but only against employees that (1) took leave under the FFCRA or (2) "filed any complaint or instituted or caused to be instituted any proceeding under" this statute. *Id.* at 197. The FFCRA provides a private cause of action for qualifying employees who seek to challenge their employers' "interference with the exercise of rights, discrimination, and interference with proceedings or inquiries described in the FMLA." 29 C.F.R. § 826.151.

8

Defendants argue that Carter's FFCRA claim should be dismissed because he "has failed to allege that he engaged in protected activity under the FFCRA." (Mot. Dismiss at 12.) This Court agrees. In his Complaint, Carter does not allege that he took leave—much less filed a complaint or instituted a proceeding—for any purpose relevant to the FFCRA. Defendants correctly note that Carter allegedly took medical leave for a knee injury (*see* Compl. ¶ 16(g)), which is "not a cognizable claim for benefits recognized under the FFCRA." (Mot. Dismiss at 12.) Similarly, Carter's allegations that Defendants terminated him because he complained about the lack of COVID-19 precautions at his workplace do not fit within the purview of the FFCRA, which regulates employees' leave-taking during the pandemic. *See, e.g., Colombe v. SGN, Inc.*, Civ. No. REW-20-0374, 2021 WL 1198304, at *5 (E.D. Ky. Mar. 29, 2021) (considering an FFCRA retaliation claim brought by an employee who took leave to care for a family member with COVID-19, and emphasizing that under the FFCRA, "[a]s for retaliation, the statutory scope for protected activity is quite narrow").

### B. OSHA Claims – Counts III and IV

In Counts III and IV of his Complaint, Carter alleges that Defendants failed to adhere to the duties that OSHA imposes on employers. (Compl. ¶¶ 38(a), 42(a).) Under OSHA, "[e]ach employer [ ] shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees; [and] (2) shall comply with occupational safety and health standards promulgated under this chapter." 29 U.S.C. § 654(a).

OSHA also prohibits retaliation against employees who exercise their rights under this statute. Section 11(c) of OSHA provides that "[n]o person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted

or caused to be instituted any proceeding under or related to this Act." 29 U.S.C. § 660(c)(1). The Court need not reach the substantive question of whether Carter's internal complaint that his supervisors were not adhering to proper COVID-19 precautions fits within the purview of that provision, however, because Carter failed to meet a prerequisite to filing an OSHA claim.

In their Motion to Dismiss, Defendants correctly note that a plaintiff must file a complaint with the Department of Labor prior to instituting an OSHA suit in federal court. (Mot. Dismiss Mem. Supp. at 9, ECF No. 10-1.) In response, Carter points to a U.S. Postal Service receipt on which he wrote, "Complaint to DLLR" as proof that he satisfied this administrative exhaustion requirement. (Pl. Resp. Ex. 4, ECF No. 20-10.)[6] Even if a mailing receipt ostensibly reflecting an administrative complaint—sent to Maryland's Department of Labor—were somehow able to show that Carter exhausted his claims before the U.S. Department of Labor, Carter did not satisfy the requirement that such an administrative complaint be filed within *thirty days* of the alleged OSHA violation. *See* 29 U.S.C. § 660(c)(2). Carter's mailing receipt is dated December 11, 2020, which is over two months after his alleged termination on September 25, 2020. (*See* Pl. Resp. Ex. 4.)

Regardless, Carter's OSHA claims would fail on substantive grounds because the Fourth Circuit has held that Section 11(c) does not provide a private right of action through which individual employees may sue their employers. *See Scarborough v. Aegis Commc'ns Grp., Inc.*, 217 F.3d 840 (Table) (4th Cir. 2000) ("[T]here is no private right of action under OSHA"); *see also Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097 (D.C. Cir. 2017) (holding that,

---

[6] Although courts generally do not consider evidence submitted by the parties at the motion to dismiss stage, *see supra* Part II, the Fourth Circuit permits a court to take judicial notice of documents attached to a motion to dismiss "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Liberally construing Carter's *pro se* Complaint, he submits this receipt in a direct attempt to prove that he satisfied a threshold exhaustion requirement for bringing a claim, and Defendants do not dispute the authenticity of this exhibit. Therefore, the Court will consider it in the context of assessing Carter's OSHA claim.

"[a]lthough Section 11(c) affords the Secretary of Labor a cause of action," it creates neither an express nor implied "private cause of action for retaliation claims").

Because Carter has failed to state claims under OSHA, this Court dismisses the OSHA claims in Counts III and IV of his Complaint.

### C. *Potential Title VII Claim – Count VI*

Count VI of Carter's Complaint alleges that Defendants created a "hostile working environment" consisting of "well-over one year's worth of daily, continuous negative and adverse actions," without specifying the federal or state law under which this claim arises. (Compl. ¶ 50.) In keeping with the general practice of liberally construing *pro se* complaints, this Court will interpret Count VI of the Complaint as a "hostile working environment" claim under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[7] *See White v. White*, 886 F.2d 721, 722–23 (4th Cir. 1989) ("[A court] must [ ] hold the pro se complaint to less stringent standards than pleadings drafted by attorneys and must read the complaint liberally.").

Title VII prevents employers from, *inter alia*, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). To prevail on a "hostile work environment" claim under Title VII, "a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of [his] sex [or race], (3) was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work

---

[7] This interpretation is also consistent with Carter's explicit reference to Title VII in his response to Defendants' Motion to Dismiss, which implies that he intended to bring a Title VII claim in his Complaint. (Opp'n Mot. Dismiss at 26.)

environment, and (4) was imputable to [his] employer." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011).

"This test sets a very high bar for establishing that a work environment is a legally actionable hostile one." *Chadha v. Northrop Grumman Sys. Corp.*, Civ. No. RDB-16-1087, 2017 WL 3226861, at *3 (D. Md. 2017). Further, the requirement that harassment be based on an employee's protected characteristic means that, "while Title VII prohibits particular types of discriminatory conduct, it is not a general 'bad acts' statute." *Id.* at *3 (citing *Hart v. Broadway Servs., Inc.*, 899 F. Supp. 2d 433, 441 (D. Md. 2012); *Bonds*, 629 F.3d at 384).

Assuming the allegations in the Complaint are true, the pattern of unwarranted disciplinary actions taken against Carter could constitute unwelcome harassment. However, the Court need not decide whether this harassment is pervasive or attributable to GardaWorld, because the Complaint does not sufficiently allege the presence of the second element of a hostile work environment claim. In Count VI of the Complaint, Carter does not allege that his hostile work environment was connected to any protected characteristic. (*See* Compl. ¶¶ 49–50.)

Because this Court liberally construes this *pro se* Complaint, the Court also considers statements made elsewhere in the Complaint, but still does not find any general allegations that Carter's hostile work environment was discriminatory—let alone specific allegations as to *how* it might have been discriminatory. *See Bonds*, 629 F.3d at 385 (dismissing a hostile work environment claim when an employee did not "plausibl[y] claim that any harassment that [the employee] suffered was due to her race or gender"). While Carter's allegations that his supervisors filed administrative complaints against him—and even fabricated charges—are concerning and unusual, there is no reason to perceive them as discriminatory. *See Chadha*, 2017 WL 3226861, at *4 (when a plaintiff's coworkers repeatedly called him "chicken,"

12

concluding that, "[w]hile the 'chicken' comments may be unusual, [Plaintiff] presents no evidence that the comments by [Defendants] were based on any age, race, or disability discrimination").

In his response to Defendants' Motion to Dismiss, Carter does repeatedly state that Defendants' actions discriminated against him "based on Plaintiff's race (African American), age (64 years old), and sex (Male)." (Opp'n Mot. Dismiss at 25.) However, this Court is assessing the plausibility of the allegations in Carter's *complaint*, rather than allegations that Carter makes for the first time in his *response* to Defendants' motion to dismiss. Even if those allegations *were* in Carter's Complaint, they are only conclusory statements that Defendants were discriminatory, rather than specific allegations about discriminatory actions taken by Defendants, or specific allegations showing that Defendants behaved differently toward similar employees in Carter's position that were of a different race, age, or gender. *Cf., e.g., Equal Emp. Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314, 317 (4th Cir. 2008) (finding a genuine dispute of material fact regarding this element of a hostile work environment claim when a Muslim employee alleged that his coworkers called him derogatory names, including "Taliban," and explicitly ridiculed his beard and religious headwear).

In sum, Carter does not allege facts that, taken as true, show Defendants plausibly harassed him at work *because* of his race, age, or gender. Accordingly, the Court dismisses Count VI, but *only* based on the Court's construction that it is a hostile work environment claim under Title VII of the Civil Rights Act. In other words, if a state court were to consider this claim and interpret it as arising under Maryland law, this claim might survive. However, as explained below, because this Court will decline to exercise supplemental jurisdiction over Carter's state law claims, it will not consider whether Count VI supports a viable state law claim.

***D. State Law Claims – Remaining Counts***

Carter also brings various claims under Maryland statutes and tort law. Specifically, he alleges that Defendants violated the Maryland Healthy Working Families Act (Counts I, II, and V); Maryland's good faith and fair dealings policy (Counts I, III, IV); and Maryland's Fair Employment Practices Act (Count IX); and committed the torts of harassment (Count V), malicious prosecution (Count V), negligence (Count VII), and intentional infliction of emotional distress (Count VIII).[8] (*See* Compl., Am. Compl.)

Because this Court has dismissed Carter's federal claims for failure to state a claim upon which relief can be granted, the Court no longer has original jurisdiction under 28 U.S.C. § 1331.[9] While a federal court has discretion to retain supplemental jurisdiction over state law claims that are related to dismissed federal claims, *see* 28 U.S.C. § 1367(c), it generally should not continue to exercise this jurisdiction "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 357 (1988). In such cases, federal courts tend to exercise their "inherent power to remand removed State claims when the federal claims drop out of the case." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001).

Accordingly, this Court will remand the remaining state law claims in Carter's Complaint to the Circuit Court for Baltimore County.

---

[8] As is clear from this list, several counts in Carter's Complaint reference multiple sources of law, and several sources of law appear in multiple counts of the Complaint. Read liberally, Carter's Complaint also includes a fraud claim in its factual background section. (*See* Compl. ¶ 23 (citing Maryland's fraud law and alleging that "Defendants knowingly committed the unlawful act of fraud").)

[9] Defendants removed this case to federal court based on federal question jurisdiction (*see* Not. Removal), but neither party has shown that the Court has diversity jurisdiction over this case. *See* 28 U.S.C. § 1332(a)(1) (providing that district courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states" ); *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC,* 636 F.3d 101, 103 (4th Cir. 2011) (citing *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996)) (explaining that diversity jurisdiction generally "requires complete diversity among the parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant").

## IV. Conclusion

For the foregoing reasons, an order shall enter (1) granting in part Defendants' Motion to Dismiss (ECF No. 10); and (2) remanding the remaining state law claims to the Circuit Court for Baltimore County.

DATED this 20 day of May, 2021.

BY THE COURT:

James K. Bredar
Chief Judge